UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF OKLAHOMA

UNITED FOOD AND COMMERCIAL
WORKERS UNION,
Individually and On Behalf of All Others
Similarly Situated,

        Plaintiff,

        -against-

CHESAPEAKE ENERGY CORPORATION,
AUBREY K. MCCLENDON, MARCUS C.
ROWLAND, MICHAEL A. JOHNSON,
RICHARD K. DAVIDSON, FRANK A.
KEATING, BREENE M. KERR, CHARLES T.
MAXWELL, MERRILL A. MILLER, JR.,
DONALD L. NICKLES, FREDERICK B.
WHITTEMORE, UBS INVESTMENT BANK,
ABN AMRO, BANC OF AMERICA
SECURITIES LLC and WELLS FARGO
SECURITIES,

        Defendants.

**Civil Action No. 5:09-cv-01114-D**

**CLASS ACTION**

**CHESAPEAKE ENERGY AND
INDIVIDUAL DEFENDANTS'
MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF
MOTION TO DISMISS AMENDED
COMPLAINT**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................................ 1

FACTUAL BACKGROUND ..................................................................................... 1

OVERVIEW OF COMPLAINT AND GROUNDS FOR DISMISSAL ....................... 3

I.    CONTROLLING LEGAL STANDARDS ........................................... 6

    A.    Omissions Not Actionable Absent A Duty To Disclose........................... 6

    B.    Issuers Are Not Required to Disclose Speculative, Public or Overly Detailed Information ................................................................................ 7

    C.    Misstatements or Omissions Must Be Material at the Time of the Offering................................................................................................... 8

    D.    Plaintiff Must Allege Plausible Facts Demonstrating Entitlement to Relief ........................................................................................................ 9

ARGUMENT .............................................................................................................. 9

I.    THE COMPLAINT ALLEGES NO CONTEMPORANEOUS FACTS TO SHOW ITS CLAIMS ARE PLAUSIBLE .............................................. 9

II.    THE PURPORTED OMISSION REGARDING MR. MCCLENDON'S MARGINED STOCK IS NOT ACTIONABLE AS A MATTER OF LAW ...... 11

    A.    The Registration Statement Disclosed the Full Extent of McClendon's Margined Holdings............................................................. 11

    B.    Chesapeake Had No Duty to Monitor or Disclose Information Regarding Mr. McClendon's Personal Financial Information ................. 11

    C.    Plaintiff's Allegations Further Fail Because They Are Based on Hindsight................................................................................................ 12

    D.    Defendants Were Not Required to Speculate Regarding Financial Crises or Potential Impacts on Mr. McClendon's Stock Holdings.......... 12

    E.    The Allegations Also Fail on Materiality Grounds.................................. 12

III.    KNOCKOUT HEDGES WERE FULLY DISCLOSED TO INVESTORS AND WERE NOT MATERIAL IN ANY EVENT............................................ 13

    A.    The Knockout Hedges Were Fully Disclosed.......................................... 13

    B.    Chesapeake Was Not Required to Speculate About Future Natural Gas Prices or Their Possible Impacts on Knockout Hedges.................... 14

    C.    Use of Knockout Hedges Was Immaterial in Any Event ........................ 15

IV.    THE PURPORTED OMISSION REGARDING LEHMAN IS NOT ACTIONABLE AS A MATTER OF LAW ....................................................... 15

# TABLE OF CONTENTS
(continued)

Page

A.   Plaintiff's Attempt to Invoke Item 303 of Regulation S-K Is a Non-Starter ...................................................................... 16

    1.   Chesapeake Could Not Have Known Lehman Would Go Bankrupt ..................................................................... 16

    2.   Chesapeake's Selection of Lehman As the Lead Underwriter on the Offering Demolishes Plaintiff's Claim ......... 17

    3.   The Only "Trend" at the Time of the Offering Was Positive ...... 18

B.   Chesapeake's Exposure to Lehman Was Immaterial in Any Event ........ 18

V.   THE ABSENCE OF LOSS CAUSATION IS DEMONSTRATED ON THE FACE OF THE COMPLAINT ................................................. 19

A.   There Is No Causal Connection Between Anything Chesapeake Could Have Disclosed on July 9, 2008 and Any Purported Loss ........... 20

B.   Chesapeake's Stock Price Movements Affirmatively Establish the Absence of Loss Causation .................................................. 22

    1.   There Can Be No Loss Causation for Any of the 70% Decline That Preceded the October 10, 2008 "Corrective" Disclosure .................................................................. 22

    2.   The Increase in Chesapeake's Stock Price Following the October 10 Disclosures Precludes Loss Causation ..................... 22

VI.   PLAINTIFF'S 12(a)(2) CLAIMS FAIL BECAUSE CHESAPEAKE AND THE INDIVIDUAL DEFENDANTS WERE NOT "SELLERS" ...................... 24

VII.   THE SECTION 15 CONTROL PERSON CLAIM MUST BE DISMISSED FOR FAILURE TO ALLEGE A PRIMARY VIOLATION ......... 25

CONCLUSION ................................................................................ 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ABN Amro, Inc. v. Capital Int'l Ltd*,
  595 F. Supp. 2d 805 (N.D. Ill 2008) ........................................................... 25

*Akerman v. Oryx Commc'ns, Inc.*,
  810 F.2d 336 (2d Cir. 1987) ........................................................................ 22

*Alaska Elec. Pension Fund v. Olofson*,
  2009 WL 1580296 (D. Kan. June 3, 2009) ................................................... 9

*In re Am. Bus. Fin. Servs., Inc. Sec. Litig.*,
  2007 WL 81937 (E.D. Pa. 2007) ................................................................. 25

*Ashcroft v. Iqbal*,
  129 S. Ct. 1937 (2009) ............................................................................. 9, 10

*Basic Inc. v. Levinson*,
  485 U.S. 224 (1988) .......................................................................... 7, 18, 24

*Bastian v. Petren Res. Corp.*,
  892 F.2d 680 (7th Cir. 1990) ....................................................................... 21

*Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*,
  833 A.2d 961 (Del. Ch. 2003),
  *aff'd*, 845 A.2d 1040 (Del. Supr. 2004) ...................................................... 11

*Belodoff v. Netlist, Inc.*,
  2009 WL 1293690 (C.D. Cal. April 17, 2009) ............................................ 20

*Belodoff v. Netlist, Inc.*,
  2009 WL 2777320 (C.D. Cal. Sept. 1, 2009) .............................................. 10

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007) ................................................................................. 9, 10

*Blue Chip Stamps v. Manor Drug Stores*,
  421 U.S. 723 (1975) ...................................................................................... 1

*In re Britannia Bulk Holdings Inc. Sec. Litig.*,
  2009 WL 3353045 (S.D.N.Y. Oct. 19, 2009) .............................................. 22

*Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*,
  511 U.S. 164 (1994) ...................................................................................... 1

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*City of Philadelphia v. Fleming Cos.*,
264 F.3d 1245 (10th Cir. 2001) ................................................................ 18

*Consolidated Gold Fields, PLC v. Anglo Am. Corp. of S. Afr. Ltd.*,
713 F. Supp. 1457 (S.D.N.Y. 1989) ....................................................... 8, 12

*Cooperman v. Individual, Inc.*,
171 F. 3d 43 (1st Cir. 1999) ...................................................................... 7

*In re Cybershop.com Sec. Litig.*,
189 F. Supp. 2d 214 (D.N.J. 2002) ............................................................ 24

*Davidco Investors, LLC v. Anchor Glass Container Corp.*,
2006 WL 547989 (M.D. Fla. Mar. 6, 2006) ............................................... 20

*In re Dell Inc., Sec. Litig.*,
591 F. Supp. 2d 877 (W.D. Tex. 2008) ...................................................... 22

*Denny v. Barber*,
576 F.2d 465 (2d Cir. 1978) ...................................................................... 7

*In re Donald J. Trump Casino Sec. Litig.*,
793 F. Supp. 543 (D.N.J. 1992),
*aff'd*, 7 F.3d 357 (3d Cir. 1993) ......................................................... 11, 12

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005) .................................................................. 1, 19, 20, 21

*ECA, Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*,
553 F. 3d 187 (2d Cir. 2009) ...................................................................... 9

*Garber v. Legg Mason, Inc.*,
537 F. Supp 2d 597 (S.D.N.Y. 2008) ...................................................... 7, 8

*Gebhardt v. ConAgra Foods, Inc.*,
335 F.3d 824 (8th Cir. 2003) ..................................................................... 8

*In re GlenFed Sec. Litig.*,
42 F.3d 1541 (9th Cir. 1994) ...................................................................... 4

*In re Global Crossing, Ltd. Sec. Litig.*,
471 F. Supp. 2d 338 (S.D.N.Y. 2006) ....................................................... 20

*Grossman v. Novell, Inc.*,
120 F.3d 1112 (10th Cir. 1997) ......................................................... 3, 4, 7, 9

# TABLE OF AUTHORITIES

(continued)

**Page(s)**

*I. Meyer Pincus & Assocs. v. Oppenheimer & Co.*,
  936 F. 2d 759 (2d Cir. 1991) ............................................................................. 8

*Klein v. Gen. Nutrition Cos.*,
  186 F. 3d 338 (3d Cir. 1999) ............................................................................. 8

*Landmen Partners, Inc. v. Blackstone Group, LP*,
  2009 U.S. Dist. LEXIS 87001 (S.D.N.Y. Sept. 22, 2009).............................. *passim*

*Lentell v. Merrill Lynch & Co.*,
  396 F.3d 161 (2d Cir. 2005) ............................................................................. 20

*Maher v. Durango Metals, Inc.*,
  144 F.3d 1302 (10th Cir. 1998) ....................................................................... 25

*Masters v. GlaxoSmithKline*,
  271 F. App'x 46 (2d Cir 2008) ......................................................................... 24

*In re Merrill Lynch & Co. Research Reports Sec. Litig.*,
  272 F. Supp. 2d 243 (S.D.N.Y. 2003) ........................................................ *passim*

*In re Metro. Sec. Litig*,
  532 F. Supp. 2d 1260 (E.D. Wash. 2007)......................................................... 25

*In re MobileMedia Sec. Litig.*,
  28 F. Supp. 2d 901 (D.N.J. 1998) ..................................................................... 8

*In re Morgan Stanley Tech. Fund Sec. Litig.*,
  2009 WL 256005 (S.D.N.Y. Feb. 2, 2009)....................................................... 24

*Olkey v. Hyperion 1999 Term Trust, Inc.*,
  98 F.3d 2 (2d Cir. 1996) ................................................................................... 14

*Oxford Asset Mgmt., Ltd. v. Jaharis*,
  297 F. 3d 1182 (11th Cir. 2002) ....................................................................... 7

*Pace v. Swerdlow*,
  519 F.3d 1067 (10th Cir. 2008) ........................................................................ 2

*Panther Partners, Inc. v. Ikanos Commc'ns, Inc.*,
  538 F. Supp. 2d 662 (S.D.N.Y. 2008),
  *vacated in part on other grounds*, 2009 WL 2959883 (2d Cir. Sept. 17, 2009).................... 7, 9

*Pinter v. Dahl*,
  486 U.S. 622 (1988)........................................................................................... 24

# TABLE OF AUTHORITIES
(continued)

Page(s)

*Port Dock & Stone Corp. v. Oldcastle Northeast, Inc.*,
  507 F. 3d 117 (2d Cir. 2007) ................................................................ 10

*Ridge at Red Hawk, L.L.C. v. Schneider*,
  493 F.3d 1174 (10th Cir. 2007) ............................................................ 9

*Rubin v. MF Global, Ltd.*,
  634 F. Supp. 2d 459 (S.D.N.Y. 2009) ........................................... 7, 9, 20

*Shain v. Duff & Phelps Credit Rating Co.*,
  915 F. Supp. 575 (S.D.N.Y. 1996) ........................................................ 24

*Siebert v. Sperry Rand Corp.*,
  586 F. 2d 949 (2d Cir. 1978) ................................................................ 8

*Steckman v. Hart Brewing, Inc.*,
  143 F.3d 1293 (9th Cir. 1998) .............................................................. 19

*Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*,
  552 U.S. 148 (2008) ............................................................................. 1

*Tellabs, Inc. v. Makor Issues & Rights Ltd.*,
  551 U.S. 308 (2007) ............................................................................. 1

*Thomas v. Metro. Life Ins. Co.*,
  2008 WL 4619822 (W.D. Okla. Oct. 16, 2008) ...................................... 2

*In re Ultrafem Inc. Sec. Litig.*,
  91 F. Supp. 2d 678 (S.D.N.Y. 2000) ..................................................... 25

*In re VeriSign, Inc., Derivative Litig.*,
  531 F. Supp. 2d 1173 (N.D. Cal. 2007) ................................................. 24

*Weiss v. Amkor Tech., Inc.*,
  527 F. Supp. 2d 938 (D. Ariz. 2007) ..................................................... 13

*Wielgos v. Commonwealth Edison Co.*,
  892 F. 2d 509 (7th Cir. 1989) .............................................................. 8

*In re Williams Sec. Litig.*,
  339 F. Supp. 2d 1242 (N.D. Okla. 2003) ......................................... 7, 8, 12

**TABLE OF AUTHORITIES**
(continued)

Page(s)

**Statutes**

15 U.S.C. § 77k(a) .................................................................................. 6, 7, 8

15 U.S.C. § 77k(e)(3) ................................................................................. 20

15 U.S.C. § 77*l* ......................................................................................... 24

15 U.S.C. § 77*l*(a)(2) ............................................................................... 7, 8

**Rules**

17 C.F.R. § 229.303(a)(3)(ii) ................................................................. 7, 16

Rule 12(b)(6) ....................................................................................... 1, 9, 20

# INTRODUCTION

The securities laws do not "provide investors with broad insurance against market losses."[1]  As the Supreme Court has repeatedly emphasized, securities class actions, "if not adequately contained, can be employed abusively to impose substantial costs on companies and individuals whose conduct conforms to the law."[2]  Because securities class actions present "'a danger of vexatiousness different in degree and kind from that which accompanies litigation in general,'"[3] plaintiffs are not permitted to use unfounded claims and the threat of "extensive discovery and the potential for uncertainty and disruption . . . to extort settlements from innocent companies."[4]

This lawsuit presents a textbook example of the abusive litigation that prompted the Supreme Court's concerns, and should be dismissed at the threshold.  The Consolidated Amended Complaint (the "Complaint") is an obvious and clumsy attempt to exploit the catastrophic economic and financial crisis of 2008 with the 20/20 vision of hindsight.  That crisis affected virtually every company and investor in this country.  The drop in Chesapeake's stock price in the fall of 2008 had nothing to do with any purported misrepresentation or omission in the prospectus at issue, which was filed months earlier.  Plaintiff's reverse-engineered claims suffer from layers of fatal defects, and can be disposed of as a matter of law pursuant to Rule 12(b)(6).

# FACTUAL BACKGROUND

On July 9, 2008, Chesapeake Energy Corporation ("Chesapeake") undertook an underwritten public offering of 25 million shares of common stock at $57.25 per share (the "Offering"), using a "shelf takedown."  Compl. ¶¶ 27-32.  As part of that process, a registration statement filed on December 8, 2005 was updated by a current prospectus

---

[1] *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 345 (2005).

[2] *Tellabs, Inc. v. Makor Issues & Rights Ltd.*, 551 U.S. 308, 313 (2007).

[3] *Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 189 (1994) (quoting *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 739 (1975)).

[4] *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 163 (2008).

supplement, which, among other things, incorporated a series of other SEC filings made through July 9, 2008.  Compl. ¶ 32.  The prospectus supplement and incorporated documents became part of the registration statement (collectively, the "Registration Statement"), and were effective on July 9, 2008.  *Id.*

The facts appearing on the face of the Complaint and documents properly before the Court on this motion[5] show that after the July 2008 Offering Chesapeake, like innumerable other companies throughout the world, suffered the consequences of the worst financial crisis since the Great Depression.  No one -- least of all Chesapeake -- foresaw that event, or the resultant natural gas and stock price declines, at the time of the Offering.  Indeed, Chesapeake's Chairman and CEO, Aubrey McClendon, purchased one million shares in the Offering at a cost of more than $57 million, and suffered losses far larger than any of the investors included in the alleged class.  RJN Ex. A at S-24.

Natural gas accounts for approximately 92% of Chesapeake's production.  RJN Ex. B at 1.  During the six months preceding the Offering, natural gas prices and Chesapeake's stock price had moved in tandem, each rising approximately 40%.  RJN Ex. C at 1-9.  On the date of the Offering the New York Mercantile Exchange ("NYMEX") price of natural gas was $12.01 per mcf (million cubic feet), *id.* at 5, and Chesapeake stock closed at $57.72 per share on the NYSE, *id.* at 1.

As a result of the carnage wrought by the deepening financial crisis, Lehman Brothers filed for bankruptcy protection on September 15, 2008.  RJN Ex. B at 106.  By mid-October natural gas prices had plummeted to $6.54 per mcf, and the price of Chesapeake stock dropped to $16.52 per share.  The extreme stock price decline triggered

---

[5] In considering this Motion to Dismiss, the Court may take judicial notice of documents that are referred to in and are central to the complaint, even if those documents were not attached to the complaint or explicitly incorporated by reference. See Request for Judicial Notice In Support of Motion to Dismiss ("RJN") at 3 (citing *Pace v. Swerdlow*, 519 F.3d 1067, 1072 (10th Cir. 2008)).  The court may also consider Company filings with the Securities and Exchange Commission and other publicly available factual information. RJN at 3-4 (citing *Thomas v. Metro. Life Ins. Co.*, No. CIV-07-0121, 2008 WL 4619822, at *5 (W.D. Okla. Oct. 16, 2008)).

margin calls that resulted in the liquidation of more than 90% of Mr. McClendon's stock holdings on October 8, 9 and 10, 2008.  RJN Ex. D at 1; RJN Ex. E at 4.

### OVERVIEW OF COMPLAINT AND GROUNDS FOR DISMISSAL

Importantly, the Complaint does not claim that the Registration Statement contained <u>a single false statement or inaccuracy</u>, or that defendants were reckless or committed fraud.  The best plaintiff can do is to allege a handful of conclusory assertions regarding allegedly "omitted" information that arguably was significant only <u>after</u> the unanticipated events that shook the financial system and global economy to their core. Specifically, the Complaint alleges that the Registration Statement should have disclosed:

(1)  That Mr. McClendon might be unable to generate the cash necessary to satisfy margin calls on his Chesapeake stock holdings in the event of a major stock price decline (¶¶ 34-37);

(2)  That Lehman Brothers was the counterparty to a material portion of the contracts hedging Chesapeake's oil and gas production (¶¶ 38-47); and

(3)  That a significant portion of Chesapeake's hedging contracts had "kick-out" or "knockout" provisions that might limit their effectiveness in the event of large declines in natural gas prices (¶¶ 52-54).

Whatever else one might say about those allegations (and much will be said below), this much is unambiguously clear:  The calamities that befell the world economy and wiped out major financial institutions could not possibly have been factored into the disclosures that were included in the Registration Statement.  That fact is critical because under settled law those disclosures must be evaluated as of the date the Registration Statement became effective -- July 9, 2008 -- not with the benefit of hindsight many months later.  *E.g.*, *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1124 (10th Cir. 1997).  As the Tenth Circuit emphasized in *Grossman*, the preclusion of retrospective analysis is necessary to prevent the kind of abuse that is so readily apparent in this case:

Securities fraud cases often involve some <u>more or less catastrophic event</u> occurring between the time the complained-of statement was made and the time a more sobering truth is revealed (precipitating a drop in the stock price).  Such events might include, for example, a general <u>decline in the stock market</u>, [or] a <u>decline in the other markets affecting the company's</u>

product . . . .[*Id.* (emphasis added) (quoting *In re GlenFed Sec. Litig.*, 42 F.3d 1541, 1548-49 (9th Cir. 1994) (en banc))].

The collapse of natural gas prices, Chesapeake's stock drop, the margin calls on Mr. McClendon's stock holdings and the Lehman bankruptcy "resulted from unforeseeable catastrophic events" that occurred after the Offering.  Plaintiffs are not permitted to assert backward-looking claims based on declines in the stock market or the market for natural gas.  Rather, they must show that the disclosures that form the "basis" for their claims were false or materially misleading when made:

> When such an event has occurred, it is clearly insufficient for plaintiffs to say that the later, sobering revelations make the earlier, cheerier statement a falsehood.  In the face of such intervening events, a plaintiff must set forth, as part of the circumstances constituting fraud, an explanation as to why the disputed statement was untrue or misleading *when made*. [*Id.* (underline added; italics in original) (quoting *GlenFed*, 42 F. 3d at 1548-49)].

The Complaint does not come close to making any such showing. Although plaintiff's wholesale reliance on hindsight and intervening events infects the entirety of the Complaint, its post hoc assertions suffer from numerous other defects that are independently dispositive, as summarized below:

First, as the language of Sections 11 and 12 makes clear, there is no abstract duty to disclose information, even if that information is material at the time of the offering.  Omissions are actionable only if (i) they render specific affirmative statements materially misleading, or (ii) there is an independent duty to disclose.  The Complaint fails to state a claim because it merely recites a laundry list of purported omissions.

Second, none of the "omissions" alleged in the Complaint was necessary to prevent an affirmative statement from being materially misleading.  In fact, the Complaint does not even attempt to identify a specific statement that was misleading by virtue of an omission.

Third, the Complaint does not (and cannot) allege any independent duty to disclose any supposedly omitted information.  Plaintiff's only attempt on that score is a

single passing reference to an SEC regulation, Item 303(a) of Regulation S-K, that directs registrants to "describe any <u>known</u> trends or uncertainties" that are <u>expected</u> to have a material impact on financial performance.  None of the "trends" later visited on the global economy was "known" -- to Chesapeake or anyone else -- on July 9, 2008.

<u>Fourth</u>, none of the purported omissions was material when viewed in the context of the Registration Statement's disclosures and the facts that existed at the time of the Offering, or <u>even after</u> the intervening calamities.  Chesapeake did not sustain a material loss in connection with any of the matters referred to in the Complaint.  Moreover, its stock price <u>rose</u> after the Company announced the liquidation of Mr. McClendon's stock holdings, quantified the outer limit of its potential exposure in connection with the Lehman bankruptcy, and addressed the use of knockout hedges on October 10, 2008.

<u>Fifth</u>, the Complaint fails to plead facts that could establish a plausible entitlement to relief as required by other controlling cases.  Indeed, plaintiff's conclusory attempt to reverse-engineer claims after the financial crisis that followed the Offering is the antithesis of a plausible demonstration that it is entitled to relief.

<u>Sixth</u>, the Registration Statement explicitly disclosed the number of shares held by Mr. McClendon, and that they were margined.  Plaintiff does not (and cannot) allege that at the time of the Offering anyone thought that there would be a global financial debacle or a 70% drop in Chesapeake's stock price, and it would have been impossible to craft disclosures based on such clairvoyance.  Nor was Chesapeake required to monitor Mr. McClendon's personal finances, or to laden the Registration Statement with speculation regarding possible consequences of improbable scenarios.

<u>Seventh</u>, at the time of the Offering, no one could have predicted that an iconic Wall Street institution was on a course to bankruptcy.  Any suggestion that defendants believed Lehman was in danger of financial collapse is refuted by the fact that Chesapeake selected Lehman as the <u>lead underwriter</u> on the Offering.  Moreover, Chesapeake did not sustain a material loss on its hedging transactions with Lehman even when it <u>did file</u> for bankruptcy protection.

Eighth, contrary to the allegations of the Complaint, the face of the Registration Statement shows clearly that Chesapeake disclosed the fact that certain of its hedging contracts had "kickout" or "knockout" provisions and provided detailed quantitative information regarding the extent of the exposure.  Moreover, hedging positions can be restructured in response to changing market conditions, and the Company did not sustain a material loss on the hedges that contained such provisions even after the price of natural gas collapsed.

Ninth, there is no possible causal connection between the purported defects in the Registration Statement and any loss sustained by plaintiff.  Chesapeake's stock price declined by approximately 70% before there was any disclosure of the information plaintiff claims was omitted from the Registration Statement, and rose after the information -- and adverse consequences that could not possibly have been foreseen on July 9, 2008 --was disclosed.

In addition, the claims asserted under Section 12 further fail as a matter of law because neither Chesapeake nor the individual defendants is a "seller" for purposes of the statute.  As the Registration Statement shows on its face, the securities in the Offering were sold by the Company to the underwriters as part of a firm commitment offering. The underwriters sold the stock to investors.

## I.     CONTROLLING LEGAL STANDARDS

Plaintiff's attempt to plead a "pure omissions" case based on hindsight confronts a series of core legal principles -- summarized below -- that are decisive.  As demonstrated in the Argument Section that follows at pages 9-25, those controlling standards require dismissal of the Complaint as a matter of law.

### A.     Omissions Not Actionable Absent A Duty To Disclose

To state a claim under Sections 11 and 12, plaintiffs must allege facts establishing that the Registration Statement contained either "an untrue statement of material fact" or omission of material fact "necessary to make the statements therein not misleading."  15 U.S.C. § 77k(a); 15 U.S.C. § 77*l*(a)(2) (same).

"'Silence, absent a duty to disclose'" cannot serve as the basis for liability under federal securities law. *Grossman*, 120 F.3d at 1125 (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 239 n.17 (1988)).[6] Plaintiffs must allege (i) an affirmative statement made misleading by virtue of an omission, or (ii) an independent "legal obligation to disclose the allegedly omitted information." *In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 272 F. Supp. 2d 243, 248 (S.D.N.Y. 2003) (citing 15 U.S.C. §§ 77k & 77*l*(a)(2)). *See, e.g., Cooperman v. Individual, Inc.*, 171 F. 3d 43, 49 (1st Cir. 1999) ("[T]he mere possession of material non[-]public information does not create a duty [under Sections 11 and 12 ] to disclose it.").

Item 303(a) of Regulation S-K instructs issuers to "[d]escribe any <u>known</u> trends or uncertainties that have had or that the registrant reasonably <u>expects</u> will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(a)(3)(ii) (emphasis added). *See, e.g., Landmen Partners, Inc. v. Blackstone Group, LP*, No. 08-CV-3601, 2009 U.S. Dist. LEXIS 87001, at *14-15 (S.D.N.Y. Sept. 22, 2009) (citing *Garber v. Legg Mason, Inc.*, 537 F. Supp 2d 597, 611 (S.D.N.Y. 2008)); *see also Oxford Asset Mgmt., Ltd. v. Jaharis*, 297 F. 3d 1182, 1191 (11th Cir. 2002).

### B.     Issuers Are Not Required to Disclose Speculative, Public or Overly Detailed Information

"[C]ompanies are not required to disclose speculative facts which might have some unknown impact on future earnings, rather they are required to disclose material facts which are known at the time of the preparation of disclosure documents." *In re Williams Sec. Litig.*, 339 F. Supp. 2d 1242, 1263 (N.D. Okla. 2003). *See, e.g., Denny v.*

---

[6] Put another way, a claim under Section 11 requires a showing that a defendant "'has an affirmative duty to disclose the information but fails to do so.'" *Rubin v. MF Global, Ltd.*, 634 F. Supp. 2d 459, 466 n.3 (S.D.N.Y. 2009) (quoting *Panther Partners, Inc. v. Ikanos Commc'ns, Inc.*, 538 F. Supp. 2d 662, 668 (S.D.N.Y. 2008), *vacated in part on other grounds*, 2009 WL 2959883 (2d Cir. Sept. 17, 2009)). "The content of the duty 'depends largely on the itemized disclosures required by the securities laws . . . '" *Id.* (quoting *Panther Partners*, 538 F. Supp. 2d at 668).

*Barber*, 576 F.2d 465, 470 (2d Cir. 1978) (no need to exercise "clairvoyance");

*Consolidated Gold Fields, PLC v. Anglo Am. Corp. of S. Afr. Ltd.*, 713 F. Supp. 1457,

1470 (S.D.N.Y. 1989) ("speculation could easily mislead and confuse shareholders.").

Nor are issuers required to disclose information that is already public (*Merrill Lynch &*

*Co. Research Reports*, 272 F. Supp. 2d at 249-50),[7] or to "[obfuscate] truly material

information in a flood of unnecessary detail." *Landmen Partners*, 2009 U.S. Dist. LEXIS

87001, at *23-24 (citing *I. Meyer Pincus*, 936 F. 2d at 762).

### C.    Misstatements or Omissions Must Be Material at the Time of the Offering

Liability for a misstatement or the omission of information that the defendant had

an independent duty to disclose can be established only upon showing the fact at issue

was material at the time of the disclosure. *See, e.g.*, *Gebhardt v. ConAgra Foods, Inc.*,

335 F.3d 824, 831 (8th Cir. 2003) (materiality determined "from the perspective of a

reasonable investor at the time of the misrepresentation, not from the perspective of a

reasonable investor looking back on how events unfolded"). Materiality is determined as

of the date the prospectus or registration statement became effective, in the context of the

other information that was in the market at that time. 15 U.S.C. §§ 77k(a) & 77l(a)(2);

*see also I. Meyer Pincus & Assocs. v. Oppenheimer & Co.*, 936 F. 2d 759, 763 (9th Cir.

1991); *In re MobileMedia Sec. Litig.*, 28 F. Supp. 2d 901, 924 (D.N.J. 1998); *Landmen*

*Partners*, 2009 U.S. Dist. LEXIS 87001, at *14-15, n.8.[8]

In the Tenth Circuit, "[c]ourts do not hesitate to dismiss securities claims pursuant

to Rule 12(b)(6) where the alleged misstatements or omissions are plainly immaterial."

---

[7] *See also Klein v. Gen. Nutrition Cos.*, 186 F. 3d 338, 343 (3d Cir. 1999) (where the information was public knowledge, "[f]ederal securities laws do not require a company to state the obvious"); *Wielgos v. Commonwealth Edison Co.*, 892 F. 2d 509, 517 (7th Cir. 1989) (same ); *Siebert v. Sperry Rand Corp.*, 586 F. 2d 949, 952 (2d Cir. 1978) ("[T]here is no duty to disclose information to one who reasonably should already be aware of it.").

[8] The standard for assessing materiality under Section 10(b) and Rule 10b-5 is the same as under Sections 11 and 12(a)(2). *See Garber*, 537 F. Supp. 2d at 615 (citing *I. Meyer Pincus*, 936 F. 2d at 761).

*Grossman*, 120 F. 3d at 1118; *see also Alaska Elec. Pension Fund v. Olofson*, No. 08-2344, 2009 WL 1580296, at *2 (D. Kan. June 3, 2009). There is no "bright line rule" for materiality, but an impact of more than five percent of a company's revenues is "'a good starting point for assessing the materiality of the alleged'" misstatement or omission. *Landmen Partners*, 2009 LEXIS 87001, at *17-19 (quoting *ECA, Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*, 553 F. 3d 187, 204 (2d Cir. 2009)).

**D.    Plaintiff Must Allege Plausible Facts Demonstrating Entitlement to Relief**

Although Sections 11 and 12 do not require plaintiffs to plead fraudulent intent, and are thus not subject to the particularized pleading requirements of Rule 9(b) or the Securities Litigation Reform Act of 1995, the Supreme Court's decisions in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) and *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009), changed the landscape for pleading claims under the 33 Act. After *Twombly* and *Iqbal*, a complaint will not survive a Rule 12(b)(6) motion unless it alleges "'enough facts to state a claim to relief that is <u>plausible</u> on its face.'" *Ridge at Red Hawk, L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007) (quoting *Twombly*, 550 U.S. at 570) (emphasis added); *see also Iqbal*, 129 S. Ct. at 1949.

**ARGUMENT**

**I.    THE COMPLAINT ALLEGES NO CONTEMPORANEOUS FACTS TO SHOW ITS CLAIMS ARE PLAUSIBLE**

The Complaint fails across the board under *Twombly* and *Iqbal* because it utterly fails to plead facts necessary to "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Rather, plaintiff engages "'in retrospective pleading'" by attempting to second-guess contemporaneous disclosures "'in light of the much-later materialization'" of a catastrophic economic downturn. *Rubin v. MF Global, Ltd.*, 634 F. Supp. 2d 459, 474 (S.D.N.Y. 2009) (quoting *Panther Partners, Inc.*, 538 F. Supp. 2d at 672). Such "pleading by hindsight" cannot support a finding of plausibility, and mandates dismissal of plaintiff's claims under Sections 11 and 12 of the '33 Act. *Id.*

(dismissing §§ 11 and 12 claims pursuant to *Iqbal*); *Belodoff v. Netlist, Inc.*, 2009 WL 2777320, at *9 (C.D. Cal. Sept. 1, 2009) (same).

To determine whether Section 11 and 12 claims contain enough factual support to meet the "plausibility" standard, *Iqbal* instructs that a court should "begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Iqbal*, 129 S. Ct. at 1950-51. The Court should then consider whether the remaining fact-based allegations "are not merely consistent with the conclusion that the defendant violated the law, but . . . <u>actively and plausibly suggest that conclusion.</u>" *Port Dock & Stone Co. v. Oldcastle Northeast, Inc.*, 507 F. 3d 117, 121 (2d Cir. 2007) (citing *Twombly*, 550 U.S. at 557) (emphasis added).

At the risk of belaboring the obvious, the purported "omissions" relating to Mr. McClendon's ability to satisfy margin calls, exposure to Lehman Brothers as a counterparty to hedging transactions, and inclusion of "knockout" or "kick-out" provisions in hedging contracts, could <u>only</u> be viewed as significant in light of unanticipated events that did not occur until well after the Offering. Plaintiff merely attempts to denigrate the Registration Statement's contemporaneous disclosures based on hindsight and intervening events. To demonstrate entitlement to relief, the Complaint must allege facts showing that the Registration Statement was materially false or misleading at the time of the Offering.

Moreover, the Complaint relies on conclusory assertions that, under *Twombly* and *Iqbal*, are not entitled to a presumption of truth. Pronouncements that Mr. McClendon "lacked the cash necessary to satisfy his margin loans" (Compl. ¶ 34), that Lehman's "deteriorating financial condition" was having "an unfavorable impact on the Company's revenues and income from continuing operations" (¶ 50), that "the likelihood that Lehman would be able to pay Chesapeake for the output under the hedging contracts at the agreed-upon prices was greatly reduced" (¶ 38), and that the Registration Statement "was negligently prepared and as a result . . . omitted to state other facts necessary to

make the statements made therein not misleading" (¶ 33), fall <u>far</u> short of the mark.

## II.    THE PURPORTED OMISSION REGARDING MR. MCCLENDON'S MARGINED STOCK IS NOT ACTIONABLE AS A MATTER OF LAW

### A.    The Registration Statement Disclosed the Full Extent of McClendon's Margined Holdings

As the Complaint (¶ 34) itself acknowledges, the Registration Statement disclosed

that virtually all of Mr. McClendon's Chesapeake stock was held in margin accounts,

including the exact number of margined shares.  See RJN Ex. F at 29.  At the time of the

Offering, there was nothing more of substance that <u>could have been</u> disclosed.

Reflecting back on the margin calls that resulted in the sale of most of Mr.

McClendon's holdings after the melt-down, plaintiff nevertheless asserts that Chesapeake

violated the securities laws because it "failed to disclose that Defendant McClendon

lacked the cash necessary to satisfy his margin loans such that if there was a significant

decline in the value of his investments, the stock would be seized and sold into the

market . . . ."  Compl. ¶ 34.  That contention goes nowhere.

The risk that stock held in margin accounts may be sold if the stock suffers a

major decline in value is inherent in the concept of margining.  Indeed, that is the <u>point</u> of

the disclosure that Chesapeake made.

### B.    Chesapeake Had No Duty to Monitor or Disclose Information Regarding Mr. McClendon's Personal Financial Information

Plaintiff's premise that Chesapeake was required to investigate and disclose the

personal finances of its CEO is also dead wrong.  Companies and their officers and

directors are under no obligation to monitor or disclose the personal financial situations

of their officers or directors.  *See, e.g.*, *Beam ex rel. Martha Stewart Living Omnimedia,*

*Inc. v. Stewart*, 833 A.2d 961, 971 (Del. Ch. 2003), *aff'd*, 845 A.2d 1040 (Del. Supr.

2004); *In re Donald J. Trump Casino Sec. Litig.*, 793 F. Supp. 543, 565 (D.N.J. 1992)

(purported connections between an insider defendant's personal finances and the

company's success are "are beyond the bounds of management's responsibility to

disclose"), *aff'd*, 7 F.3d 357 (3d Cir. 1993).

Even when a company is "closely identified" with a particular insider, there is no rule or legal principle "that the Board is required to monitor, much less control, the way [that insider] handles [his] personal financial and legal affairs." *Beam*, 833 A.2d at 971. Nor would Mr. McClendon's <u>personal</u> finances would have a material effect on <u>Chesapeake's</u> operations or financial performance. (As noted below, Chesapeake's stock price did not decline when the margin sales were announced on October 10, 2008.)

### C.    Plaintiff's Allegations Further Fail Because They Are Based on Hindsight

Not only does the Complaint fail to allege <u>facts</u> that might suggest that at the time of the Offering Mr. McClendon lacked financial resources, it is clear that there were no such indications at that time. To the contrary, Mr. McClendon purchased <u>$57 million</u> worth of additional shares in the Offering itself. RJN Ex. A at S-24. He had been holding large amounts of stock in margin accounts for <u>years</u>, including through periods of large stock price declines. RJN Exs. G at 27; H at 9; and I at 11-12. In July 2008, it was impossible to predict a global financial crisis rivaling the Great Depression -- much less whether Mr. McClendon would be able to generate sufficient cash to meet margin calls in the event of such a catastrophe.

### D.    Defendants Were Not Required to Speculate Regarding Financial Crises or Potential Impacts on Mr. McClendon's Stock Holdings

Even if there had been some basis upon which Chesapeake could have attempted to make predictions about future stock price declines and Mr. McClendon's likely ability to satisfy margin calls under various scenarios, the law is clear that "companies are not required to disclose speculative facts which might have some unknown impact on future earnings." *In re Williams*, 339 F. Supp. 2d at 1263. To the contrary, such speculation is wholly inappropriate because it "could easily mislead and confuse" investors, *Consolidated Gold Fields*, 713 F. Supp. at 1470, and result in a "flood of unnecessary detail," *Landmen Partners*, 2009 U.S., Dist. LEXIS 87001, at *23-24.

### E.    The Allegations Also Fail on Materiality Grounds

It is also clear that any "omission" of clairvoyant speculation regarding Mr.

McClendon's financial resources and possible impacts of unprecedented stock price declines on his margined shares would have been immaterial. When the <u>sales themselves</u> were disclosed to the market <u>after</u> Chesapeake's stock price decline, there was no adverse reaction. Indeed, the price of Chesapeake's stock went <u>up</u>. See pp. 19-24, below. *See, e.g.*, *Weiss v. Amkor Tech., Inc.*, 527 F. Supp. 2d 938, 947-48 (D. Ariz. 2007) (dismissing securities fraud case where once "a corrective disclosure was issued the stock price actually increased").

## III. KNOCKOUT HEDGES WERE FULLY DISCLOSED TO INVESTORS AND WERE NOT MATERIAL IN ANY EVENT

In what can most generously be explained as an egregious oversight, the Complaint (¶ 13) alleges that the Registration Statement "did not disclose that many of the Company's hedging agreements contained a 'kick-out' provision under which the counterparty exposure is 'kicked out' if the price of natural gas falls below a specific price." That assertion fails for the simple reason that the Registration Statement indisputably <u>did</u> disclose the information plaintiff alleges was omitted. While further analysis is unnecessary, plaintiff's claim must also be dismissed because Chesapeake was not required to speculate regarding unprecedented declines in natural gas prices and did not sustain a material loss in connection with the "knockout" [9] provisions even <u>after</u> natural gas prices collapsed.

### A. The Knockout Hedges Were Fully Disclosed

---

[9] Though the Complaint uses the term "kick-out," the terms kick-out and knockout are interchangeable. Through the use of knockout hedges, Chesapeake receives a premium (in the form of a higher-than-market fixed price at the time the hedge is entered into) in exchange for the knockout provision, which could reduce the counterparty's exposure to $0 below a certain level. For example, Chesapeake might enter into a hedging agreement to receive a fixed price of $8 per mcf with a knockout level of $5.75 per mcf. If gas is below $5.75 per mcf on the day of settlement, neither party owes the other anything, and it is as if the contract never existed. However, if gas is at or above $5.75 per mcf, the counterparty pays Chesapeake the fixed amount of $8 per mcf . In this way, the counterparty minimizes its potential future exposure under the hedging agreement, while Chesapeake stands to receive a fixed price which is higher than what an at-the-market hedge would have provided at the time the hedge was entered into with the counterparty.

Not only did Chesapeake disclose the fact that some of its hedging contracts had knockout provisions, it provided detailed information regarding the nature of the arrangements, the prices at which the kick-outs would be triggered, and the timing and value of the hedges.  Indeed, it is difficult to imagine what more Chesapeake <u>could have</u> disclosed regarding the knockout swaps.  The May 2008 Form 10-Q, which was part of the Registration Statement,[10] provides an example of some of the key disclosures.

Under the heading "Quantitative and Qualitative Disclosures About Market Risk . . . Natural Gas and Oil Hedging Activities," the Company noted that "[a]s of March 31, 2008, our natural gas and oil derivative instruments were comprised of swaps, basis protection swaps, <u>knockout swaps</u>, cap-swaps, call options and collars."  RJN Ex. K at 34 (emphasis added).  The disclosure described the knockout swaps in lay terms, and explained that "[t]he fixed price received by Chesapeake includes a premium in exchange for the possibility to reduce the counterparty's exposure to zero, in any given month, if the floating market price is lower than certain pre-determined knockout prices."  *Id.*  In addition to highlighting the possibility that the counterparties' contractual obligations on the hedges could be eliminated in certain circumstances, the May 2008 Form 10-Q specified the precise volume and trigger levels of the Company's knockout swaps from 2008 into 2010.

The <u>actual</u> disclosures in the Registration Statement control over plaintiff's mischaracterization of them in the Complaint, and mandate dismissal.  *See, e.g.*, *Olkey v. Hyperion 1999 Term Trust, Inc.*, 98 F.3d 2, 9 (2d Cir. 1996) (upholding dismissal of Section 11 case where "plaintiffs' claims are contradicted" by company disclosures and thus "no set of additional facts could prove the plaintiffs' claims").

### B.    Chesapeake Was Not Required to Speculate About Future Natural Gas Prices or Their Possible Impacts on Knockout Hedges

Because natural gas prices had been rising during the period leading up to the Offering, RJN Ex. C at 9, knockout provisions had no impact, and there was no trend that

---

[10] RJN Ex. A at S-29.

might suggest that they would have an adverse impact in the foreseeable future. Once again, Chesapeake could not have anticipated the collapse of natural gas prices that accompanied the global recession. Nor was it required to speculate regarding potential future price movements or their possible impacts on specific hedging positions, or to attempt to provide reams of sensitivity analyses addressing every possible outcome. See pp. 7-9, above.

### C.    Use of Knockout Hedges Was Immaterial in Any Event

Although the detailed disclosure of the information plaintiff was omitted claims is dispositive, it is equally clear that any purported omission would be immaterial as a matter of law. In the period preceding the Offering natural gas prices were $12.01 per mcf and had been rising. RJN Ex. C at 9. As Chesapeake disclosed, RJN Ex. A at S-9, natural gas prices can be volatile, but there was no basis for predicting a dramatic pricing reversal. Hedging positions can be restructured and rehedged to adapt to market developments in any event. RJN Ex. L at 10, 62. Furthermore, even <u>after</u> the reversal, Chesapeake did not sustain a material loss as a result of the knockouts -- either in the second half of 2008 or through the first three quarters of 2009. *Id.* at 10, 62.

## IV.    THE PURPORTED OMISSION REGARDING LEHMAN IS NOT ACTIONABLE AS A MATTER OF LAW

Plaintiff's allegations regarding Lehman Brothers continue the retrospective approach employed throughout the Complaint. The possibility that the failure of one of Chesapeake's hedging counterparties to perform could result in a loss was disclosed. RJN Ex. A at S-13 ("our commodity price risk management transactions may expose us to the risk of financial loss in certain circumstances, including [if] the counterparties to our contracts fail to perform under the contracts.").

Defendants were not required to discuss specific counterparties, and could not have known, expected or predicted that Lehman was going to file for bankruptcy. Nor were they required to laden the Registration Statement with speculation regarding the potential consequences of such an unprecedented occurrence. See pp. 7-8, above.

Moreover, the Company did not sustain a material loss even after Lehman collapsed.

### A.    Plaintiff's Attempt to Invoke Item 303 of Regulation S-K Is a Non-Starter

The Complaint (¶ 38) asserts that the Registration Statement "was required to disclose that Lehman was a counterparty for a material amount of the Company's hedging contracts and that should Lehman not be able to perform, the Company could suffer losses of as much as $50 million."  Because plaintiff is unable to point to a single statement that might have been rendered materially misleading by the "omission" of such information, it is forced to fall back on a claim that Chesapeake had a duty to disclose the information pursuant to Item 303 of SEC Regulation S-K.  Compl. ¶ 49.  That assertion fails on multiple grounds.

### 1.    Chesapeake Could Not Have Known Lehman Would Go Bankrupt

As the Complaint (¶ 49) acknowledges, Item 303 is an SEC regulation regarding the possible disclosure of "known" trends that the issuer "reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."  17 C.F.R. § 229.303(a)(3)(ii) (emphasis added).  For Item 303 to apply, it must be shown that at the time of the Offering:  (1) Chesapeake knew that Lehman was trending toward bankruptcy, and (2) "expected" that trend to have a material impact on its financial performance.  No such showing is remotely possible.  Not surprisingly, Plaintiff alleges no facts to suggest Chesapeake possessed such unique clairvoyance.

Any retrospective depiction of Lehman's demise as a foregone conclusion in early July 2008 is also directly refuted by the documents and events relied upon in the Complaint.  Throughout June and July of 2008 -- and after the Offering in August and September -- Lehman continued to reassure the market that it was well-positioned to deal with the challenges it was confronting.

The Complaint (¶¶ 40-48) makes clear that information regarding Lehman's financial performance was prominently featured throughout the market.  Any facts

regarding any discernible "trend" toward bankruptcy were thus available for all to see, and under settled law Chesapeake was not required to incorporate any of those public facts into the Registration Statement. *See, e.g.*, *In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 272 F. Supp. 2d 243, 249-50 (S.D.N.Y. 2003). Moreover, Lehman had weathered financial storms for more than 100 years and the publicly available information cited in the Complaint makes abundantly clear that at the time of the Offering no one knew or suspected that it was on a path to bankruptcy.

In the Bloomberg article describing the loss recounted in paragraph 41 of the Complaint, Lehman's CEO stated: "We have begun to take the necessary steps [to] ensure that this quarter's unacceptable performance is not repeated." RJN Ex. M at 1. The article further reported that the largest publicly traded fund manager in the U.S. and a mutual fund firm with $173 billion in holdings each expressed optimism about Lehman's future. *Id.* at 2.

On July 11, 2008, Standard & Poor's Rating Services said that "the counterparty credit rating of Lehman Brothers Holdings . . . continues to reflect the company's solid liquidity and funding profile." RJN Ex. N at 1.

Most important of all, the Complaint (¶ 42) itself acknowledges that Lehman was able to raise <u>$6 billion dollars</u> in the capital markets shortly before the Offering. The concept that investors would knowingly throw billions of dollars into a company that "was on the verge of collapse" is self-refuting. That fact, standing alone, would require dismissal of plaintiff's attempt to exploit a massive financial collapse with the perfect vision of hindsight.

### 2.  Chesapeake's Selection of Lehman As the Lead Underwriter on the Offering Demolishes Plaintiff's Claim

Any suggestion that Chesapeake "knew" that Lehman was on a path to bankruptcy, and "expected" a contractual default that would materially impair the Company's financial performance, is further eviscerated by the fact Chesapeake selected Lehman as the lead underwriter (and "book-runner") on the Offering. RJN Ex. A at 1.

Companies do not knowingly select doomed investment banks to play that crucial role, and it is inconceivable that Chesapeake would have done so here.

### 3.    The Only "Trend" at the Time of the Offering Was Positive

At the time of the Offering, gas prices had been increasing steadily since at least March 2008. RJN Ex. A at S-13; RJN Ex. C at 9.  If Lehman had failed at a time when gas prices were elevated, as they were at the time of the Offering, Chesapeake might well have <u>benefited</u> from the release of its hedging transactions with Lehman.[11]

### B.    Chesapeake's Exposure to Lehman Was Immaterial in Any Event

"In evaluating the materiality of an event that is 'contingent or speculative in nature,'" "materiality will depend at any given time upon a balancing of both the indicated probability that the event will occur and the anticipated magnitude of the event in light of the totality of the company activity." *City of Philadelphia v. Fleming Cos.*, 264 F.3d 1245, 1265 (10th Cir. 2001) (quoting *Basic, Inc. v. Levinson,* 485 U.S. 224 (1988)) (other internal quotation marks omitted).

At the time of the Offering a Lehman bankruptcy was not "contingent."  It was wholly unforeseen and unforeseeable at the beginning of July, and for an extended period <u>thereafter</u>.  There was no "anticipated magnitude" of any "event."  Lehman was merely one of a diversified group of nineteen counterparties.  Chesapeake established the multi-party hedging facility for the express purpose of minimizing its exposure in the event a particular counterparty failed,  RJN Ex. E at 3, and the facility worked as intended.

Although the date of the Offering is the only time frame that counts, it is clear that,

---

[11]  Hedging contracts are used to neutralize market risk.  For instance, agreeing to sell natural gas one year in the future at $7 per mcf allows the seller to plan future revenues and eliminates the risk that the price of gas will drop and that it would realize less than $7 per mcf.  However, it also means that if the market price of natural gas were to increase to $9 per mcf over the course of that year the seller's revenue would be decreased, in effect, by $2 per mcf.  Gas prices, as quoted on NYMEX, were $12.01 per mcf in July, at the time of the offering, and $7.37 per mcf in September, at the time Lehman went bankrupt. RJN. Ex. C at 9.

even in hindsight -- <u>after</u> the financial crisis and Lehman's demise -- the outer limit of the potential loss was still immaterial. The Complaint (¶ 51) attempts to prop up plaintiff's materiality position by citing the $50 million number mentioned in Chesapeake's October 10, 2008 press release, but the $50 million merely fixes an outer limit of loss after the unanticipated collapse, noting that losses on Lehman hedges "will not exceed" $50 million. Compl. ¶ 51. The actual loss sustained by Chesapeake in connection with Lehman's default was less than $15 million. RJN Ex. L at 47.

Even if the $50 million outer limit had materialized, it would be <u>less than 1%</u> of both assets and revenues in both 2007 and 2008. Based on the Company's 2007 financial performance, a $50 million exposure represents only 0.6% of revenues and 0.16% of assets. RJN Ex. B at 68, 70. Compared to the Company's 2008 financials, $50 million is 0.6% of revenues and 0.13% of assets. RJN Ex. B at 68, 70. As the cases have consistently held, such percentages (and percentages running far higher) are not material. *See, e.g.*, *Landmen Partners,* 2009 U.S. Dist. LEXIS 87001 at *18-19 (5% threshold for materiality); *Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1298 (9th Cir. 1998) (3%).[12]

Any suggestion that the $50 million outer limit on potential exposure was material is further refuted by the stock price reaction on the day following the October 10, 2008 press release. See pp. 22-24, below.

## V.    THE ABSENCE OF LOSS CAUSATION IS DEMONSTRATED ON THE FACE OF THE COMPLAINT

Loss causation is required because the securities laws are not intended to "provide investors with broad insurance against market losses," but rather "to protect them against those economic losses that misrepresentations actually cause." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 345 (2005). Accordingly, there must be "a causal connection

---

[12] The after-the-fact $50 million number was not even material when viewed in the context of Chesapeake's hedging contracts. The October 10, 2008 press release reported that the value of its hedging contracts had increased by $6.6 billion since June. RJN Ex. E at 3. Fifty million dollars thus represents less than one percent of the <u>change</u> in value of Chesapeake's outstanding hedges during a three-month period.

between the material misrepresentation and the loss." *Id.* at 342.

In contrast to Section 10(b) of the '34 Act, the statutes at issue here do not require plaintiffs to plead or prove loss causation. Rather, Sections 11 and 12 specify the <u>absence</u> of loss causation as an affirmative defense, on which defendants bear the burden.[13] The allocation of the burden of proof makes no difference in this case, however, because it is clear on the face of the Complaint and documents properly before the Court that there is no causal connection between any supposed misstatement and any purported loss.

Accordingly, the Court can -- and <u>should</u> -- dismiss the plaintiff's Section 11 and 12 claims pursuant to Rule 12(b)(6). *See, e.g.*, *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005); *Belodoff v. Netlist, Inc.*, No. SACV 07-00677, 2009 WL 1293690, at *12 (C.D. Cal. April 17, 2009); *Rubin*, 634 F. Supp 2d at 468; *In re Global Crossing, Ltd. Sec. Litig.*, 471 F. Supp. 2d 338, 347-48 (S.D.N.Y. 2006); *Davidco Investors, LLC v. Anchor Glass Container Corp.*, No. 8:04CV2561, 2006 WL 547989, at *25 (M.D. Fla. Mar. 6, 2006); *Merrill Lynch Research Reports*, 272 F. Supp. 2d at 253-55.

A.    **There Is No Causal Connection Between Anything Chesapeake Could Have Disclosed on July 9, 2008 and Any Purported Loss**

At the most basic level, plaintiff's claims should be dismissed because there can be no causal connection between anything that Chesapeake could have disclosed in the Registration Statement and any subsequent stock price decline. The information concerning Mr. McClendon's margin sales, potential losses on hedging transactions with Lehman, and knockout hedges, was disclosed (and could only have been disclosed) for the first time in Chesapeake's October 10, 2008 press release. Compl. ¶ 37 (margined stock sales), ¶ 51 (exposure on Lehman hedges), and ¶ 54 (use of knockout provisions in

---

[13] Section 11(e) of the '33 Act provides that, "if the defendant proves that any portion or all of [plaintiff's purported] damages represents other than the depreciation in value of such security resulting from such part of the registration statement, with respect to which his liability is asserted, not being true or omitting to state a material fact required to be stated therein or necessary to make the statements therein not misleading, <u>such portion of or all such damages shall not be recoverable.</u>" 15 U.S.C. § 77k(e)(3) (emphasis added).

hedging contracts). The intervention of the collapse of the financial markets and natural gas prices between the Offering and the October 10, 2008 press release would break any possible causal connection between anything that Chesapeake might have disclosed on July 9, 2008, and the stock losses that accompanied those devastating events. *See, e.g.*, *Bastian v. Petren Res. Corp.*, 892 F.2d 680, 685 (7th Cir. 1990) (emphasizing that the securities laws are not intended to "insure[] against national economic calamities").

Because natural gas accounts for 92% of Chesapeake's overall production, the Company's stock price closely tracks the price of natural gas. *See, e.g.,* RJN Ex. P at 15 ("The Company's stock price fluctuates based on many industry-related factors that are not within the control of our management, including volatility of oil and gas prices and global supply/demand trends for natural resources"). As natural gas prices declined severely in the third quarter of 2008, Chesapeake's stock fell from a July 9, 2008 Offering price of $57.25 to a close of $16.52 on October 10, 2008. That drop corresponds almost exactly to the decline of natural gas prices on the NYMEX. *See* RJN Ex. C.

None of the stock price decline from the date of the Offering through October 10, 2008, and none of the decline that followed, had anything to do with anything that was said or not said in the Registration Statement. As demonstrated in detail above, at the time of the Offering Chesapeake could not possibly have made additional meaningful disclosures regarding either a global economic and gas price collapse, or the potential consequences of such unforeseen catastrophes. That is true with respect to whether Mr. McClendon might have sufficient resources to meet margin calls (which did not result in losses to the Company). See pp. _, above. It is equally true with respect to the immaterial loss sustained in connection with the Lehman default (see pp. 15-19, above), and regarding the knockout hedging provisions (which were fully disclosed and produced no material loss to Chesapeake) (see pp. 13-15, above).

As a matter of law, the absence of a causal connection between any actionable omission and any subsequent loss negates loss causation. *See Dura*, 544 U.S. at 342.

**B.      Chesapeake's Stock Price Movements Affirmatively Establish the Absence of Loss Causation**

Chesapeake's stock price movements further establish the absence of loss causation -- and defendant's affirmative defense -- on the face of the Complaint and as a matter of law.  The fact that severe market forces drove Chesapeake's stock price down 70% <u>prior to</u> the disclosure of information related to the supposed "omissions" on October 10, 2008 conclusively eliminates loss causation up to that point.  The fact that Chesapeake's stock did not decline, but instead rose substantially, immediately after <u>all</u> of the "omitted" information was disclosed on October 10, 2008, conclusively eliminates loss causation from that date forward.

**1.      There Can Be No Loss Causation for Any of the 70% Decline That Preceded the October 10, 2008 "Corrective" Disclosure**

Chesapeake's stock declined from the $57.25 Offering price to $16.52 at the October 10, 2008 close.  RJN Ex. C at 1.  The information upon which plaintiff attempts to reverse-engineer its claims was disclosed after the markets closed on October 10, 2008.  Compl. ¶¶ 37, 51, 54.

Under black-letter law, "'price decline[s] before disclosure may not be charged to defendants.'"  *Merrill Lynch & Co. Research Reports*, 272 F. Supp. 2d at 254 (dismissing Section 11 where stock decline took place before alleged disclosures) (quoting *Akerman v. Oryx Commc'ns, Inc.*, 810 F.2d 336, 342 (2d Cir. 1987)).  Declines that occurred prior to the "revelation" of information are <u>necessarily</u> disconnected from the absence of or alleged concealment of the information.  *See, e.g.*, *In re Britannia Bulk Holdings Inc. Sec. Litig.*, --- F. Supp. 2d ---, 2009 WL 3353045 (S.D.N.Y. Oct. 19, 2009), *14 (dismissing Section 11 case because "a 'price decline before disclosure may not be charged to defendants'") (quoting *Akerman*, 810 F.2d at 342); *In re Dell Inc., Sec. Litig.*, 591 F. Supp. 2d 877, 906 (W.D. Tex. 2008) (quoting *Akerman*, 810 F.2d at 342).

**2.      The Increase in Chesapeake's Stock Price Following the October 10 Disclosures Precludes Loss Causation**

The Complaint alleges that <u>all</u> of the information relating to the supposed

omissions was disclosed to the market in the October 10, 2008 press release:

Paragraph 37 notes that the October 10 release stated that Mr. McClendon had "'involuntarily sold substantially all of his shares of Chesapeake common stock in the past three days in order to meet margin calls,'" and reprints a large portion of the discussion of that subject.

Paragraph 51 alleges that the release "disclosed that the Company had financial exposure to Lehman, which included amounts for unpaid gas sales and amounts due and owing under various derivative contracts. According to the press release, with respect to the terminated derivative contracts, the losses to Chesapeake 'will not exceed $50 million.'"

Paragraph 54 states: "In the October 10th Press Release Chesapeake admitted that 'a portion of the company's hedging positions contain provisions that limit counterparty exposure through 'kicked-out' price levels which would 'terminate a hedge for a particular month when the NYMEX settlement price is below a specified kick out price at contract expiration and result in no financial payment by either the counterparty of Chesapeake.' Further, according to the press release, the Company has 'consistently utilized' kick-out provisions for the past '57 months.'"

Putting aside the fact that the information disclosed in the October 10, 2008 press release could not possibly have been the subject of meaningful disclosures on July 9th, it would be difficult to hypothesize a more complete and compelling "corrective" disclosure of "omitted" information. All of the information that plaintiff claims was omitted, and all of the adverse consequences of the wholly unforeseeable events that occurred after the Offering, were laid out in a single press release. Yet, the stock price did not decline. Indeed, it moved sharply in the opposite direction.

On October 13, 2008, the first trading day after the October 10 disclosures, Chesapeake's stock opened up by 15 percent. RJN Ex. J at 1. By the end of that first trading day, when the market had fully digested the Company's disclosures, the Company's stock price closed 22 percent above the previous close. *Id.*

Those facts, <u>standing alone</u>, conclusively establish an absence of loss causation. *See, e.g.*, *In re VeriSign, Inc., Derivative Litig.*, 531 F. Supp. 2d 1173, 1208 (N.D. Cal. 2007); *Masters v. GlaxoSmithKline*, 271 F. App'x 46, 51 (2d Cir 2008); *In re Cybershop.com Sec. Litig.*, 189 F. Supp. 2d 214, 233 (D.N.J. 2002). It further demonstrates as a matter of law that any stock price decline on subsequent dates (*see* ¶ 55, discussing Company stock price in "early 2009") cannot be attributed to any "omission" alleged in the Complaint. *See, e.g.*, *Basic*, 485 U.S. at 246 ("[T]he market price of shares traded on well-developed markets reflects all publicly available information . . . .").

## VI.    PLAINTIFF'S 12(a)(2) CLAIMS FAIL BECAUSE CHESAPEAKE AND THE INDIVIDUAL DEFENDANTS WERE NOT "SELLERS"

Plaintiff's claims under Section 12 of the '33 Act (15 U.S.C. § 77*l*) must be dismissed for the additional reason that the statute does not apply to Chesapeake or the individual defendants. Section 12 is limited to any person who "offers or sells" the securities at issue. Under settled law, the Company and the individual defendants fall outside the statutory definition.

A party can be liable under Section 12(a)(2) only if he passes title or solicits the immediate purchase motivated by a desire to serve his own financial interests. *Pinter v. Dahl*, 486 U.S. 622, 642 (1988);[14] *see also, e.g.*, *In re Morgan Stanley Tech. Fund Sec. Litig.*, --- F. Supp. 2d ---, 2009 WL 256005, at *6 (S.D.N.Y. Feb. 2, 2009). Accordingly, Section 12 liability extends only to direct sellers or persons who "solicited" plaintiff's purchase. *Id.* To be liable as a seller, the defendant must be the "buyer's immediate seller . . . a buyer cannot recover against his seller's seller." *Pinter*, 486 U.S. at 644 n.21.

The Offering was executed on a "firm commitment" basis. Chesapeake sold the stock to the underwriters at a 3.75% discount (including commissions), and the

---

[14] Although *Pinter* involved analysis of Section 12(a)(1), the *Pinter* analysis is fully applicable to Section 12(a)(2) claims. *See, e.g.*, *Shain v. Duff & Phelps Credit Rating Co.*, 915 F. Supp. 575, 580 (S.D.N.Y. 1996).

underwriters sold stock to a multitude of individual investors at the $57.25 offering price. RJN Ex. A at 1.  Neither Chesapeake nor the individual defendants passed title directly to plaintiff or any other investor.  Nor did the Company or any of the individual defendants solicit any purchase by any investor.

Under settled law, the fact that plaintiff does not (and cannot) allege that Chesapeake or the individual defendants passed title or solicited individual sales mandates dismissal.  *See, e.g.*, *In re Metro. Sec. Litig*, 532 F. Supp. 2d 1260, 1296 (E.D. Wash. 2007) ("[T]he contention that the defendant solicited the sale must be supported by factual allegations at the pleading stage." (internal quotation marks omitted)); *ABN Amro, Inc. v. Capital Int'l Ltd*, 595 F. Supp. 2d 805, 831-32 (N.D. Ill 2008); *see also In re Am. Bus. Fin. Servs., Inc. Sec. Litig.*, 2007 WL 81937, at *9 (E.D. Pa. 2007).

## VII.   THE SECTION 15 CONTROL PERSON CLAIM MUST BE DISMISSED FOR FAILURE TO ALLEGE A PRIMARY VIOLATION

Plaintiff's failure to state a primary claim under Sections 11 and 12 requires dismissal of the control person claim asserted under Section 15 of the '33 Act.  *Maher v. Durango Metals*, *Inc.*, 144 F.3d 1302, 1305 (10th Cir. 1998); *In re Ultrafem Inc. Sec. Litig.*, 91 F. Supp. 2d 678, 701 (S.D.N.Y. 2000).

## CONCLUSION

This is a lawsuit that should never have been filed.  Based on the showing set forth above, it should be dismissed with prejudice.

November 16, 2009                    Respectfully submitted,

                                     Orrick, Herrington & Sutcliffe LLP

                                     By:   */s/ Robert P. Varian*

       Robert P. Varian
       M. Todd Scott
       Joseph Giometti
       Lily Becker
       David S. Keenan
       The Orrick Building
       405 Howard Street
       San Francisco, CA  94105-2669
       (415)773-5700
       (415)773-5759
       rvarian@orrick.com
*Attorneys for Defendants*

*Chesapeake Energy Corporation, Aubrey K. McClendon, Marcus C. Rowland, Michael A. Johnson, Richard K. Davidson, Frank A. Keating, Breene M. Kerr, Charles T. Maxwell, Merrill A. Miller, Jr., Donald L. Nickles, Frederick B. Whittemore*