UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| UNITED FOOD AND COMMERCIAL WORKERS UNION, et al., Individually and On Behalf of All Others Similarly Situated, | ) ) ) ) | No. 5:09-cv-01114-D |
| | ) | CLASS ACTION |
| Plaintiffs, | ) ) | |
| | ) | PLAINTIFF'S OPPOSITION TO THE MOTION TO DISMISS FILED BY CHESAPEAKE ENERGY AND THE INDIVIDUAL DEFENDANTS |
| vs. | ) ) | |
| CHESAPEAKE ENERGY CORPORATION, et al., | ) ) ) | |
| Defendants. | ) ) | |

480420_1

# TABLE OF CONTENTS

**Page**

I.    Introduction and Summary of Argument                                    1

II.   Argument                                                               4

    A.    Legal Standard on a Motion to Dismiss                           4

    B.    The Complaint States a Claim for Violations of §11 of the Securities
      Act                                                                    5

        1.    Legal Standard to Plead a §11 Claim                        5

        2.    Requirements Under Item 303 of Regulation S-K              6

        3.    Defendants Failed to Disclose Material Facts Concerning
            McClendon's Financial Condition                                  9

            a.    McClendon's Massive Holdings Called for Diligence    9

            b.    McClendon's Lack of Liquidity Was a Material Fact    12

        4.    Defendants Failed to Adequately Disclose the Extent of
            Chesapeake's Knockout Hedges                                     13

            a.    Defendants Did Not Disclose Current and Available
                  Material Information Regarding Chesapeake's
                  Knockout Hedges                                            13

            b.    Adequate Disclosures of the Knockout Hedges Did
                  Not Require Speculation                                    14

            c.    The Increased Volume and Value of Chesapeake's
                  Knockout Hedges Was Material                               16

        5.    Defendants Failed to Disclose Chesapeake's Material
            Exposure to Lehman Brothers                                      16

            a.    Lehman's Financial Condition Required Disclosure
                  that Lehman Was a Counterparty                             16

            b.    Chesapeake's Exposure to Lehman Was Material         18

    C.    Defendants' Arguments Concerning Loss Causation Should Not Be
      Considered, but if They Are, They Should Be Rejected                   20

**Page**

    1.    Plaintiff Is Not Required to Plead or Prove Loss Causation    20

    2.    Defendants Do Not (And Cannot) Conclusively Demonstrate Lack of Loss Causation    22

  D.    Defendants Were "Sellers" Under §12(a)(2)    24

III.  Conclusion    25

# TABLE OF AUTHORITIES

**Page**

## CASES

*Ackerman v. Oryx Commc'ns, Inc.*,
   810 F.2d 336 (2d Cir. 1987) ................................................................. 22

*Ashcroft v. Iqbal*,
   _ U.S. _, 129 S. Ct. 1937 (2009) ......................................................... 5

*Basic Inc. v. Levinson*,
   485 U.S. 224 (1988) ........................................................................... 19

*Bastian v. Petren Res. Corp.*,
   892 F.2d 680 (7th Cir. 1990) ......................................................... 22, 23

*Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*,
   833 A.2d 961 (Del. Ch. 2003) ............................................................. 10

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ............................................................................. 4

*Belodoff v. Netlist, Inc.*,
   No. SACV 07-00677 DOC (MLGx), 2009 WL 2777320
   (C.D. Cal. Sept. 1, 2009) ................................................................. 4, 21

*Capri v. Murphy*,
   856 F.2d 473 (2d Cir. 1988) ................................................................ 24

*City of Phila. v. Fleming Cos.*,
   264 F.3d 1245 (10th Cir. 2001) ........................................................... 19

*Consol. Gold Fields, PLC v. Anglo Am. Corp.*,
   713 F. Supp. 1457 (S.D.N.Y. 1989) ..................................................... 11

*Davidco Investors, LLC v. Anchor Glass Container Corp.*,
   No. 8:04CV2561T-24EAJ, 2006 WL 547989
   (M.D. Fla. Mar. 6, 2006) ..................................................................... 21

*Dura Pharms., Inc. v. Broudo*,
   544 U.S. 336 (2005) ............................................................................ 21

*ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*,
   553 F.3d 187 (2d Cir. 2009) .......................................................... 18, 19

**Page**

*Freeland v. Iridium World Commcn's, Ltd.,*
    233 F.R.D. 40 (D.D.C. 2006) ........................................................ 21, 22

*Ganino v. Citizens Utils. Co.,*
    228 F.3d 154 (2d Cir. 2000) ................................................................ 19

*Glassman v. Computervision Corp.,*
    90 F.3d 617 (1st Cir. 1996) ............................................................... 19

*Herman & MacLean v. Huddleston,*
    459 U.S. 375 (1983) .......................................................................... 5, 6

*In re Am. Bank Note Holographics Sec. Litig.,*
    93 F. Supp. 2d 424 (S.D.N.Y. 2000) .............................................. 24, 25

*In re Britannia Bulk Holdings Inc. Sec. Litig.,*
    No. 08 Civ. 9554 (DLC), 2009 WL 3353045
    (S.D.N.Y. Oct. 19, 2009).................................................................... 23

*In re Charles Schwab Corp. Sec. Litig.,*
    257 F.R.D. 534 (N.D. Cal. 2009) ...................................................... 23

*In re Cybershop.com Sec. Litig.,*
    189 F. Supp. 2d 214 (D.N.J. 2002).................................................... 24

*In re Dell Inc., Sec. Litig.,*
    591 F. Supp. 2d 877 (W.D. Tex. 2008) .............................................. 23

*In re Donald J. Trump Casino Sec. Litig.,*
    793 F. Supp. 543 (D.N.J. 1992).......................................................... 10

*In re Flag Telecom Holdings, Ltd. Sec. Litig.,*
    352 F. Supp. 2d 429 (S.D.N.Y. 2005) ................................................ 25

*In re Global Crossing, Ltd. Sec. Litig.,*
    471 F. Supp. 2d 338 (S.D.N.Y. 2006) ................................................ 21

*In re Home Health Corp. of Am. Inc.,*
    No. CIV. A. 98-834, 1999 WL 79057
    (E.D. Pa. Jan. 29, 1999).................................................................... 19

*In re Indep. Energy Holdings PLC Sec. Litig.,*
    154 F. Supp. 2d 741 (S.D.N.Y. 2001) ................................................ 25

**Page**

*In re Initial Pub. Offering Sec. Litig.*
  241 F. Supp. 2d 281 (S.D.N.Y. 2003) ..................................................... 6

*In re Initial Pub. Offering Sec. Litig.*,
  358 F. Supp. 2d 189 (S.D.N.Y. 2004) ..................................................... 7

*In re Kidder Peabody Sec. Litig.*,
  10 F. Supp. 2d 398 (S.D.N.Y. 1998) ..................................................... 19

*In re Merrill Lynch & Co. Research Reports Sec. Litig.*,
  272 F. Supp. 2d 243 (S.D.N.Y. 2003) ............................................. 17, 23

*In re Proxima Corp. Sec. Litig.*,
  No. 93-1139-IEG (LSP), 1994 U.S. Dist. LEXIS 21443
  (S.D. Cal. May 4, 1994) ..................................................... 25

*In re VeriSign, Inc., Derivative Litig.*,
  531 F. Supp. 2d 1173 (N.D. Cal. 2007)..................................................... 24

*In re Wash. Mut.*,
  259 F.R.D. 490 (W.D. Wash. 2009)..................................................... 22

*In re Williams Sec. Litig.*,
  339 F. Supp. 2d 1242 (N.D. Okla. 2003) ............................................. 11

*In re WorldCom, Inc. Sec. Litig.*,
  294 F. Supp. 2d 392 (S.D.N.Y. 2003) ..................................................... 22

*In re WRT Energy Sec. Litig.*,
  No. 96 Civ. 3610 (JFK), 2005 U.S. Dist. LEXIS 31280
  (S.D.N.Y. Dec. 1, 2005) ..................................................... 21

*Isquith ex rel. Isquith v. Middle S. Utils.*,
  847 F.2d 186 (5th Cir. 1988) ..................................................... 6

*J&R Mktg. v. GMC*,
  549 F.3d 384 (6th Cir. 2008) ..................................................... 7

*Landmen Partners Inc. v. Blackstone Group, L.P.*,
  No. 08-CV-3601 (HB), 2009 WL 3029002
  (S.D.N.Y. Sept. 22, 2009) ............................................. 11, 19

**Page**

*Lentell v. Merrill Lynch & Co.*,
    396 F.3d 161 (2d Cir. 2005) ........................................................................ 21, 23

*Masters v. GlaxoSmithKline*,
    271 F. App'x 46 (2d Cir. 2008) .................................................................... 24

*Olkey v. Hyperion 1999 Term Trust*,
    98 F.3d 2 (2d Cir. 1996) .............................................................................. 14

*Parnes v. Gateway 2000*,
    122 F.3d 539 (8th Cir. 1997) ....................................................................... 19

*Pinter v. Dahl*,
    486 U.S. 622 (1988) ..................................................................................... 24

*Robbins v. Okla. ex rel. Dep't of Human Servs.*,
    519 F.3d 1242 (10th Cir. 2008) ................................................................... 4

*Rubin v. MF Global, Ltd.*,
    634 F. Supp. 2d 459 (S.D.N.Y. 2009) ......................................................... 4

*Scheuer v. Rhodes*,
    416 U.S. 232 (1974) ..................................................................................... 4

*Schwartz v. Celestial Seasonings*,
    124 F.3d 1246 (10th Cir. 1997) ................................................................... 5

*Shaw v. Digital Equip. Corp.*,
    82 F.3d 1194 (1st Cir. 1996) ....................................................................... 6, 8

*Steckman v. Hart Brewing*,
    143 F.3d 1293 (9th Cir. 1998) ..................................................................... 6, 8, 19

*Weiss v. Amkor Tech, Inc.*,
    527 F. Supp. 2d 938 (D. Ariz. 2007) .......................................................... 13

*Yuan v. Bayard Drilling Techs., Inc.*,
    96 F. Supp. 2d 1259 (W.D. Okla. 1999) ..................................................... 6

Page

**STATUTES, RULES AND REGULATIONS**

15 U.S.C.
§77k(a) ........................................................................................... 5
§78j(b) .............................................................................. 13, 21, 22

17 C.F.R.
§229.303(a) ..................................................................................... 8
§229.303(a)(3)(ii) ........................................................................... 7
§240.10b-5 .................................................................................... 21

Federal Rules of Civil Procedure
Rule 8(a) .......................................................................................... 6
Rule 12(b)(6) .................................................................................... 4
Rule 15(a) ...................................................................................... 25

**SECONDARY AUTHORITIES**

*Commission Statement About Management's Discussion and Analysis of*
*Financial Condition and Results of Operations* (Jan. 25, 2002)
67 Fed. Reg. 3746-02, 3747 ..................................................... 8

*Disclosure in Management's Discussions and Analysis About Off-Balance*
*Sheet Arrangements and Aggregate Contractual Obligations*
(Jan. 28, 2003) SEC Release No. 67, 2003 ............................. 8

*Management's Discussion and Analysis of Financial Condition and Results of*
*Operations; Certain Investment Company Disclosures* (May 18, 1989)
SEC Release No. 6835 ....................................................... 7, 8

Plaintiff hereby respectfully submits its Opposition to the Motion to Dismiss ("Motion") the Amended Complaint (the "Complaint") filed by Defendant Chesapeake Energy and the Individual Defendants (collectively, "defendants").

## I.    Introduction and Summary of Argument

This is a federal securities class action on behalf of purchasers of the common stock of Chesapeake Energy ("Chesapeake" or the "Company") in the Company's July 2008 secondary public stock offering (the "Offering"). The Complaint alleges that the Registration Statement omits material facts and facts necessary to make the statements made therein not misleading, in violation of the Securities Act of 1933 (the "Securities Act").

Defendants assert this case is a "clumsy attempt to exploit the catastrophic economic and financial crisis of 2008 with the 20/20 vision of hindsight." Defs' Mem. at 2. Notwithstanding this bombastic statement, defendants knew there was a financial crisis occurring when they made the Offering. To avoid this obvious truth, defendants' Motion is composed of generalized and misguided assertions that the Complaint fails to allege facts supporting a plausible claim. Furthermore, the Complaint makes significant allegations defendants concededly ignore.

In a three-day period, Chesapeake's stock price plummeted from over $26 to approximately $16 per share as a result of CEO and co-founder McClendon pouring his stock into the market due to margin calls. *See infra* §II.B.3. Defendants admit they knew McClendon held 29 million shares of Chesapeake stock in margin accounts and that McClendon's ability to satisfy margin calls was omitted from the Registration Statement. According to defendants, however, they were not required to investigate beyond widely

known public information. They were. McClendon's inability to satisfy margin calls (especially in a recently volatile natural gas market) was material. Defendants' suggestion it was not is belied by the fact that Chesapeake's stock price plummeted when this risk materialized and that Chesapeake itself attempted to stem the rapid decline of its stock price by issuing a press release concerning McClendon's margin calls.

Defendants also contend full disclosure was made regarding Chesapeake's contracts featuring knockout hedges, but rely on data that was three months old and obsolete by the time of the Offering. By the end of June 2008 (just before the Offering), the volume and fair value of Chesapeake's knockout hedges had dramatically changed. Defendants were aware of these changes yet failed to provide updated information in the Registration Statement. *See infra* §II.B.4.a. The volume and fair market value of Chesapeake's hedges is a material fact, as evidenced by (among other things) the Company's prior disclosures of the information. Defendants ignore the recent significant changes in the volume and fair value of the hedges at the time of the Offering and assert they "could not have anticipated" the decline of natural gas prices. Defs' Mem. at 15. But the natural gas prices triggering these knockout hedges were in the same range as prices only months prior. *See infra* §II.B.4.b.

Defendants further dispute that they were under a duty to disclose that Lehman Brothers ("Lehman") was a counterparty to a number of Chesapeake's hedging contracts notwithstanding the financial institution was on the verge of bankruptcy at the time of the Offering. *See infra* §II.B.5. Defendants acknowledge that Lehman's demise was public information, but fail to account for the fact that they failed to disclose Chesapeake's significant ties to Lehman, leaving investors without the opportunity to adequately consider

- 2 -

the facts surrounding their investment in Chesapeake.  *See infra* §II.B.5.a.

Defendants also present this Court with factual arguments concerning materiality and loss causation, both of which are inappropriate for resolution on a motion to dismiss.  *See infra* §II.B.3.b; II.B.4.c; II.B.5.b; II.C.  Despite these efforts, defendants cannot escape the significant decline suffered by Chesapeake's stock price and the subsequent flat line that continued thereafter.  *See infra* §II.C.2.  This decline was specific to Chesapeake and the direct result of the risks defendants failed to disclose in the Offering.  *See infra* §II.C.2.



Indeed, competitors of Chesapeake who did not suffer from the Company's undisclosed problems fared much better than Chesapeake after the Offering.

Defendants further seek to avoid liability by ignoring the Complaint's allegations that they solicited in the Offering, and thus, are "sellers" for purposes of §12(a)(2).  *See infra* §II.D.  Finally, throughout their Motion, defendants rely on factual contentions, inapplicable

- 3 -

case law, and internally inconsistent assertions. Not only is this reliance inappropriate, but it fails to support defendants' arguments. Accordingly, for all the reasons stated herein defendants' Motion fails as well.

## II.    Argument

### A.    Legal Standard on a Motion to Dismiss

In reviewing a motion to dismiss, the court must presume that the allegations of the amended complaint are true, read the amended complaint as a whole, and give plaintiff the benefit of every favorable inference that can be drawn from its allegations. *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974). Furthermore, a complaint "attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations," but rather must simply provide the grounds of entitlement to relief and raise a right to relief above the speculative level. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Interpreting *Twombly*, the Tenth Circuit has held that "[t]he allegations must be enough that, if assumed to be true, the plaintiff plausibly . . . has a claim for relief." *Robbins v. Okla. ex rel. Dep't of Human Servs.*, 519 F.3d 1242, 1247 (10th Cir. 2008).

Defendants attempt to write off the entire Complaint as "retrospective pleading" in order to avoid liability for their negligent failure to investigate and disclose material facts available at the time of the Offering.[1] Defs' Mem. at 9-11. As is discussed in detail below,

---

[1]    Defendants cite *Rubin v. MF Global, Ltd.*, 634 F. Supp. 2d 459 (S.D.N.Y. 2009), and *Belodoff v. Netlist, Inc.*, No. SACV 07-00677 DOC (MLGx), 2009 WL 2777320 (C.D. Cal. Sept. 1, 2009), but these cases are inapplicable. In *Rubin*, there were no allegations that the defendants could have been aware of the undisclosed risks through a diligent investigation. 634 F. Supp. 2d at 473-74. In *Belodoff*, the court found that the alleged omission was in fact

each of defendants' omissions were significant at the time of the Offering and required

investigation and disclosure. These allegations provide "factual content that allows the court

to draw the reasonable inference that the defendant[s] [are] liable for the misconduct

alleged." *Ashcroft v. Iqbal*, _ U.S. _, 129 S. Ct. 1937, 1949 (2009).

### B.    The Complaint States a Claim for Violations of §11 of the Securities Act

#### 1.    Legal Standard to Plead a §11 Claim

The issuer of a security, as well as any person who signed the registration statement

and/or served as a director of the issuer, is subject to liability under §11 if the registration

statement as of its effective date omitted to state a required material fact or a material fact

necessary to make the statements therein not misleading. 15 U.S.C. §77k(a); *Schwartz v.

Celestial Seasonings*, 124 F.3d 1246, 1251 (10th Cir. 1997).

Defendants' attempt to elevate the standard for pleading a §11 claim is indicative of

the high standard of liability required of defendants here. Under §11, "a plaintiff who

'purchased a security issued pursuant to a registration statement . . . need only show a

material misstatement or omission to establish [a] *prima facie* case.'" *Schwartz*, 124 F.3d at

1251 (quoting *Herman & MacLean v. Huddleston*, 459 U.S. 375, 382 (1983)).[2] Section 11

"was designed to assure compliance with the disclosure provisions" of the Securities Act by

"imposing a stringent standard of liability on the parties who play a direct role in a registered

---

disclosed. 2009 WL 2777320, at *9. Here, plaintiff has properly alleged that defendants
failed to disclose material risks that they were either aware of or could have discovered
through investigation at the time of the Offering.

[2]     Here, as elsewhere, unless noted otherwise, citations are omitted and emphasis added.

offering." *Huddleston*, 459 U.S. at 381-82 (footnote omitted).  The intention is "that issuers,

under pain of civil liability, [will] not cut corners in preparing registration statements and

that they disclose all material information required by the applicable statutes and

regulations."  *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1204 (1st Cir. 1996) (citing

*Huddleston*, 459 U.S. at 381-82).  Because "'the principal goal of the Securities Act is

disclosure, close questions will generally be resolved in favor of inclusion of information.'"

*Isquith ex rel. Isquith v. Middle S. Utils.*, 847 F.2d 186, 201-02 (5th Cir. 1988).

Furthermore, a §11 claim is subject only to the notice pleading standards of Rule 8(a),

and a short and plain statement of the claim will suffice.  *See Yuan v. Bayard Drilling Techs.,*

*Inc.*, 96 F. Supp. 2d 1259, 1266-66 (W.D. Okla. 1999); *In re Initial Pub. Offering Sec. Litig.*

("*IPO*"), 241 F. Supp. 2d 281, 342 (S.D.N.Y. 2003) (noting that a simply pled §11 claim will

satisfy Rule 8(a), "just as the half-page model complaints in the Appendix to the Federal

Rules of Civil Procedure satisfy the pleading requirements of the Federal Rules").

### 2.    Requirements Under Item 303 of Regulation S-K

Chesapeake filed a Form S-3 registration statement in connection with the Offering,

which is a streamlined registration statement that only "certain well-capitalized and widely

followed issuers" may use.  *See Shaw*, 82 F.3d at 1205.  Although Form S-3 permits an

issuer to incorporate by reference prior periodic filings (such as Forms 10-K and 10-Q), it

also requires an issuer to disclose "'any and all material changes . . . which have not been

described in a report'" included in a prior filing.  *Id.*  Failure to comply with Item 303 creates

liability under §11.  *See Steckman v. Hart Brewing*, 143 F.3d 1293, 1296 (9th Cir. 1998)

(holding that §11 imposes liability if a registrant "'omits to state a material fact required to

480420_1

be stated'" in the registration statement and that "any omission of facts 'required to be stated'" under Item 303 will produce liability); *J&R Mktg. v. GMC*, 549 F.3d 384, 390-91 (6th Cir. 2008) (finding that Item 303 provides a duty to disclose under §11; *In re Initial Pub. Offering Sec. Litig.*, 358 F. Supp. 2d 189, 211 (S.D.N.Y. 2004) ("An omission of fact 'required to be stated' under Item 303 will generally produce liability under section 11."). Defendants failed to follow this requirement as they did not disclose current facts that were available to them at the time of the Offering.

Item 303 requires an issuer to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."   17 C.F.R. §229.303(a)(3)(ii).  In 1989, the SEC issued an interpretive release on Item 303 and the disclosure required under the regulation.  *See Management's Discussion and Analysis of Financial Condition and Results of Operations; Certain Investment Company Disclosures*, SEC Release No. 6835, 1989 WL 1092885, at *1 (May 18, 1989) (hereinafter referred to as "1989 Interpretive Release").  In the 1989 Interpretive Release, the SEC stated that:

> Required disclosure is based on ***currently known trends, events and uncertainties that are reasonably expected to have material effects***, such as: A reduction in the registrant's product prices; erosion in the registrant's market share; changes in insurance coverage; or the likely non-renewal of a material contract.
>
> *       *       *
>
> A disclosure duty exists where a trend, demand, commitment, event or uncertainty is both presently known to management and reasonably likely to have material effects on the registrant's financial condition or results of operation.

*Id.* at *4 (emphasis in original).  Defendants repeatedly argue that they could not anticipate

- 7 -

the undisclosed risks that materialized and caused Chesapeake's stock price to crater and flat line. This argument must fail, however, due to the fact that the undisclosed risks materialized only a few months after the Offering. The disclosures required by Item 303 are intended to provide investors with the information necessary to make informed investment decisions. *See, e.g., id.* at *17 (noting that "[t]he MD&A requirements are intentionally flexible and general").[3] Indeed,

> [t]he primary purpose of the "material changes" disclosure requirement of Item 11(a) . . . is to ensure that the prospectus provides investors with an ***update*** of the information required to be disclosed in the incorporated Exchange Act filings, including the information provided in those filings concerning "known trends and uncertainties" with respect to "net sales or revenues or income from continuing operations."

*See Shaw*, 82 F.3d at 1205 (citing Item 303(a)(3)(ii)) (emphasis in original); *see also Steckman*, 143 F. 3d at 1296.

---

[3]    *See also* 17 C.F.R. §229.303(a) (requiring disclosure of "such other information" as necessary to provide an understanding of corporate conditions); *Disclosure in Management's Discussions and Analysis About Off-Balance Sheet Arrangements and Aggregate Contractual Obligations*, SEC Release No. 67, 2003 WL 175446, at *2 (Jan. 28, 2003) (providing that "[t]he disclosure in MD&A is of paramount importance in . . . providing investors with the disclosure necessary to evaluate a company and to make informed investment decisions"); *Commission Statement About Management's Discussion and Analysis of Financial Condition and Results of Operations*, 67 Fed. Reg. 3746-02, 3747 (Jan. 25, 2002) (observing that Item 303 "identifies a basic and overriding requirement of MD&A" in requiring the disclosure of "'such other information,'" while noting the importance of providing investors with "an accurate understanding" of a company).

###### 3. Defendants Failed to Disclose Material Facts Concerning McClendon's Financial Condition

###### a. McClendon's Massive Holdings Called for Diligence

Throughout their Motion, defendants assert they could not possibly have disclosed material facts concerning CEO and co-founder McClendon's financial condition, notwithstanding his massive holdings in the Company. *See* Defs' Mem. at 11 ("nothing more of substance that ***could have been*** disclosed") (emphasis in original); *id.* at 12 ("impossible to predict . . . whether Mr. McClendon would be able to generate sufficient cash"). According to defendants, his financial condition was "unanticipated" (*id.* at 3), "unforeseeable" (*id.* at 4), and it would have been "impossible to craft disclosures" of his financial condition because it would have required "clairvoyance." *Id.* at 5. Nonsense. It would have taken minutes for defendants to conduct diligence beyond public facts in order to disclose McClendon's liquidity or other factors relevant to his ability to meet margin calls.

Indeed, defendants suggest they weren't required to do any such diligence whatsoever even though McClendon, the Company's CEO and largest individual shareholder, admittedly had huge holdings in Chesapeake (29 million shares) and was significantly increasing those holdings. *See* Defs' Mem. at 12 ("$57 million worth of additional shares"). What defendants say is the margined holdings of McClendon's they disclosed from public data (*id.* at 11 (citing RJN Ex. F. at 29)) and McClendon's increased purchases made it "clear" McClendon in fact had adequate "financial resources." *Id.* at 12. In other words, it is defendants' position they were free to give the impression McClendon was able to satisfy significant margin calls when in fact he was not. This clearly is ***not*** the law.

- 9 -

McClendon's massive holdings called for diligence to which investors were entitled and his purchase of additional $57 million worth of shares in the Offering only made his financial condition more deserving of investigation and disclosure. Instead, defendants did not lift a finger and thereby ignored that McClendon did not have liquidity to meet margin calls.

Chesapeake's answer to this assertion: "No Duty." *Id*. at 11. Defendants contend they were under "no obligation" to "investigate and disclose" any financial information regarding McClendon. *Id.* This is precisely the opposite of the obligations federal securities laws impose. Therefore, it is no wonder that defendants do not (they cannot) cite any authority to support their contention. Instead, at page 11 of their Motion, defendants cite *Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 833 A.2d 961, 971 (Del. Ch. 2003), a case arising out of Martha Stewart's insider trading scandal, based on alleged failure to "monitor" under Delaware law. *Beam* had nothing to do with the federal securities laws, and contrary to what defendants suggest, plaintiff here does ***not*** allege breach of fiduciary duty for failure to "monitor." *See* Defs' Mem. at 11 ("no obligation to monitor"). And in *In re Donald J. Trump Casino Sec. Litig.*, 793 F. Supp. 543, 564-65 (D.N.J. 1992), plaintiffs alleged failure to disclose Donald Trump's financial condition when it did not matter, because Trump's capital contribution obligation was $75 million. The prospectus disclosed he "could make good on this obligation," and Trump "in fact did so." *Id.* at 564. *Trump* in fact ***supports*** plaintiff's allegation by demonstrating personal financial condition can be material and should be disclosed, for in *Trump*, Mr. Trump's personal net worth ***was*** disclosed.

Defendants go so far as to assert that even if they did investigate any disclosure regarding McClendon's finances, the disclosure which they would control would "result in a 'flood of unnecessary detail.'" Defs' Mem. at 12. Defendants are wrong. It is ridiculous to suggest that a simple disclosure of risk as would be required here would be misleading or confusing.[4]

Defendants, who concede that "natural gas prices and Chesapeake's stock price had moved in tandem," (Defs' Mem. at 2), also assert it was unreasonable to require them to "make predictions about future stock price declines and Mr. McClendon's likely ability to satisfy margin calls." *Id.* at 12 ("clairvoyant speculation"). But disclosing facts regarding McClendon's then-existing financial condition, such as his liquidity, did not require specific predictions. Furthermore, it is outrageous for defendants to suggest they did not understand natural gas prices (after a significant volatile rise) might come down, and Chesapeake's stock price would too. Indeed, at the time Chesapeake's stock price caused margin calls on McClendon's account, natural gas prices had declined to levels at which they were

_____

[4]       Defendants' reliance on *In re Williams Sec. Litig.*, 339 F. Supp. 2d 1242, 1263 (N.D. Okla. 2003), *Consol. Gold Fields, PLC v. Anglo Am. Corp.*, 713 F. Supp. 1457, 1470 (S.D.N.Y. 1989), and *Landmen Partners Inc. v. Blackstone Group, L.P.*, No. 08-CV-3601 (HB), 2009 WL 3029002 (S.D.N.Y. Sept. 22, 2009), is misplaced. In *Williams*, the plaintiffs' allegations were not speculative as they asserted how the omitted facts were material at the time of the offerings. 339 F. Supp. 2d at 1263-64. Plaintiff has done exactly that here. In *Consol. Gold Fields*, the court found each of the omitted facts were available to investors, even if not set forth in the exact fashion that plaintiffs desired. 713 F. Supp. at 1471-74. Defendants here did not disclose any information regarding McClendon's financial status. Finally, in *Landmen Partners*, the alleged omissions were not deemed speculative, but instead would have provided investors with an abundance of useless information. 2009 WL 3029002, at *6. Information concerning McClendon's financial inability to meet margin calls would not have proved useless to investors.

480420_1

frequently trading only months before. *See infra* at 15. Defendants also decry that CEO McClendon purchased one million shares in the Offering, suggesting he was an innocent victim. With all respect, investors should not be held accountable for McClendon's irresponsible decision to leverage his finances to the hilt without adequate liquidity, all to the effect of causing Chesapeake's stock to implode when natural gas prices reached levels they were at only months before and McClendon could not meet margin calls.

### b. McClendon's Lack of Liquidity Was a Material Fact

As a last ditch effort, defendants argue that the omissions regarding McClendon's financial condition were immaterial because there was no adverse reaction in response to a press release they made on October 10, 2008. Defs' Mem. at 12-13. But, the risk associated with McClendon's margined stock had already materialized over the three days ***prior*** to the October 10 Press Release. That risk – the seizure and sale of McClendon's margined stock – caused Chesapeake's stock to materially decline from $28.55 to $16.31 on extremely heavy trading volume. ¶¶36, 37.[5] In fact, Chesapeake issued its press release to stem the decline in its stock price caused by McClendon's margin calls. Ex. A to the Declaration of Francis A. DiGiacco in Support of Plaintiff's Opposition to Defendants' Motion to Dismiss ("DiGiacco Decl.") ("confidence in Chesapeake remains undiminished"). That Chesapeake's stock price briefly slightly increased (and thereafter went back down) after the press release on October 10, 2008, does ***not*** negate the damage caused by McClendon's margin sales or the continued

---

[5]     Unless noted otherwise, all "¶" references are to the Amended Complaint.

decline in the Company's stock price thereafter.[6]  Furthermore, defendants do not (and cannot) impute general market buoyancy was a cause of the momentary increase in Chesapeake's stock price, for Chesapeake's market sector and the S&P 500 increased at the same time Chesapeake's stock price momentarily increased.

> **4.    Defendants Failed to Adequately Disclose the Extent of Chesapeake's Knockout Hedges**
>
> > **a.    Defendants Did Not Disclose Current and Available Material Information Regarding Chesapeake's Knockout Hedges**

Calling it an "egregious oversight," defendants mischaracterize the Complaint as alleging defendants did not disclose Chesapeake's contracts containing knockout hedges. Defs' Mem. at 13.  This is not a matter of whether or not it was known that Chesapeake had knockout hedges.  Defendants' oversimplification of the allegations ignores the significance of current information then available to defendants concerning these knockout hedges. Defendants assert the May 2008 Form 10-Q "provides . . . some of the key disclosures." Defs' Mem. at 14.  But the information provided in this document was only current as of March 31, 2008.  Defs' RJN Ex. K at 36.  The Offering was July 9, 2008 – more than three months later – and by that time, the volume and fair value of Chesapeake's knockout hedges

---

[6]     At page 13 of their Motion, defendants cite *Weiss v. Amkor Tech, Inc.*, 527 F. Supp. 2d 938 (D. Ariz. 2007) in purported support of their contention the press release was a "corrective disclosure."  First, this confuses securities fraud claims brought under §10(b) with plaintiff's §11 claim, which does ***not*** require a showing of loss causation.  *See infra* §II.C.1.  Second, despite the short-lived increase after the October 10 Press Release (which was not a "corrective disclosure"), Chesapeake's stock price never recovered from the hit it suffered.  The stock remained within range of, and far below, the price after the sale of McClendon's margined stock ($16.31), and never again traded anywhere near the price it was at prior to the sale ($28.55).  *See supra* §II.B.3.b.

480420_1

had changed drastically.

Defendants were required to *update* information previously disclosed through public filings, like the May 2008 Form 10-Q. Defendants did not. Evident in Chesapeake's August 2008 Form 10-Q, which reported information as of June 30, 2008 – a little over a week before the Offering – the volume of Chesapeake's knockout swaps had increased by several thousand in every quarter from what was disclosed in the May 2008 Form 10-Q. DiGiacco Decl., Ex. B. Additionally, the fair value of these knockout swaps had dropped by as much as $200 million in many of the quarters reported. *Id.* The fact that this information was available to defendants as of June 30, 2008 (*before* the Offering) tends to demonstrate that defendants' investigation was inadequate. This information was materially different than what had been previously reported and incorporated into the Registration Statement. Defendants do not dispute that they omitted this information, *nor* do they deny that they were required to investigate the knockout hedges.[7]

**b. Adequate Disclosures of the Knockout Hedges Did Not Require Speculation**

Defendants incorrectly contend that in order to properly disclose the impact of knockout hedges, they would have had to "speculate" about future natural gas prices. Defs' Mem. at 14-15. First, as previously discussed, defendants only had to disclose the increase in volume and decrease in fair value of the knockout hedges they were aware of as of the

---

[7]    Defendants cite to *Olkey v. Hyperion 1999 Term Trust*, 98 F.3d 2, 9 (2d Cir. 1996), which is inapplicable here. The actual disclosures in the Registration Statement do not contradict the allegations of the Complaint as they did not disclose the volume or fair value of Chesapeake's knockout hedges *at the time* of the Offering.

- 14 -

time of the Offering. Yet, defendants failed to do so. Second, the drop in natural gas prices that impacted these knockout hedges was directly in line with what natural gas prices had been only six months prior to the Offering. As illustrated by the graph below, for months natural gas prices hovered around $9.00 per thousand cubic feet of natural gas equivalent ("mcfe"), even dropping as low as $8.73 per mcfe on January 23, 2008. At the beginning of October 2008, when a number of hedges were knocked out, the price of natural gas was just below $9.00 per mcfe. This is hardly the exceptional price defendants claim they could not have predicted, especially when natural gas was at a similar price only months before. Moreover, natural gas prices had been *declining* at the time of the offering, not "rising" (Defs' Mem. at 14) as defendants suggest.



- 15 -

It is incredible for defendants to suggest they were ignorant of natural gas prices. Chesapeake's offering was on the heels of the ***largest*** 5-day drop in natural gas prices in over a year, from $12.88 to $12.17.

**c.    The Increased Volume and Value of Chesapeake's Knockout Hedges Was Material**

Defendants further contend that Chesapeake's exposure to knockout hedges was immaterial. Defs' Mem. at 15. This contention, however, is undercut by the fact that Chesapeake discloses information regarding these hedges in its SEC filings. Defendants deemed this information material for inclusion in its public filings, but now argue that it is immaterial for the Offering. Moreover, during the last half of 2008, when a number of Chesapeake's hedges were knocked out (*See* Ex. L attached to Defs' Mem), Chesapeake's stock price declined severely and never recovered. Apparently, the market found it significant that Chesapeake's hedges were being knocked out, exposing the Company to further risk of declining natural gas prices.

**5.    Defendants Failed to Disclose Chesapeake's Material Exposure to Lehman Brothers**

**a.    Lehman's Financial Condition Required Disclosure that Lehman Was a Counterparty**

Defendants state "unique clairvoyance" was required to "have known Lehman would go bankrupt" only two months after the Offering. Lehman's deteriorating condition required disclosure they were a counterparty. Defs' Mem. at 16.

If defendants were merely required to disclose Lehman's status as a counterparty only after Lehman's bankruptcy it would defeat the purpose of the Securities Act. As stated in the Complaint, at the beginning of 2008, fears began to surround Lehman when it reported a

- 16 -

preliminary loss projection for the second quarter of 2008 and its stock plummeted 61%. ¶40.  Lehman then set a record net loss of $2.8 billion for the second quarter of 2008 as well as negative revenues of $668 million stemming from a $4.1 billion write-down of investments, many of which were tied to subprime mortgage-backed securities.  ¶41.

Defendants attempt to write these facts off as a "retrospective depiction" of Lehman's fall, but by July 4, 2008, Lehman's stock price was down 65.8% since the beginning of the year and growing concern surrounded Lehman's ability to survive additional losses.  ¶44. Amidst the news that financial institutions like Lehman would have to recover on their own, defendants were acutely aware of the significance Lehman's demise would pose to Chesapeake.  ¶¶46-48.  Unfortunately for investors, this knowledge of Chesapeake's relationship with Lehman was unique to defendants.  Although defendants concede that the information regarding the end of Lehman was "prominently featured throughout the market," their argument that this relieves them from liability is misguided.[8]  Defs' Mem. at 16. Investors were never made aware of the fact that Lehman was a counterparty for many of Chesapeake's hedging contracts because defendants failed to disclose it.

Defendants rely on the general optimistic statements of Lehman's CEO and a credit rating agency to argue that Lehman's trend towards financial ruin was not cognizable.  Defs' Mem. at 17.  These arguments are inappropriate at this stage of the litigation as they are

_____

[8]     Defendants inappropriately rely on *In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 272 F. Supp. 2d 243 (S.D.N.Y. 2003).  In that case, the information that defendants failed to disclose was already public, thus relieving them of liability. *Id.* at 249-50.  Here, the fact that Lehman was a counterparty to many of Chesapeake's hedging contracts was not public information even though Lehman's financial crisis was.

based on newspaper articles containing facts not discussed or relied upon in the Complaint. Moreover, these arguments are unpersuasive because (among other reasons) Chesapeake investors were not afforded the opportunity to weigh Lehman's future.

Defendants also contend Chesapeake's selection of Lehman as lead underwriter (and "book-runner") somehow dismisses their duty to disclose that Lehman was a counter party to many of Chesapeake's hedging contracts. Defs' Mem. at 17-18. First, as alleged in the Complaint, Chesapeake selected five *joint* book-running managers: Lehman, ABN AMRO, Banc of America Securities LLC, UBS Investment Bank, and Wells Fargo Securities. ¶¶18-21. Second, Chesapeake's selection of Lehman as an underwriter does not render inconsequential the negative information concerning Lehman's financial performance just before the Offering.

Defendants ask the Court to weigh facts in asserting at the time of the Offering it seemed Chesapeake would have benefited from the release of its hedging transactions with Lehman. Defs' Mem. at 18. As defendants concede, the purpose of hedging contracts is to neutralize market risk, *i.e.*, a drop in natural gas prices. Defs' Mem. at 18 n.11. Only a few months after the Offering, that risk occurred as natural gas prices dropped to the same price they had been at less than a year before. *See supra* at 15. As Lehman defaulted on the hedging contracts due to bankruptcy, Chesapeake was exposed to greater risk. Due to defendants' failure to disclose Chesapeake's relationship with Lehman, investors were unable to consider and evaluate this risk at the time of the Offering.

### b.     Chesapeake's Exposure to Lehman Was Material

Defendants claim that Lehman's demise was "wholly unforeseeable," and thus,

- 18 -

immaterial.  Defs' Mem. at 18.  Again defendants rely on legal principles only applicable in securities *fraud* cases in presenting their argument.  *Id.* (citing *City of Phila. v. Fleming Cos.*, 264 F.3d 1245, 1265 (10th Cir. 2001)).  Aside from the black-letter law that materiality is a fact-specific inquiry, defendants fail to meet their exceptional burden at the pleading stage that the alleged omission was """"so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of [its] importance.""" *ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009) (citing *Basic Inc. v. Levinson*, 485 U.S. 224, 240 (1988), and *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 162 (2d Cir. 2000)).

Seeking to avoid this heavy burden, defendants urge this Court to adopt a bright-line rule for materiality.  Defs' Mem. at 19.  Such a rule has been rejected by a number of other courts reasoning that the proper approach is to consider a plaintiff's allegations in context along with qualitative factors.[9]  *Ganino*, 228 F.3d at 162 (citing *Parnes v. Gateway 2000*, 122 F.3d 539 (8th Cir. 1997), and *Glassman v. Computervision Corp.*, 90 F.3d 617 (1st Cir. 1996)); *see also In re Home Health Corp. of Am. Inc.*, No. CIV. A. 98-834, 1999 WL 79057, at *6-*7 (E.D. Pa. Jan. 29, 1999) (finding that qualitative factors rendered *de minimus* loss significant); *In re Kidder Peabody Sec. Litig.*, 10 F. Supp. 2d 398, 410 (S.D.N.Y. 1998)

---

[9]    Even *Landmen Partners*, 2009 WL 3029002, at *5, which defendants cite (Defs' Mem. at 19), acknowledges the importance of considering the context of misstatements and omissions and engages in a review of qualitative factors before reaching its conclusion. Moreover, defendants misread *Steckman*, 143 F.3d 1293, that a 3% difference is immaterial as a matter of law.  Defs' Mem. at 19.  The court in *Steckman* reasoned that a 3% difference in accounts receivable was insufficient to show that defendants were aware of a downward trend in sales – *not materiality*.  143 F.3d at 1298.

(same).

Moreover, a significant portion of Chesapeake's liquidity is concentrated in derivative instruments like those to which Lehman was a counterparty.  DiGiacco Decl., Ex. B at 12. Although these derivative instruments hedge Chesapeake's exposure to natural gas and oil prices, they also increase Chesapeake's exposure to credit risk from its counterparties.  *Id.* This risk materialized when Lehman filed for bankruptcy.  As indications of Lehman's financial disaster surfaced in early 2008, the risk to Chesapeake was significant.  Without the protection provided by its hedging agreement with Lehman, Chesapeake was increasingly vulnerable to changes in natural gas and oil prices.  This increased risk to an obviously significant aspect of Chesapeake's business was material and required disclosure.

Defendants selectively compare the potential loss of $50 million on Chesapeake's hedging contract with Lehman with Chesapeake's revenues and assets.  Defs' Mem. at 19. However, the more appropriate comparison is to the total fair value of derivative instruments, like the contract with Lehman.  Such a comparison shows that a loss of $50 million represents almost 5% of the fair value of Chesapeake's short-term derivative instruments and over 19% of the fair value of its long-term derivative instruments.  This quantitative significance in addition to the qualitative significance of Chesapeake's hedging agreements makes the information regarding Lehman material.

### C.     Defendants' Arguments Concerning Loss Causation Should Not Be Considered, but if They Are, They Should Be Rejected

#### 1.     Plaintiff Is Not Required to Plead or Prove Loss Causation

Defendants concede  that "the statutes at issue here do not require plaintiffs to plead

480420_1

or prove loss causation." Defs' Mem. at 20. This concession should be the end of their

argument. Nonetheless, defendants assert an absence of loss causation – an affirmative

defense for which they carry the burden despite their claim that it "makes no difference in

this case."[10] *Id.* at 20-24. This argument is inappropriate for resolution here.

Defendants primarily rely on *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336 (2005)

(Defs' Mem. at 19), but damages and loss are presumed under §§11 and 12, therefore *Dura,*

is not instructive. *See, e.g.*, *Freeland v. Iridium World Commcn's, Ltd.*, 233 F.R.D. 40, 46-

47 (D.D.C. 2006); *In re WRT Energy Sec. Litig.*, No. 96 Civ. 3610 (JFK), 2005 U.S. Dist.

LEXIS 31280, at *3-*4 (S.D.N.Y. Dec. 1, 2005). The court in *WRT Energy* explained:

> *Dura* is just not controlling here. The case arose under Rule 10b-5 and
> Section 10(b) of the Securities Exchange Act of 1934, under which the
> plaintiff has the burden of pleading loss causation. The issue was whether an
> allegation of an inflated purchase price on the date of purchase, in and of
> itself, was sufficient to meet that burden. Defendants cite no case extending
> *Dura* to cases brought under Section 11 of the 1933 Act, where the plaintiff
> need not plead loss causation as part of its *prima facie* claim.

2005 U.S. Dist. LEXIS 31280, at *3-*4. An investor's "failure to show loss causation is not

fatal to §§11 and 12 claims because he does not bear the burden of proof on loss causation

---

[10]     Defendants cite a number of cases for the proposition that plaintiff's claims should be
dismissed for lack of loss causation. Defs' Mem. at 20. However, a majority of the cases
cited are inapplicable or hold in favor of the plaintiff. *Lentell v. Merrill Lynch & Co.*, 396
F.3d 161, 173 (2d Cir. 2005) (claims brought under §10(b), which require plaintiff to plead
loss causation); *Belodoff v. Netlist, Inc.*, No. SACV 07-00677 DOC (MLGx), 2009 WL
1293690, at *12 (C.D. Cal. Apr. 17, 2009) (court does not reach issue of loss causation); *In
re Global Crossing, Ltd. Sec. Litig.*, 471 F. Supp. 2d 338, 347-48 (S.D.N.Y. 2006) (court
finds no absence of loss causation); *Davidco Investors, LLC v. Anchor Glass Container
Corp.*, No. 8:04CV2561T-24EAJ, 2006 WL 547989, at *25 (M.D. Fla. Mar. 6, 2006)
(plaintiffs could not establish loss causation because they sold shares prior to disclosure).

vis-à-vis those claims." *Freeland*, 233 F.R.D. at 47.

       **2.**      **Defendants Do Not (And Cannot) Conclusively**
                  **Demonstrate Lack of Loss Causation**

      Even if defendants' position were proper at this time, their vague factual arguments are woefully insufficient to meet the heavy burden imposed by their premature affirmative defense. *See Ackerman v. Oryx Commc'ns, Inc.*, 810 F.2d 336, 341 (2d Cir. 1987); *see also In re WorldCom, Inc. Sec. Litig.*, 294 F. Supp. 2d 392, 408 (S.D.N.Y. 2003). For example, defendants make the assertion that the state of the financial markets and natural gas prices require this Court to find that "*[n]one* of the stock price decline . . . had *anything* to do with *anything* that was said or not said in the Registration Statement." Defs' Mem. at 21. This hyperbolic statement is patently false and illustrates defendants' desire to use the current state of the economy as a cover for their potential §11 liability. It is well established the global recession began in 2007. And the effects of the credit crisis on financial markets had already began in early 2008, well *before* the Offering. And the Offering was on the heels of the largest 5-day decline in natural gas prices in at least the past year.

      Furthermore, plaintiff is not required to show that defendants' conduct is the *only* cause of the stock decline in order to plead its claim. *In re Wash. Mut.*, 259 F.R.D. 490, 508 (W.D. Wash. 2009) (court held that although the housing market downturn may have affected stock prices, it did not foreclose the possibility that the alleged misconduct had an impact as well). Defendants mistakenly rely on *Bastian v. Petren Res. Corp.*, 892 F.2d 680, 685 (7th Cir. 1990), for the proposition that the occurrence of an "economic calamity" is an automatic free pass for violations of the securities laws. First, *Bastian* dealt exclusively with a §10(b) claim, which requires a plaintiff to plead loss causation. *Id.* at 682. Second, the

- 22 -

court specifically discussed the possibility that defendants may be held liable for losses due to their own misconduct even in the midst of a down economy. *Id.* at 684. That is the case here.

Defendants further claim that a lack of loss causation is illustrated by stock price movement before and after the October 10 Press Release. Defs' Mem. at 22-24. But defendants ignore the fact materialization of the risk they failed to disclose had already caused Chesapeake's stock price to drop ***before*** the press release. *See supra* §II.B.3.b; *In re Charles Schwab Corp. Sec. Litig.*, 257 F.R.D. 534, 547 (N.D. Cal. 2009) (loss causation exists where concealed or omitted risk materializes and diminishes the market value of the security) (citing *Lentell*, 396 F.3d at 173, 177). The 70% decline in the Company's stock price immediately before the press release was directly attributable to McClendon's inability to meet margin calls – the risk that defendants failed to disclose.[11] Furthermore, plaintiff clearly asserts that the omitted facts were revealed to the market throughout late 2008 and early 2009. ¶55. (Undisclosed risks were "laid out in a single press release" and were "fully

---

[11]    Defendants' claim that price drops prior to disclosures may not be held against defendants does not apply here. Defs' Mem at 22. Although "[i]t is generally the case that declines in the value of shares prior to the public disclosure of previously omitted information may not be charged to the defendant . . . this is not necessarily the case in situations, for example, where the negative undisclosed information leaks into the marketplace." *Levine*, 508 F. Supp. 2d at 273-74. Here, not only did the undisclosed information leak into the market prior to disclosure, but the actual risk that defendants failed to disclose occurred. Defendants' reliance on *Merrill Lynch*, 272 F. Supp. 2d at 254, *In re Britannia Bulk Holdings Inc. Sec. Litig.*, No. 08 Civ. 9554 (DLC), 2009 WL 3353045, at *14 (S.D.N.Y. Oct. 19, 2009), and *In re Dell Inc., Sec. Litig.*, 591 F. Supp. 2d 877, 906 (W.D. Tex. 2008), is unpersuasive as these cases did not involve the occurrence of a negative event prior to the disclosure of that event.

digested" by the market in a single day.)  The consequences of the risks defendants failed to disclose affected Chesapeake's stock price for months.  This is evident in the fact that the stock continued to trade at a depressed level, never recovering from its initial decline.[12]

### D.      Defendants Were "Sellers" Under §12(a)(2)

Defendants contend that plaintiff does not allege facts to support that Chesapeake and the individual defendants were "sellers" under §12(a)(2).  Defs' Mem. at 25.  Defendants seem to ignore the allegations of their substantial participation in all stages of the Offering.  Under §12(a)(2), the term seller is "not limited to those who pass title," but also includes the person who successfully solicits the purchase motivated "at least in part by a desire to serve his own financial interests or those of the securities owners."  *Pinter v. Dahl*, 486 U.S. 622, 643, 647 (1988); *Capri v. Murphy*, 856 F.2d 473, 478 (2d Cir. 1988).  As such, "solicitation" for purposes of this section includes both in-person solicitation and substantial involvement in the offering process.  *Capri*, 856 F.2d at 478; *In re Am. Bank Note Holographics Sec. Litig.*, 93 F. Supp. 2d 424, 439 (S.D.N.Y. 2000).

As detailed in the Complaint, defendants were involved in all stages of the Offering, including hiring the underwriters, planning the Offering, and attending multi-city road shows

---

[12]     Defendants cite without any discussion *In re VeriSign, Inc., Derivative Litig.*, 531 F. Supp. 2d 1173, 1208 (N.D. Cal. 2007), *Masters v. GlaxoSmithKline*, 271 F. App'x 46, 51 (2d Cir. 2008), and *In re Cybershop.com Sec. Litig.*, 189 F. Supp. 2d 214, 233 (D.N.J. 2002).  These cases do not support defendants' argument.  Not one of the cases involves claims arising under §11.  Further, in *VeriSign*, the plaintiff did not allege any disclosure of the concealed information (options backdating).  531 F. Supp. 2d at 1208.  Similarly in *Masters*, the plaintiff failed to allege any disclosures resulting in stock price drops.  271 F. App'x at 51.

during which they would meet with potential investors and present highly favorable information about Chesapeake. ¶¶22, 23, 24. Moreover, each of the individual defendants signed the Registration Statement. ¶¶7-16. Defendants do not dispute any of these allegations (nor can they).

Given the foregoing, it is plain that the Complaint sufficiently pleads defendants "solicited" the purchase of securities in the Offering. *See, e.g.*, *Am. Bank Note*, 93 F. Supp. 2d at 439; *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 352 F. Supp. 2d 429, 454 (S.D.N.Y. 2005); *In re Proxima Corp. Sec. Litig.*, No. 93-1139-IEG (LSP), 1994 U.S. Dist. LEXIS 21443, at *5 (S.D. Cal. May 4, 1994); *In re Indep. Energy Holdings PLC Sec. Litig.*, 154 F. Supp. 2d 741, 761-62 (S.D.N.Y. 2001). Defendants are "sellers" under §12(a)(2).

## III.    Conclusion

For all the reasons stated herein, the Motion lacks merit and should be denied. In the event that the Court finds that any of the Counts of the Complaint fail to state a claim, plaintiff requests and should be granted leave to file an amended complaint pursuant to Federal Rule of Civil Procedure 15(a). As the Rule indicates, a "court should freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a).

DATED: February 4, 2010                    Respectfully submitted,

                                           COUGHLIN STOIA GELLER
                                            RUDMAN & ROBBINS LLP
                                           JAMES I. JACONETTE
                                           FRANCIS A. DiGIACCO


                                           _____
                                              s/ JAMES I. JACONETTE
                                              JAMES I. JACONETTE

655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
SAMUEL H. RUDMAN
DAVID A. ROSENFELD
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)

COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
RANDI D. BANDMAN
52 Duane Street, 7th Floor
New York, NY  10007
Telephone:  212/693-1058
212/693-7423 (fax)

LYTLE, SOULÉ & CURLEE, P.C.
MICHAEL C. FELTY
MICHAEL A. BETTS
119 North Robinson, Suite 1200
Oklahoma City, OK  73102
Telephone:  405/235-7471
405/232-3852 (fax)

Lead Counsel for Plaintiffs

SCHWARZWALD McNAIR & FUSCO LLP
EBEN O. McNAIR IV
616 Penton Media Building
1300 East Ninth Street
Cleveland, OH  44114-1503
Telephone:  216/566-1600
216/566-1814 (fax)

Additional Counsel for Plaintiff

- 26 -

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 4, 2010, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on February 4, 2010.

s/ JAMES I. JACONETTE
JAMES I. JACONETTE

COUGHLIN STOIA GELLER
        RUDMAN & ROBBINS LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-3301
Telephone:  619/231-1058
619/231-7423 (fax)
E-mail:        jamesj@csgrr.com

# Mailing Information for a Case 5:09-cv-01114-D

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Hissan Ahsan Bajwa**
  hissanbajwa@paulhastings.com

- **Lily I Becker**
  lbecker@orrick.com,rrivera@orrick.com,gjohnson@orrick.com

- **Michael A Betts**
  betts@lytlesoule.com,mjones@lytlesoule.com

- **Francis A DiGiacco**
  fdigiacco@csgrr.com

- **Michael C Felty**
  felty@lytlesoule.com,weis@lytlesoule.com

- **E Joseph Giometti**
  jgiometti@orrick.com

- **Daniel Bruce Goldman**
  dangoldman@paulhastings.com

- **James I Jaconette**
  jamesj@csgrr.com,karenc@csgrr.com,e_file_sd@csgrr.com

- **David S Keenan**
  dkeenan@orrick.com

- **Drew Neville , Jr**
  dneville@hartzoglaw.com,gbrown@hartzoglaw.com

- **Reagan Therese Roth**
  reaganroth@paulhastings.com

- **M Todd Scott**
  tscott@orrick.com,elee@orrick.com

- **Robert P Varian**
  rvarian@orrick.com,bclarke@orrick.com

- **James R Webb**
  jim.webb@mcafeetaft.com,karen.hill@mcafeetaft.com

- **Ryan S Wilson**
  RWilson@hartzoglaw.com,swatts@hartzoglaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

**Randi Dawn Bandman**
,

**Mary Katherine Blasy**
,

**Jack Gerald Fruchter**
,

**Christopher J Keller**
,

**Mark Peter Kindall**
,

**David Avi Rosenfeld**
,

**Samuel Howard Rudman**
,

**Barry G Sher**
,