UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| UNITED FOOD AND COMMERCIAL WORKERS UNION, Individually and On Behalf of All Others Similarly Situated,<br><br>    Plaintiff,<br><br>    -against-<br><br>CHESAPEAKE ENERGY CORPORATION, AUBREY K. MCCLENDON, MARCUS C. ROWLAND, MICHAEL A. JOHNSON, RICHARD K. DAVIDSON, FRANK A. KEATING, BREENE M. KERR, CHARLES T. MAXWELL, MERRILL A. MILLER, JR., DONALD L. NICKLES, FREDERICK B. WHITTEMORE, UBS INVESTMENT BANK, ABN AMRO, BANC OF AMERICA SECURITIES LLC and WELLS FARGO SECURITIES,<br><br>    Defendants. | **Civil Action No. 5:09-cv-01114-D**<br><br>**CLASS ACTION**<br><br>**CHESAPEAKE ENERGY AND INDIVIDUAL DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS AMENDED COMPLAINT** |

## TABLE OF CONTENTS

|  |  | Page |
|---|---|---|
| INTRODUCTION | | 1 |
| I. | THE PURPORTED OMISSION REGARDING MR. MCCLENDON'S MARGINED STOCK IS NOT ACTIONABLE AS A MATTER OF LAW | 1 |
| II. | KNOCKOUT HEDGES WERE FULLY DISCLOSED TO INVESTORS AND WERE NOT MATERIAL IN ANY EVENT | 3 |
| III. | THE PURPORTED OMISSION REGARDING LEHMAN IS NOT ACTIONABLE AS A MATTER OF LAW | 5 |
| | A. Chesapeake Could Not Have Known on July 9, 2008 That Lehman Would Go Bankrupt in Mid-September | 5 |
| | B. On July 9, 2008 Chesapeake Did Not "Expect" That A Lehman Bankruptcy Would Have A Material Effect On Its Performance | 6 |
| IV. | THE ABSENCE OF LOSS CAUSATION IS DEMONSTRATED ON THE FACE OF THE COMPLAINT | 8 |
| V. | DEFENDANTS WERE NOT SELLERS UNDER SECTION 12(A)(2) | 9 |
| CONCLUSION | | 10 |

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Amarosa v. Ernst & Young LLP*,
    --- F. Supp. 2d -- 2009 WL 4434943 (S.D.N.Y. Nov. 30, 2009) ........................................ 8

*Ashcroft v. Iqbal*,
    129 S. Ct. 1937 (2009) ................................................................................................ 1, 6, 7

*Bauchman for Bauchman v. W. High Sch.*,
    132 F.3d 542 (10th Cir. 1997) ......................................................................................... 4, 9

*Craftmatic Sec. Litig. v. Kraftsow*,
    890 F.2d 628 (3d Cir. 1989) ............................................................................................... 10

*Grossman v. Novell, Inc.*,
    120 F.3d 1112 (10th Cir. 1997) ............................................................................................ 5

*Merrill Lynch & Co. Research Reports Sec. Litig.*,
    272 F. Supp. 2d 243 (S.D.N.Y. 2003) ................................................................................. 8

*Moore v. Kayport Package Express, Inc.*,
    885 F.2d 531 (9th Cir. 1989) ............................................................................................. 10

*Pinter v. Dahl*,
    486 U.S. 622 (1988) ............................................................................................................ 9

*S. Cherry Street, LLC v. Hennessee Group LLC*,
    573 F.3d 98 (2d Cir. 2009) .................................................................................................. 6

*Shaw v. Digital Equip. Corp.*,
    82 F.3d 1194 (lst Cir. 1996) .............................................................................................. 10

*In re Sonus Networks, Inc. Sec. Litig.*,
    No. Civ. A. 04-10294, 2006 WL 1308165 (D. Mass May 10, 2006) ................................ 10

*In re Stratosphere Corp. Sec. Litig.*,
    1 F. Supp. 2d 1096 (D. Nev. 1998) ................................................................................... 10

*In re Washington Mutual, Inc. Sec., Derivative & ERISA Litig.*,
    259 F.R.D. 490 (W.D. Wash. 2009) ................................................................................... 8

*Wilson v. Saintine Exploration & Drilling Corp.*,
    872 F.2d 1124 (2d Cir. 1989) ............................................................................................ 10

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

**Statutes**

15 U.S.C. § 77k(e)(3) ..................................................................................................... 9

**Rules**

17 C.F.R. § 229.303(a)(3)(ii) .......................................................................................... 5

**INTRODUCTION**

Plaintiff's Opposition (the "Opposition") to Motion to Dismiss (the "MTD") underscores the many reasons that the Complaint should be dismissed with prejudice. It ignores many of the decisive points and controlling case law cited in the MTD, and proceeds as if the greatest financial meltdown since the Great Depression simply did not exist. It also ignores -- and indeed attempts to rewrite -- several of the core allegations of the Complaint, a tactic that further highlights plaintiff's inability to avoid dismissal.

The reasons for these evasive maneuvers are readily apparent. The Complaint's claims are based on the 20/20 vision of hindsight, not the circumstances and information that existed at the time of the July 9, 2008 Offering as required by the Securities Act. Plaintiff is unable to identify a single statement that was either false or misleading at the time of the Offering and none of the purported "omissions" relied upon in the Complaint was material before, or even after, the collapse of the financial markets.

Equally important, the Complaint lacks any of the requisite factual allegations to make plaintiff's claims plausible, as required by *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009). Lacking factual allegations to substantiate plaintiff's claims, the Complaint is built on the premise that Chesapeake "must have known" then-unknowable facts. But such conclusory retrospective assertions are not entitled to the assumption of truth, do not "actively" suggest that defendants violated the law and thus cannot "provide the framework of a complaint." *Id.* at 1950-51.

**I.  THE PURPORTED OMISSION REGARDING MR. MCCLENDON'S MARGINED STOCK IS NOT ACTIONABLE AS A MATTER OF LAW**

The Opposition cannot point to a single statement that might have been rendered materially misleading by virtue of the "omission" of information regarding Mr. McClendon's personal finances. Nor does the Complaint attempt to plead that any such information was required to be disclosed under Item 303 of Regulation S-K. (Any such effort would be wholly unavailing, both because Item 303 addresses the operations of the issuer, not the personal finances of officers or directors, and at the time of the Offering there was no "known trend" that

might implicate Mr. McClendon's personal finances in any event.) The claim must be dismissed for those reasons alone. See MTD at 7.

Although further discussion is unnecessary, it is equally clear: (1) that companies are not required to monitor or disclose personal financial information regarding CEOs or founders;[1] and (2) that at the time of the Offering there was no reason to expect <u>either</u> a massive economic meltdown, or that McClendon would be unable to satisfy margin calls if such a catastrophe occurred. See MTD at 11-12. Chesapeake's stock price had been steadily rising in an economy that was thriving. Far from exhibiting liquidity constraints, Mr. McClendon had the cash to purchase $57 million shares of stock in the July 9, 2008 Offering. Plaintiff's "claims" are transparently based on the intervention of unforeseen cataclysms that shook the global economy to its core. Under settled law, disclosures can only be evaluated as of the date of the Offering. See MTD at 9-10.

The fact that Mr. McClendon's personal finances were immaterial at the time of the Offering is decisive, but, even <u>after</u> the meltdown, Chesapeake's stock price did not decline when the Company announced that the margined shares had actually been sold. The forced sales of McClendon's stock in October 2008 could not have had a significant impact on Chesapeake's stock price,[2] but the issue is the impact of information disclosed to the market -- not speculation about the effects of individual trades on Chesapeake's stock price. When the market learned for the first time of information far more negative than anything that could possibly have been disclosed at the time of the Offering (i.e., that severe price declines had triggered margin sales), the price went up. MTD at 22-24.

---

[1] Mr. McClendon's personal finances were not material to the operations of the Company, and the Opposition's attempt to distinguish the Martha Stewart and Donald Trump cases (p. 10) goes nowhere. Both cases stand for the cited proposition, and in Mr. Trump's case his personal financial condition arguably was material to the operation of the enterprise because he had personally guaranteed a major loan made to the company.

[2] October 9, 2008, the second day of Mr. McClendon's forced sales was, at the time, the third largest single day decrease in the history of the Dow Jones Industrial Average. See http://online.wsj.com/mdc/public/page/2_3047-djia_alltime.html). October 10, 2008, the third day of his forced sales, is the highest volume trading day in New York Stock Exchange history and October 8 and 9, 2008, were then the sixth and eighth largest volumes in history. See http://online.wsj.com/mdc/public/page/2_3047-nyse_volume.html.

The Opposition calls defendants' arguments on these fundamental points "nonsense" (p. 9), because "[i]t would have taken minutes for defendants to conduct diligence beyond public facts in order to disclose McClendon's liquidity or other factors relevant to his ability to meet margin calls." *Id.* That assertion further underscores plaintiff's inability to deal with the facts and law that require dismissal of the Complaint. Due diligence is an affirmative defense that comes into play only if there is a material misstatement, and there is no material misstatement alleged here.

It does not matter that it allegedly would have "taken minutes" to conduct diligence into Mr. McClendon's liquidity and personal finances. As a matter of law, there was no duty to make any disclosure in those areas, and the Registration Statement contained no statement that could possibly be considered materially misleading by virtue of the "omission" of such information. Similarly, the assertion that it would have been easy to investigate unspecified "other factors relevant to his ability to meet margin calls" is meaningless unless it was necessary to disclose such "factors" at the time of the Offering. On July 9, 2008 there was no reason to believe that Mr. McClendon's personal finances were important, or to analyze his ability to meet margin calls across a spectrum of improbable hypothetical scenarios. (It would not have taken long to conduct diligence regarding the possible consequences of a meteor hitting one of Chesapeake's natural gas plays, but that does not mean that there was a duty to include such disclosures in the Registration Statement.)

## II. KNOCKOUT HEDGES WERE FULLY DISCLOSED TO INVESTORS AND WERE NOT MATERIAL IN ANY EVENT

Plaintiff's about-face on disclosures regarding knockout provisions in Chesapeake's natural gas hedges is both remarkable and revealing. The Complaint unequivocally alleges that Chesapeake failed to disclose the existence of knockout provisions in its hedging contracts, and based plaintiff's "claim" squarely on that supposed omission. It states: (1) that "the Registration Statement did not disclose a key component of the Company's hedging contracts" (¶ 52); (2) that "the Registration Statement did not disclose that many of the Company's hedging agreements

contained a 'kick-out' provision" (*id.*); (3) that Chesapeake had "a duty to disclose the facts about the 'kick-out' provisions" (*id.*); (4) that the "fact that a significant portion of Chesapeake's hedging contracts <u>contained 'kick-out' provisions</u> was a material fact" (¶ 53); and (5) that Chesapeake "admitted" that "a portion of the Company's hedging positions <u>contain provisions</u> that limit counter party exposure through 'kicked-out' price levels" (¶ 54).  (Emphasis added.)

Defendants pointed out that knockout provisions were disclosed and described in minute detail in the Registration Statement.  MTD at 13-14.  Rather than acknowledging that the allegations of the Complaint are baseless, plaintiff levels yet another unfounded accusation, claiming that "defendants mischaracterize the Complaint as alleging defendants did not disclose Chesapeake's contracts containing knockout hedges."  Opp. at 13.

Complaints must be evaluated on the allegations they contain, not on the basis of revisionist history served up in a subsequent brief.  *See, e.g.*, *Bauchman for Bauchman v. W. High Sch.*, 132 F.3d 542, 550 (10th Cir. 1997).  That is the beginning and the end of the relevant analysis.  Moreover, plaintiff's attempt to rewrite the Complaint would fail miserably even if it were permitted.

No statement regarding knockout hedges was, or is alleged to have been, false or misleading.  Nor were the knockout provisions material to Chesapeake <u>either</u> at the time of the Offering <u>or</u> thereafter.  See MTD at 15; RJN Ex. L at 10, 62.  On that basis alone, the Complaint fails to state a claim under the Securities Act.

Moreover, as Chesapeake disclosed, hedging contracts, including knockout provisions, are subject to ongoing restructuring, and were in fact restructured as natural gas prices declined.  See MTD at 15; RJN Ex. L at 10, 62.  Furthermore, Chesapeake's disclosures regarding such hedges were labeled "forward-looking" and were accompanied by pointed cautionary language,[3]

---

[3] For example, under the heading "Forward-Looking Statements," Chesapeake explained in relevant part that "[t]his report includes 'forward-looking' statements," and further that "[s]tatements concerning the fair values of derivative contracts and their estimated contribution to our future results of operations are based upon market information as of a specific date," and "[t]hese market prices are subject to significant volatility."  Then, among the "risk-factors" Chesapeake listed were "the volatility of natural gas and oil prices," and "lower prices realized on natural gas and oil sales and collateral required to secure hedging liabilities resulting from our commodity price risk management activities."  RJN Ex. K at 34.

and the Registration Statement specifically stated that the disclosures regarding hedging positions "speak only as of the date of this report, and we undertake no obligation to update this information." RJN Ex. K at 34. *See, e.g.*, *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1120 (10th Cir. 1997).

### III.   THE PURPORTED OMISSION REGARDING LEHMAN IS NOT ACTIONABLE AS A MATTER OF LAW

The Complaint does not claim that the Registration Statement contained any statement regarding Lehman Brothers that was false or materially misleading, and, true to form, relies on hindsight to advance a fatally defective "claim." Ignoring the fact that Lehman was merely one of a diversified group of nineteen hedging counterparties, the Complaint (¶ 38) asserts that Chesapeake was obligated by Item 303 of SEC Regulation S-K to disclose that Lehman was the "counterparty for a material amount of the Company's hedging contracts and that should Lehman not be able to perform, the Company could suffer losses of as much as $50 million."

Item 303 has no application -- even to Lehman Brothers alone -- unless plaintiff can show that, at the time of the Offering: (1) Chesapeake "knew" that Lehman was trending towards bankruptcy, and (2) "expected" that trend to have a material impact on its financial performance. 17 C.F.R. § 229.303(a)(3)(ii) (emphasis added). As the MTD demonstrated in detail, the Complaint cannot allege facts to support either element, and further fails because the Company's exposure to Lehman was plainly not material at the time of the Offering, or even after Lehman went bankrupt. MTD at 15-19.

### A.   Chesapeake Could Not Have Known on July 9, 2008 That Lehman Would Go Bankrupt in Mid-September

It is abundantly clear, from the face of the Complaint, from the articles it cites[4] and otherwise, that at the time of the Offering no one -- least of all Chesapeake -- expected Lehman

---

[4] Although plaintiff's argument hangs on public information, it has asked the Court to ignore the news articles, press releases, and public facts that Defendants cite as proof that Lehman's bankruptcy was not inevitable in July 2008. Opp. at 17-18 (asserting that the newspaper articles contain facts "not discussed or relied upon in the Complaint").

Brothers to go bankrupt. Indeed, the demise of that Wall Street icon shocked the market when it occurred more than two months later. The Complaint (¶ 30) itself alleges that Chesapeake selected Lehman Brothers and UBS to act as joint book-running managers on the Offering, and Lehman's lead role vis a vis UBS is reflected by its listing to the left of UBS on the face of the Prospectus Supplement. See RJN Ex. A. The notion that Chesapeake selected a lead underwriter on a major securities offering "knowing" that it was in financial peril is self-refuting.

Importantly, the Complaint pleads no facts to support <u>either</u> the assertion that on July 9, 2008 Chesapeake knew that Lehman would file for bankruptcy in September 2008, or that a Lehman bankruptcy would have a material impact on Chesapeake if it occurred. Nor <u>can</u> plaintiff possibly do so. At the time of the Offering, Lehman's counter-party credit rating by independent third parties had been reaffirmed, and it had just raised $6 billion in the capital markets. See MTD at 16-18. See Compl. ¶ 42; RJN Exs. N. at 1, A at 1.

Plaintiff's request that the Court nevertheless accept the Complaint's conclusory assertions that Lehman's bankruptcy was an inevitable and known fact at the time of the Offering (Opp. at 17-18) does not come close to passing muster under *Twombly* or *Iqbal*. Those cases require plaintiffs to plead facts, not conclusions, demonstrating that a claim is plausible. See MTD at 9-10. *See, e.g.*, *S. Cherry Street, LLC v. Hennessee Group LLC,* 573 F.3d 98, 110 (2d Cir. 2009) ("'Determining whether a complaint states a plausible claim for relief will . . . be a context specific task that requires the reviewing court to draw on its judicial experience and common sense.'") (quoting *Iqbal*, 129 S.Ct. at 1950 (alteration in original)).

### B.   On July 9, 2008 Chesapeake Did Not "Expect" That A Lehman Bankruptcy Would Have A Material Effect On Its Performance

No facts alleged in the Complaint show -- or could possibly show -- that on July 9, 2008, Chesapeake expected either that Lehman would fail, or that a Lehman failure would have a material effect on the Company. To the contrary: judicially noticeable facts establish that (1) at the time of the July 2008 Offering, Lehman was one of a diversified group of nineteen hedging parties, and (2) Chesapeake maintained this diversified group of counterparties for the express

purpose of ensuring that the failure of any one counterparty would not have a material effect on the Company. See MTD at 18; RJN Ex. E. at 3.

Moreover, in July of 2008 Chesapeake's hedging positions might well have benefited from a Lehman bankruptcy. Gas prices had been rising for over a year. See MTD at 18; RJN Ex. A at S-13; RJN Ex. C at 9. Because Chesapeake's hedging contracts contemplated the sale of natural gas at prices that were lower than the then market price, at the time of the Offering the Company had substantial unrealized losses (i.e., it "owed" money) on its hedges, and that situation might worsen if prices continued to rise. See RJN Ex. A at S-13. A Lehman bankruptcy was an event of default that would have permitted Chesapeake to cancel the then-unprofitable transactions with Lehman. See RJN Ex. L at 13. While the Opposition is correct that "only a few months after the Offering . . . natural gas prices dropped to the same [low] price they had been at less than a year before" (Opp. at 18), the relevant inquiry under Item 303 is Chesapeake's expectations at the time of the Offering.

Nor did Lehman's failure ultimately have a material effect.[5] As the Company disclosed in its November 10, 2008 10-Q, "[t]he potential loss associated with the termination" of the Company's hedging transactions with Lehman "[was] not material." Indeed, the actual loss sustained by Chesapeake in connection with Lehman's default was less than $15 million (RJN Ex. L at 47), or substantially less than 1% of revenues and assets. See MTD at 19.[6]

These judicially noticeable facts are further buttressed by the reality that after the (much

---

[5] Plaintiff attempts to place the burden on defendants to show that the Lehman hedges were not material. See Opp. at 19 ("defendants fail to meet their exceptional burden"). The burden to show materiality, however, is plaintiff's, and absent any plausible facts to make that showing, its claims must be dismissed. *See Iqbal*, 129 S.Ct. at 1949 (a complaint fails "if it tenders 'naked assertions' devoid of further 'factual enhancement'") (*citing Twombly* at 557).

[6] The Opposition stretches a long way in a retrospective attempt to make Chesapeake's ultimate exposure in the Lehman bankruptcy appear material. First, plaintiff discusses materiality in the context of the $50 million outer-limit "potential" loss due to Lehman's failure, notwithstanding that actual loss on the Lehman contracts were only $15 million. *See* MTD at 19; RJN Ex. L at 47.

Second, plaintiff compares the outer-limit potential loss of $50 million to the total fair value of two separate categories of derivative instruments -- short-term and long-term. This ignores the fact that the Lehman contracts were a mix of both short-term and long-term derivative instruments. Plaintiff is miscalculating the percentages by comparing the outer limit of potential loss separately to the short-term and long-term pools instead of the combined total.

higher) <u>potential</u> exposure to Lehman was disclosed to the market on October 10, 2008, Chesapeake's stock <u>increased</u> in subsequent trading, yet one more dispositive consideration that can only yield the inference that Chesapeake's exposure to Lehman was immaterial. *See Amarosa v. Ernst & Young LLP*, --- F. Supp. 2d ---, 2009 WL 4434943, at *20 (S.D.N.Y. Nov. 30, 2009).

## IV. THE ABSENCE OF LOSS CAUSATION IS DEMONSTRATED ON THE FACE OF THE COMPLAINT

As with so much else in the Opposition, plaintiff has attempted to rewrite the Complaint and revise its theory of how Chesapeake's alleged misstatements or omissions caused its purported losses. The Complaint itself -- i.e., the document that counts -- alleges that the Company's October 10, 2008 disclosures regarding Mr. McClendon's margin sales (¶ 37), the hedging relationship with Lehman Brothers (¶ 51), and knockout hedges (¶ 54) had caused Chesapeake's stock price to drop. It alleges that "[d]uring late 2008 and early 2009," as these three purportedly "corrective" disclosures "were revealed to the market, the price of Chesapeake stock declined." Compl. ¶ 55.

The MTD demonstrated that 70% of decline occurred <u>prior</u> to the October 10, 2008 "corrective" disclosures. See MTD at 22; RJN Ex. C at 1. *See, e.g.*, *Merrill Lynch & Co. Research Reports Sec. Litig.*, 272 F. Supp. 2d 243, 254 (S.D.N.Y. 2003) ("price decline[s] before disclosure may not be charged to defendants") (citations omitted).[7] In other words, the drop was not caused by the "revelation" of some hidden truth, but by the global economic and gas price

---

[7] Plaintiff relies on *In re Washington Mutual, Inc. Securities, Derivative & ERISA Litigation*, 259 F.R.D. 490 (W.D. Wash. 2009) to argue that it is not required to show that Chesapeake's alleged conduct was the "***only*** cause of the stock decline in order to plead its claim." Opp. at 22. But Plaintiff misses the point. The question is not whether the challenged disclosures were one of multiple factors that caused the decline in Chesapeake's stock. The question is whether the disclosures -- all three of which came <u>after</u> the cited decline in stock price -- could have caused the decline <u>at all</u>. In contrast to the facts in *Washington Mut.*, where "[n]o single disclosure laid bare" the alleged misstatements and omissions, 259 F.R.D. at 507, plaintiff here alleges that the Registration Statement contained misstatements and omissions, that these misstatements and omissions were revealed for the first time on October 10, and that as result of these disclosures, plaintiff and any class suffered substantial damages. Compl. ¶ 55. The losses Plaintiff claims pre-date these alleged disclosures. Such a disconnect does indeed "foreclose the possibility that the alleged disclosures had an impact." *Washington Mut.*, 259 F.R.D. at 508; *see also Merrill Lynch & Co. Research Reports*, 272 F. Supp. 2d at 254 (dismissing Section 11 claim because "price decline[s] before disclosure may not be charged to defendants") (citations omitted).

collapse that affected the market as a whole. See MTD at 20-21.[8] This fact, along with the <u>increase</u> in Chesapeake's stock price following the October 10, 2008 disclosures (*id.* at 22), affirmatively establishes an <u>absence</u> of loss causation that is independently fatal to plaintiff's claims. *Id.*; *see* 15 U.S.C. § 77k(e)(3).

The Opposition's only response (at 23, n.11) is to turn its back on the Complaint and assert that the "undisclosed information" had previously "leak[ed] into the market" and resulted in a "materialization of the risk" that "caused Chesapeake's stock price to drop ***before*** the press release." Plaintiff's revisionist effort fails for the simple reason that the Complaint, not the Opposition, is controlling. *See, e.g.*, *Bauchman*, 132 F.3d at 550. That cuts off plaintiff's new tack at the threshold and as a matter of law.

Moreover, the unpled "leakage" theory is absurd (not merely implausible) on its face. The knockout hedges were fully disclosed from the outset. The forced sales of Mr. McClendon's stock did not occur until October 2008. The financial collapse that brought down Lehman and reversed trends in natural gas pricing did not occur until well after the Offering. Information on these topics plainly could not have "leaked out" before it existed. Conversely, on July 9, 2008 there was no disclosable "risk" that could later have "materialized."

## V. DEFENDANTS WERE NOT SELLERS UNDER SECTION 12(A)(2)

Plaintiff incorrectly asserts that Chesapeake and the defendants are "sellers" under Section 12(a)(2) because they engaged in the standard offering activities. The Supreme Court has held that for a defendant to be held liable he or she must pass title directly to the purchaser, or personally solicit the immediate purchase made by plaintiff. *Pinter v. Dahl*, 486 U.S. 622, 643 n.21 (1988) (a defendant is liable only to the "buyer's immediate seller . . . a buyer cannot recover against his seller's seller").

The Opposition nevertheless argues that 12(a)(2) liability extends to those who had "substantial participation" in the Offer. Opp. at 24. *Pinter* <u>explicitly rejects</u> that proposition, and

---

[8] The decline in Chesapeake's stock price corresponds almost exactly to the decline in natural gas prices prior to October 10, 2008. See MTD at 21.

makes clear that "substantial participation" in the sales process does not convert someone who did not pass title into a "seller." See 486 U.S. at 651. Rather, the "purchaser must demonstrate direct and active participation in the solicitation of the immediate sale" for liability to attach. *Craftmatic Sec. Litig. v. Kraftsow*, 890 F.2d 628, 636 (3d Cir. 1989) (emphasis added). Performance of services in connection with the offering itself -- rather than individual solicitation of the immediate sale -- does not bring a defendant within the definition of a seller. *Id.*; *see also Moore v. Kayport Package Express, Inc.*, 885 F.2d 531, 537 (9th Cir. 1989); *Wilson v. Saintine Exploration & Drilling Corp.*, 872 F.2d 1124 (2d Cir. 1989).[9]

Here, the Complaint merely alleges that the defendants performed the ordinary services that are routinely provided in all offerings, including hiring underwriters, planning the Offering, conducting virtual road shows, and signing the Registration Statement. *See, e.g.*, Compl. ¶¶ 22-24. This is the sort of "substantial participation in all stages of the Offering" (Opp. at 24) specifically held to be outside of 12(a)(2) "seller" liability. *Craftmatic*, 890 F.2d at 636.

## CONCLUSION

Because the defects in the Complaint are beyond repair, it should be dismissed with prejudice.

---

[9] *See also Shaw v. Digital Equip. Corp.,* 82 F.3d 1194, 1216 (lst Cir. 1996) (dismissing 12(a)(2) complaint, finding that "sparse" allegations that defendants were "involve[d] in preparing the Registration statement, prospectus, and other activities necessary to effect the sale of the securities to the investing public" do not show solicitation (internal quotation marks omitted); *In re Sonus Networks, Inc. Sec. Litig.*, No. Civ. A. 04-10294, 2006 WL 1308165, at *10 (D. Mass May 10, 2006) (finding allegations that defendants assisted in "drafting, producing, revising, reviewing, approving and/or executing" documents insufficient to establish seller status); *In re Stratosphere Corp. Sec. Litig.*, 1 F. Supp. 2d 1096 (D. Nev. 1998) (holding that mere involvement in the preparation of a Registration statement is insufficient to state a claim under Section 12).

March 15, 2010                    Respectfully submitted,

                                              Orrick, Herrington & Sutcliffe LLP

                                              By:   */s/ Robert P. Varian*

                                                  Robert P. Varian
                                                  M. Todd Scott
                                                  Joseph Giometti
                                                  Lily Becker
                                                  David S. Keenan
                                                  The Orrick Building
                                                  405 Howard Street
                                                  San Francisco, CA  94105-2669
                                                  (415)773-5700
                                                  (415)773-5759
                                                  rvarian@orrick.com
*Attorneys for Defendants*

                                              *Chesapeake Energy Corporation, Aubrey K. McClendon, Marcus C. Rowland, Michael A. Johnson, Richard K. Davidson, Frank A. Keating, Breene M. Kerr, Charles T. Maxwell, Merrill A. Miller, Jr., Donald L. Nickles, Frederick B. Whittemore*

# CERTIFICATE OF SERVICE

I hereby certify that on March 15, 2010, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed March 15, 2010 at San Francisco, California.

                                                      */s/ Robert P. Varian*
                                                      Robert P. Varian,
                                                      Admitted *Pro Hac Vice*

                                                      ORRICK, HERRINGTON & SUTCLIFFE LLP
                                                      The Orrick Building
                                                      405 Howard Street
                                                      San Francisco, CA 94105-2669
                                                      Telephone: (415)773-5700
                                                      Facsimile: (415)773-5759
                                                      Email: tscott@orrick.com

                                                      *Attorneys for Defendants Chesapeake Energy Corporation, Aubrey K. McClendon, Marcus C. Rowland, Michael A. Johnson, Richard K. Davidson, Frank A. Keating, Breen M. Kerr, Charles T. Maxwell, Merrill A. Miller, Jr., Donald L. Nickles, and Frederick B. Whittemore*

## Mailing Information for Case 5:09-cv-01114-D
**Electronic Mail Notice List**
The following are those who are currently on the list to receive e-mail notices for this case.

**_ Hissan Ahsan Bajwa**
hissanbajwa@paulhastings.com

**_ Lily I Becker**
lbecker@orrick.com,rrivera@orrick.com,gjohnson@orrick.com

**_ Michael A Betts**
betts@lytlesoule.com,mjones@lytlesoule.com

**_ Francis A DiGiacco**
fdigiacco@csgrr.com

**_ Michael C Felty**
felty@lytlesoule.com,weis@lytlesoule.com

**_ E Joseph Giometti**
jgiometti@orrick.com

**_ Daniel Bruce Goldman**
dangoldman@paulhastings.com

**_ James I Jaconette**
jamesj@csgrr.com,karenc@csgrr.com,e_file_sd@csgrr.com

**_ David S Keenan**
dkeenan@orrick.com

**_ Drew Neville , Jr**
dneville@hartzoglaw.com,gbrown@hartzoglaw.com

**_ Reagan Therese Roth**
reaganroth@paulhastings.com

**_ M Todd Scott**
tscott@orrick.com,elee@orrick.com

**_ Robert P Varian**

rvarian@orrick.com,bclarke@orrick.com

**_ James R Webb**
jim.webb@mcafeetaft.com,karen.hill@mcafeetaft.com

**_ Ryan S Wilson**
RWilson@hartzoglaw.com,swatts@hartzoglaw.com

### Manual Notice List

The following is the list of attorneys who are not on the list to receive e-mail notices for this case (who therefore require manual noticing).

Samuel H. Rudman
David A. Rosenfeld
Coughlin Stoia Geller Rudman & Robbins LLP
58 S Service Road, Suite 200
Melville, NY 11747

Mary Katherine Blasy
Scott & Scott LLP
600 B Street, Suite 1500
San Diego, CA 92101

Randi Dawn Bandman
Coughlin Stoia et al., LLP
52 Duane Street, 7th Floor
New York, NY 10007

Christopher J. Keller
Labaton Sucharow LLP
140 Broadway
New York, NY 10005

Mark Peter Kindall
Schatz & Nobel, PC
One Corporate Center
20 Church Street, Suite 1700
Hartford, CT 06103-3290

Jack G. Fruchter
Abraham, Fruchter & Twersky, LLP
One Pennsylvania Plaza, Suite 2805
New York, NY 10119