# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

UNITED FOOD AND COMMERCIAL            )
  WORKERS UNION, et al.,              )
                                         )
        Plaintiff,                 )
                                         )
vs.                                   )          No. CIV-09-1114-D
                                         )
CHESAPEAKE ENERGY CORPORATION,        )
  et al.,                             )
                                         )
        Defendants.                )

## ORDER

Before the Court is the motion [Doc. No. 106] of Plaintiff, Local 880 United Food and Commercial Workers International Union-Retail Food Employers Joint Pension Fund ("United Food" or "Lead Plaintiff"),[1] to certify this action as a class action, pursuant to Fed. R. Civ. P. 23. Defendants timely responded to the motion, and Lead Plaintiff filed a reply. On March 14, 2012, the Court conducted a hearing on the motion. Lead Plaintiff appeared by counsel, accompanied by Thomas H. Robertson, Lead Plaintiff's Chairman of the Board of Trustees. Defendants appeared by their counsel of record. Following the hearing, the Court directed the parties to submit proposed findings of fact and conclusions of law, and the parties timely filed those submissions.[2]

The Court has reviewed the parties' briefs and proposed findings of fact and conclusions of law, as well as the deposition designations and counter-designations submitted. In addition, the

---

[1]United Food was appointed Lead Plaintiff by the United States District Court for the Southern District of New York, where this action was initially filed.

[2]The Court granted Defendants' request to file its proposed findings and conclusions under seal. The Court has also granted the parties' requests to file numerous other submissions under seal, including briefs addressing the motion to certify, deposition designations, and counter-designations.

parties have filed a stipulation regarding class certification, in which they stipulate that certain Rule 23(a) class certification requirements are satisfied in this case. Having reviewed the foregoing material in light of the governing law and the arguments of counsel at the March 14 hearing, the Court finds and concludes as follows.

I. Background:

In the Amended Complaint, Lead Plaintiff alleges Defendants violated the Securities Act of 1933 in connection with a July 9, 2008 public offering of 25 million shares of Chesapeake Energy Corporation's ("Chesapeake") common stock (the "Offering"). Specifically, Lead Plaintiff alleges Defendants violated §§11 and 12(a)(2) of the Securities Act, 15 U. S. C. §§77k(a) and 77*l*(a)(2), by misstating and omitting from the registration statement and prospectus certain material facts, thereby rendering the statement misleading to potential investors. Lead Plaintiff also asserts a claim against Chesapeake Chief Executive Officer Aubrey K. McClendon ("McClendon") and nine other individuals, seeking to hold them liable for the misstatements and omissions based on their status as "control persons" under the provisions of § 15 of the Securities Act.

The factual allegations underlying Lead Plaintiff's claim that material facts were misstated and omitted are set out in the eighteen-page Amended Complaint. In summary, Lead Plaintiff generally identifies three categories of allegedly misstated and omitted material facts. First, it contends Defendants failed to properly disclose the "true risk and uncertainties" concerning the approximately 29 million shares of Chesapeake common stock held by McClendon, a substantial portion of which was held in margin accounts; Lead Plaintiff alleges Defendants failed to disclose that McClendon lacked the financial resources necessary to satisfy his margin loans. *See* Amended

Complaint, ¶¶ 34-37.  Second, Lead Plaintiff alleges Defendants failed to properly disclose that Lehman Brothers ("Lehman") was the "counterparty to a material portion of the contracts hedging Chesapeake's oil and natural gas production."  Lead Plaintiff contends the hedging contracts created a potential significant financial obligation for Lehman, and it was experiencing serious financial difficulties at the time of the July 9, 2008 offering, thus creating a risk that Lehman would be unable to perform its contractual obligations to Chesapeake.  Amended Complaint, ¶¶ 38-51.  Finally, Lead Plaintiff alleges Defendants failed to disclose that many of Chesapeake's hedging contracts contained a "kick-out" provision whereby the counterparty's exposure is eliminated if the price of natural gas falls below the price specified in the contract.  Lead Plaintiff contends that, although Defendants disclosed the existence of hedging contracts, they failed to include sufficient detail to permit investors to evaluate the possible risks associated with those contracts and the "kick-out" provisions.  Amended Complaint, ¶¶ 52-55.

Lead Plaintiff contends that the foregoing matters constitute material misrepresentations and/or omissions because the information was important to a potential investor's evaluation of the risks associated with the purchase of Chesapeake stock and the decision whether to purchase the same.  Lead Plaintiff further contends Defendants were aware of the facts and had a duty to disclose them.  As set out in the Amended Complaint, in October of 2008, McClendon was required to sell his Chesapeake stock because he was unable to satisfy margin calls.  Furthermore, Lehman's financial collapse rendered it unable to satisfy its hedging contract obligations to Chesapeake, thereby causing a decline in the value of Chesapeake's gas contracts and an ultimate decline in the value of its stock.  Additionally, Lead Plaintiff contends the kick-out provisions in other hedging

contracts resulted in Chesapeake receiving unfavorable gas prices, thereby contributing to the decline in the value of Chesapeake stock and causing damages to Lead Plaintiff and other prospective class members.

Defendants contend that they fully complied with all applicable statutory and regulatory disclosure requirements in connection with the 2008 Offering and related materials.  They further contend that Lead Plaintiff's claims are based on hindsight rather than on facts which were known or which reasonably could have been known by Defendants at the time of the offering.

In support of the motion to certify, Lead Plaintiff states that this action is proper for class certification because the Offering included 28.75 million shares of Chesapeake's common stock, which is publicly traded on the New York Stock Exchange and was purchased by numerous individuals and entities in many different states, potentially resulting in thousands of claimants. Lead Plaintiff contends it purchased stock pursuant to the Offering, that it did so in reliance on the alleged material misrepresentations and omissions in the registration statement, and that it suffered damages when its stock value later declined.   According to Lead Plaintiff, thousands of other potential class members relied on the same alleged misrepresentations and omissions in purchasing the stock, were also inured by the subsequent decline in the value of their stock, and thus incurred the same type of damages claimed by Lead Plaintiff.   As more fully set out herein, Lead Plaintiff also contends it will adequately represent the interests of the proposed class,[3] and its counsel, Robbins Geller Rudman & Dowd LLP  ("Robbins Geller"), is qualified to serve as class counsel.

---

[3]Initially, Lead Plaintiff also sought to designate Safron Capital Corporation ("Safron") as a class representative. However, on March 13, 2012, Lead Plaintiff filed a notice [Doc. No. 194] withdrawing Safron as a proposed class representative.

4

II.  The parties' stipulations:

A.  March 13, 2012 stipulations regarding class certification:

Pursuant to the stipulations filed herein on March 13, 2012 [Doc. No. 198] ("March 13 Stipulations"), the parties have stipulated as follows with regard to issues related to class certification:

1.  On August 1, 2011, Lead Plaintiff filed a Motion for Class Certification, asserting the requisite elements of Rule 23 are satisfied. Defendants thereafter filed an opposition and Lead Plaintiff filed a reply.

2.  There is no dispute between the parties that the proposed class satisfies the numerosity requirement of Fed. R. Civ. P. 23(a).

3.  There is no dispute between the parties that this action and the proposed class satisfy the commonality requirement of Fed. R. Civ. P. 23(a), except to the extent that the commonality requirement overlaps with the adequacy requirement Rule 23(a), which the Chesapeake Defendants contend has not been satisfied.[4]

4.  There is no dispute between the parties that the claims of the proposed class representatives satisfy the typicality requirement of Fed. R. Civ. P. 23(a), except to the extent that the typicality requirement overlaps with the adequacy requirement of Rule 23(a), which the

---

[4]The March 13 Stipulations include two footnotes in which Lead Plaintiff asserts objections to what it describes as Defendants' assertion of arguments not raised in their brief opposing the motion to certify or at the status conference regarding class certification issues. *See* March 13 Stipulations [Doc. No. 198] at n. 3, 4.  The Court has incorporated the March 13 Stipulations in this Order, but has omitted the footnotes because the objections do not alter the facts to which the parties stipulated, and the parties addressed all disputed certification issues in detail at the March 14 hearing. The argument asserted by Lead Plaintiff in the footnotes does not impact the Court's findings and conclusions regarding the propriety of certifying this case as a class action, and need not be addressed herein.

Chesapeake Defendants contend has not been satisfied.

5.   There is no dispute between the parties that this action satisfies the superiority requirement of Fed. R. Civ. P. 23(b)(3).

6.   These stipulations do not prejudice the parties from continuing to assert arguments regarding the other requirements of Fed. R. Civ. P.  23 for class certification and appointment of class representatives that are disputed in the parties' briefing.

B. The parties' 2011 stipulation:

On March 4, 2011, the parties filed a stipulation regarding claims arising under Sections 11 and 12 of the Securities Act [Doc. No. 94] ("2011 Stipulation").  Pursuant to the parties' joint request, the Court entered an Order [Doc. No. 111] approving the 2011 Stipulation.  The parties stipulated to the following:

1.   Persons and entities (including their assignees, heirs, or devisees) that purchased stock directly or indirectly in the July 2008 secondary offering of Chesapeake common stock (the "Offering") at $57.25 per share satisfy the "tracing" requirements of Section 11 of the Securities Act of 1933 ("Section 11").  Plaintiff is in the class of purchasers that satisfy the "tracing" requirements of Section 11.

2.   Persons and entities (including their assignees, heirs, or devisees) that can demonstrate by their records and/or records of the Underwriters, Lehman Brothers, or Chesapeake, that they purchased or received stock from persons or entities that purchased or were allocated shares in the Offering meet the tracing requirements of Section 11.

3.   Plaintiff and Defendants reserve all positions and arguments with respect to the definition

of a purchase in the Offering, and which persons and entities made purchases in the Offering.

4.   Persons and entities that purchased Chesapeake stock on the open market, and that are not included in Paragraphs 1 and 2 above, do not meet the tracing requirements of Section 11.

5.   This Stipulation is without prejudice to Plaintiff's right to assert that persons and entities meet the tracing requirements of Section 11 based on information that may be contained in documents produced by the Underwriters or Chesapeake in this action, or other persons or entities (or their assignees, heirs, or devisees).

6.   This Stipulation does not limit or otherwise affect claims asserted under Section 12 of the Securities Act of 1933.

III. Findings of fact:

In addition to the facts set forth in the March 13 Stipulations and the 2011 Stipulation, the Court finds the evidence establishes the following facts:

1.   Lead Plaintiff is a defined pension fund organized under the Taft-Hartley Act, established as a result of collective bargaining between various employers and the United Food and Commercial Workers Union. Lead Plaintiff has approximately 6,709 active participants, 5,403 inactive participants, and 3,718 active pensioners and beneficiaries. Declaration of Thomas H. Robertson in Support of Lead Plaintiff's Motion for Class Certification [Doc. No. 109] ("Robertson Decl.").

2.   Lead Plaintiff purchased 4,200 shares of Chesapeake at a price of $57.25 per share. Robertson Decl. ¶ 4.   The parties have stipulated that Lead Plaintiff purchased its shares in the Offering.  2011 Stipulation [Doc. No. 94] at ¶ 1.

3.   Prior to the transfer of this case, the Honorable Laura Taylor Swain of the United States

District Court for the Southern District of New York appointed United Food as Lead Plaintiff for all members of the proposed class and appointed Robbins Geller as Lead Counsel.   Order in Case 1:09-cv-1826-LTS (S.D.N.Y. May 28, 2009), a copy of which is included as Document No. 31 in the New York court's record transmitted to this Court upon the transfer of the case.  The New York court record is filed of record in this Court as Document No. 1.

4.   The evidence before the Court reflects that Lead Plaintiff has endeavored to become informed regarding the claims to be prosecuted in this action on behalf of the proposed class by regularly communicating with Lead Counsel, Robbins Geller, and by staying apprised of the ongoing developments in the case. Robertson Decl. [Doc. No. 109].

5.   The record in this case reflects that Lead Plaintiff has actively pursued its claims, including but not limited to its successful opposition to Defendants' motion to dismiss.  The parties have engaged in extensive discovery, and Lead Plaintiff has filed motions to compel discovery, including one motion that required a Court hearing.  All discovery issues have not been resolved, and Lead Plaintiff continues to vigorously pursue its discovery requests.

6.   Lead Plaintiff's representative, Mr. Robertson,  understands the nature of this litigation, including the facts alleged, the defendants, and the scope of the proposed class. Robertson October 13, 2011 deposition, submitted as Exhibit 1 to Jaconette Declaration in support of Lead Plaintiff's Reply [Doc. No. 150],  at 41:6-12;53:10-55:8, 58:1-10, 127:14-129:9; 150:14-20 ("Robertson Dep.").  Mr. Robertson's deposition testimony also reflects that Lead Plaintiff understands the requirements and responsibilities of serving as a class representative in a securities class action like this one.  According to Mr. Robertson, Lead Plaintiff intends to supervise and monitor the progress

of this litigation and to work with counsel to maximize the recovery to the proposed class, and vigorously prosecute the claims on behalf of the proposed class. Robertson Decl., ¶¶ 6, 9; Robertson Dep. at 47:19-48:23, 50:23-52:24, 125:14-127:13.

7.  According to Mr. Robertson, Lead Plaintiff does not make its own investment decisions, and relies on money managers to do so.  Robertson Dep., 79:6-14, 19-34; 107:23-108:14.  Robertson did not monitor Lead Plaintiff's investment in Chesapeake stock until United Food became involved in this lawsuit, and he did not see the Chesapeake registration statement for the Offering prior to the filing of this lawsuit.  *Id.* at 90:15-24; 106:25-107:10; 116:11-18; 93:11-24.

8.  Lead Plaintiff and Lead Counsel have an agreement in which Lead Counsel monitors Lead Plaintiff's investment portfolio in order to alert Lead Plaintiff to potential claims premised upon violations of the securities laws (the "Monitoring Agreement"). A copy of the Monitoring Agreement is submitted as Exhibit 22 to the Robertson Supplemental Deposition Transcript ("Robertson Supp. Dep."), attached as Exhibit 1 to Lead Plaintiff's Counter Designations of the Deposition of Thomas H. Robertson in Support of Its Motion for Class Certification [Doc. No. 207].   Pursuant to the Monitoring Agreement, Robbins Geller maintains a list of Lead Plaintiff's investments, and Robbins Geller advises Lead Plaintiff if it believes Lead Plaintiff should file a lawsuit or become involved in an existing lawsuit.  Robertson Dep., 42:13-43:21; 47:16-18; 96:5-10.   Robbins Geller does not receive payment or any fee in return for monitoring. Robertson Dep. at 141:10-14; Robertson Supp. Dep. 29:4-24; Robertson Supp. Dep. Ex. 22. The Monitoring Agreement was signed in July 2002, and Lead Plaintiff does not maintain such an agreement with other law firms.  Robertson Dep., 12:4-16.

9.  The Monitoring Agreement does not function as a retainer agreement or an agreement to initiate specific litigation, even litigation of those claims identified as a result of Lead Counsel's monitoring. Robertson Supp. Dep., 27:8-23; 47:3-9; 50:18-51:5; 112:4-6; 103:12-23; Robertson Supp. Dep. Ex. 22.   Once Lead Plaintiff is alerted to a potential claim by Robbins Geller, the Monitoring Agreement does not require Lead Plaintiff to pursue an action based on that claim. Robertson Supp. Dep. at 28:16-24; 112:11-16. If Lead Plaintiff decides to pursue such an action, the Monitoring Agreement does not require it to retain Robbins Geller to represent it in that action. Robertson Supp. Dep.  at 19:6-8; 50:21-51:1.  If it does so, however, Lead Plaintiff and Robbins Geller enter into a separate retainer agreement which provides that Robbins Geller will serve as class counsel or as individual counsel.  A separate retainer agreement was executed by Lead Plaintiff and Robbins Geller in this action, and a copy is submitted as Exhibit 25 to Mr. Robertson's supplemental deposition.  The retainer agreement authorizes Robbins Geller to hire or retain additional counsel if necessary. Robertson Supp. Dep. at 93:5-9; 102:2-15; Robertson Supp. Dep. Ex. 25. According to the agreement, the addition of counsel will not increase the fees the attorneys are paid.  Robertson Supp. Dep. at 100:3-101:12; Supp.Dep. Ex. 25.  The retainer agreement also requires the disclosure to Lead Plaintiff, in advance,  of the fee division between the attorneys, and Lead Plaintiff has the authority to approve or disapprove the division of such fees.  Robertson Supp. Dep.at 101:13-102:1; Robertson Supp. Dep. Ex. 25.

10.  Lead Plaintiff selected Robbins Geller as Lead Counsel based on Robbins Geller's success in obtaining significant recoveries in prior securities actions in which it has participated. Robertson Supp. Dep. at 113:7-20.  The firm resume of Robbins Geller reflects that it has been, or

currently serves as, lead counsel or co-lead counsel in many large securities class action lawsuits.

*See* firm resume of Robbins Geller, attached as Exhibit A to the Declaration of James I. Jaconette in Support of Lead Plaintiff's Motion for Class Certification [Doc. No. 108].  Lead Plaintiff has been involved in eleven securities class action lawsuits since 2002, and it was represented by Robbins Geller in each of those lawsuits.  Robertson Supp. Dep. Ex. 23.

11.  Lead Plaintiff is also represented by Eben O. McNair of Schwarzwald, McNair & Fusco LLP ("Schwarzwald McNair"), described by Mr. Robertson as "fund counsel."  Robertson Dep. 148:21-150:6.  Mr. McNair has served in that capacity for fifteen to twenty years, and Schwarzwald McNair has been co-counsel with Robbins Geller in at least six of Lead Plaintiff's prior securities class actions. Robertson Supp.Dep. Ex. 23. The record reflects Eben O. McNair and Schwarzwald McNair have not entered appearances in this lawsuit.  Schwarzwald McNair is not a securities litigation firm and does not have specialized knowledge in securities law.  Robertson Supp. Dep., 74:22-75:13.

12.  When the instant lawsuit was filed, Safron Capital ("Safron") was named as a plaintiff; Safron's owner and sole shareholder is Rina Rollhaus ("Mrs. Rollhaus").  Mrs. Rollhaus has also been represented by Robbins Geller in securities class action cases brought by Safron or other corporations or entities which she owns.  In 1994, the Securities Exchange Commission ("SEC") charged Mrs. Rollhaus with violations of SEC regulations.  Declaration of Christin Hill in support of Defendants' opposition to class certification [Doc. No. 131], Ex. 2.  Lead Plaintiff does not dispute that Mrs. Rollhaus entered into a settlement with the SEC regarding these allegations.

13.  Mr. Robertson was generally familiar with Safron and its assertion of claims related to

the Offering, as well as its involvement in this lawsuit; he knew Mrs. Rollhaus was sole owner of Safron.  Robertson Supp. Dep. 79:16-81:13; 80:22-81:9.  He was not aware of Safron's involvement in prior securities class action lawsuits, and he was not certain if he was informed that Mrs. Rollhaus had been accused of violating SEC regulations.  *Id.* at 77:14-78:25.

14.    In its motion for class certification, Lead Plaintiff initially sought the appointment of Safron as an additional class representative with Lead Plaintiff, and the appointment of  Safron's counsel, Abraham Fruchter & Twersky, as a proposed co-counsel for the class.  On March 13, 2012, however, this request was withdrawn.  As a result, Lead Plaintiff is now the only prospective class representative, and Robbins Geller is the only prospective class counsel.

IV. Conclusions of Law:

A. Rule 23(a) requirements:

Federal Rule of Civil Procedure 23(a) sets out four threshold requirements for certification of a case as a class action: 1) the class is so numerous that joinder of all members is impracticable; 2) questions of law or fact are common to the class; 3) the claims or defenses of the class representative are typical of the claims or defenses of the other prospective class members; and 4) the class representative will fairly and adequately protect the interests of the class.  Fed. R. Civ. P. 23(a).   These requisite elements are referred to as numerosity, commonality, typicality, and adequacy of representation.  *See Trevizo v. Adams*, 455 F.3d 1155 (10th Cir. 2006).

"A party seeking class certification must show 'under a strict burden of proof' that all four requirements are clearly met."  *Trevizo,* 455 F.3d 1155 at 1162 (quoting *Reed v. Bowen*, 849 F.2d 1307, 1309 (10th Cir. 1988)).  Despite this normal allocation of the burden of proof, a court "must

engage in its own 'rigorous analysis' of whether 'the prerequisites of Rule 23(a) have been satisfied.'"   *Shook v. El Paso County,* 386 F.3d 963, 968 (10th Cir. 2004) (quoting *General Telephone. Co. of the Southwest v. Falcon*, 457 U.S. 147, 161 (1982)), *cert. denied,* 544 U.S. 978 (2005).  "Granting or denying class certification is a highly fact-intensive matter of practicality." *Monreal v. Potter*, 367 F. 3d 1224, 1238 (10th Cir. 2004).  "Each case must be decided on its own facts, on the basis of 'practicalities and prudential considerations.'" *Reed,* 849 F. 2d at 1309 (quoting *United States Parole Comm'n v. Geraghty,* 445 U.S. 388, 406 n. 11 (1980)).

In assessing the sufficiency of the evidence regarding class certification, the substantive allegations of the complaint are accepted as true, and the merits of the claims are not considered. *Shook,* 386 F. 3d at 968.  The Court is not permitted "to conduct a preliminary inquiry into the merits of a suit in order to determine whether it may be maintained as a class action." *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 178 (1974).  However, the nature of the claims or defenses to be resolved may be considered as they bear on the certification issues to be determined.  *Joseph v. General Motors Corp.,* 109 F.R.D. 635, 637-38 (D. Colo. 1986).  "Because the class certification is subject to later modification, the court should err in favor of, and not against, the maintenance of the class action." *Id.* at 638 (citing *Esplin v. Hirschi,* 402 F.2d 94, 99 (10th Cir. 1968), *cert. denied,* 394 U.S. 928 (1969)).

With respect to each of the four Rule 23(a) requirements, in light of the evidence in this case, the Court concludes as follows:

1. Numerosity:

To prevail on its request for class certification, Plaintiff must first establish that "the class

is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a).  The mere fact that a large number of potential plaintiffs exist does not, without more, provide a basis for certification, as "there is no set formula to determine if the class is so numerous that it should be so certified."  *Rex v. Owens ex rel. State of Oklahoma,* 585 F.2d 432, 436 (10th Cir. 1978).

In this case, the parties have stipulated that the numerosity requirement is satisfied.  The Court finds the evidence of record and the governing law support the stipulation, and it is adopted. Accordingly, the Court finds the numerosity requirement is satisfied.

2.  Commonality:

A class action can only be maintained if "there are questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  To satisfy this requirement, members of the putative class must "'possess the same interest and suffer the same injury.'"  *Trevizio,* 455 F. 3d at 1163 (quoting *General Telephone Company,* 457 U.S. at 156).  A common question is one that can be resolved for every class member in a single hearing and does not require consideration of the individual circumstances of each class member.  *Thorn v. Jefferson-Pilot Life Insurance Co.,* 445 F.3d 311, 319 (4th Cir. 2006).  To satisfy the commonality requirement, there need only be one issue of law or fact common to all class members.  *Hallaba Worldcom Network Services,* 196 F.R.D. 630, 635 (N.D. Okla. 2000).  The fact that individual damages determinations may be required does not necessarily destroy the existence of commonality.  *Gunnells v. Healthplan Services, Inc.,* 348 F.3d 417, 427-28 (4th Cir. 2003) (citing Fed. R. Civ. P. Advisory Committee Note to 1996 Amendment to Rule 23, subdivision (c)(4)).

The parties in this case have stipulated that commonality exists with respect to the

14

prospective class members.  Having considered the stipulation in light of the evidence and the governing law, the Court agrees with the parties.  Accordingly, the Court finds this requirement is satisfied.

3.  Typicality:

The typicality requirement of Rule 23 limits the class claims to those "fairly encompassed" by the claims of the named plaintiff.  *General Telephone Co. of the Northwest, Inc. v. Equal Employment Opportunity Commission,* 446 U.S. 318, 330 (1980).  A named plaintiff's claim is "typical" when it arises out of the same event,  practice, or course of conduct of the defendant, and is based on the same legal theory on which the class claims are predicated.  *See Baby Neal v. Casey,* 43 F.3d 48, 57-58 (3rd Cir. 1994).  Typicality is satisfied when the named class representative will, by establishing its own claim, establish the bulk of the elements of each class member's claim.  *Brooks v. Southern Bell Tel. & Tel. Co.,* 133 F.R.D. 54, 58 (S.D. Fla.1990) (citing *General Telephone Co.,* 457 U.S. 147).

Claims may be typical without being identical.  Thus, "typicality may be satisfied even though varying fact patterns support the claims or defenses of individual class members or there is a disparity in the damages claimed by the representative parties and the other members of the class."  *In re Four Seasons Securities Laws Litigation,* 59 F.R.D. 667, 681 (W.D. Okla. 1973), *rev'd on other grounds*, 502 F.2d 834 (10th Cir. 1974).  As with commonality, individual damage questions do not preclude a finding of typicality.  *In re Texas International Securities Litigation,* 114 F.R.D. 33, 44 (W.D. Okla. 1987).

In this case, the parties have stipulated that typicality is present.  Applying the evidence

before the Court and the stipulation to the applicable legal standards, the Court adopts the parties' stipulation.  Accordingly, the Court concludes that the typicality requirement is satisfied in this case.

4.  Adequacy of representation:

The final requirement of Rule 23(a) is that the named plaintiff and its counsel must show they will adequately represent the class.  To satisfy this requirement, Lead Plaintiff must show that, as class representative, it will fairly and adequately protect the interests of the absent class members. *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 626 (1997).  Thus, the Court's determination of legal adequacy requires the resolution of two questions: "'(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?'" *Rutter & Willbanks Corp. v. Shell Oil Co.,* 314 F.3d 1180, 1187-88 (10th Cir. 2002) (quoting *Hanlon v. Chrysler Corp.,* 150 F. 3d 1011, 1020 (10th Cir. 1998)).

Although the adequacy test is described as similar to the typicality requirement, it is generally regarded as a broader test:

> The adequacy test includes, but is broader than, the typicality test. A representative may have typical claims but otherwise have a conflict with the class unrelated to those typical claims or may not be able to demonstrate able counsel who will vigorously prosecute the litigation on behalf of the class.

*Fry v. UAL Corp.,* 136 F.R.D. 626, 634 (N.D. Ill. 1991) (quoting H. Newberg, *Class Actions* § 3.22 at 200 (1977) ("Newberg")).

According to the Tenth Circuit Court of Appeals, the adequacy of representation requirement must be "stringently applied." *Albertson's Inc. v. Amalgamated Sugar Co.,* 503 F. 2d 459, 463-64 (10th Cir. 1974); *accord, Metzger v. American Fidelity Assurance Co.,* 249 F.R.D. 375, 377 (W.D.

16

Okla. 2007); *Clark v. State Farm Mut. Automobile Ins. Co.,* 245 F.R.D. 478, 485 (D. Colo. 2007); *Lile v. Simmons,* 143 F. Supp.2d 1267, 1277 (D. Kan. 2001).

Adequacy of representation is significant because a class action judgment is binding on all class members.  "The preclusive effect of a prior judgment will depend upon whether absent members were 'in fact' adequately represented by parties who are present." *Pelt v. Utah,* 539 F.3d 1271, 1284 (10th Cir. 2008). "Due process requires adequate representation 'at all times' throughout the litigation." *Id.* at 1285 (quoting *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 811-12 (1985)).

The class representative also acts as a fiduciary for the class. *Kirkpatrick v. J.C. Bradford & Co.*, 827 F.2d 718, 726 (11th Cir. 1987).  Thus, adequacy of representation may be absent where the named plaintiff might not "possess the personal characteristics and integrity necessary to fulfill the fiduciary role of class representative." *Id.*

Emphasizing the class representatives' fiduciary responsibilities to the class, Defendants in this case initially challenged the propriety of naming Safron as an additional class representative because its owner and sole shareholder, Mrs. Rollhaus, admitted she was cited by the SEC in 1994 with violating certain SEC regulations.  Because Safron is no longer a prospective class representative, however, this issue does not directly affect Lead Plaintiff's ability to function as an adequate representative and fulfill its fiduciary responsibilities.  Defendants also argue, however, that Lead Plaintiff's lack of knowledge regarding Mrs. Rollhaus's SEC citation as well as its failure to investigate Safron's background renders it an inadequate representative of the proposed class.  The Court concludes that the evidence does not support this contention.  Although the evidence shows that Mr. Robertson was not aware of this information, the Court does not find this evidence sufficient

to render Lead Plaintiff an inadequate representative in light of the other evidence before the Court.

Among the factors courts should consider in determining the adequacy of representation are the "qualifications and experience of the person or persons actually conducting the litigation." *Cotner v. Knight,* 1995 WL 441408 (10th Cir. July 21, 1995) (unpublished opinion) (citing 7A Wright Miller and Kane, *Federal Practice and Procedure*, §1769.1 n. 12 (2d ed. 1986)) ("Wright & Miller"). Adequacy of representation in a securities class action generally requires that the proposed class representative exercise authority over his investment decisions. *Fry,* 136 F.R.D. at 635. However, where a third party makes recommendations and purchases the relevant stocks for a proposed class representative, the stock owner is not necessarily an inadequate class representative. *Id.* As one court observed:

> Reliance on third parties such as investment counselors or knowledgeable family members is likely to be typical, rather than atypical, of the circumstances under which a substantial number of class members purchased their stock. Such reliance is not necessarily incompatible with a finding that the fraud was a "significant contributing cause" of their injuries.

*Kronfeld v. Trans World Airlines, Inc.,* 104 F.R.D. 50, 53 (S.D.N.Y. 1984); *see also Ettinger v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 122 F.R.D. 177, 181 (E.D. Pa. 1988). However, "a certain minimal level of participation by the plaintiff in the relevant stock transaction must be demonstrated." *Fry,* 136 F.R.D. at 635. "On-going discussions with the person executing the relevant stock transactions, for example, serve to fulfill this requirement." *Id.*

The evidence in this case establishes that Lead Plaintiff relied on money managers with regard to its investments and that Mr. Robertson was not directly familiar with the Chesapeake offering prior to the filing of this lawsuit. Pursuant to the foregoing legal authorities, however, Lead

Plaintiff's reliance on the expertise of professional investment advisors does not render it am inadequate representative.

Nor does Lead Plaintiff's reliance on the expertise of counsel adversely impact its ability to serve as an adequate class representative. On the contrary, the "primary criterion" for determining whether representation is adequate is "'whether the representative, through qualified counsel, vigorously and tenaciously protected the interests of the class.'" *Pelt,* 539 F.3d at 1285 (quoting *Gonzalez v. Cassidy,* 474 F. 2d 67, 72 (5th Cir. 1973)) (assessing adequacy in the context of a collateral attack on the judgment). In this regard, the experience of the proposed class representative's chosen counsel in similar previous litigation has been held an important factor favoring adequacy of representation. *See, e.g., Perez-Benites v. Candy Brand, LLC,* 267 F.R.D. 242 (W.D. Ark. 2010). With regard to whether a lead plaintiff and its counsel will vigorously prosecute the action on behalf of the class, "the experience and competence of the attorney representing the class may inform the court's analysis." *Lowery v. City of Albuquerque*, 273 F.R.D. 668, 680 (D. N.M. 2011). The fact that a prospective class representative has a lengthy pre-existing relationship with the counsel it selects does not impact its ability to adequately represent the class, as it is proper for the plaintiff to rely on "past successes in deciding to utilize those services again." *See, e.g., In re American Italian Pasta Co. Securities Litig.,* 2007 WL 927745, at *5 n. 4 (W.D. Mo. March 26, 2007) (unpublished opinion). Moreover, the existence of a prior successful relationship "demonstrates the exercise of good judgment and not the abdication of their obligations as class representatives." *In re Theragenics Corp. Securities Litig.*, 205 F.R.D. 687, 696 (N.D. Ga. 2002).

As noted in the factual findings herein, Lead Plaintiff has selected highly qualified counsel

with extensive experience in securities litigation, including numerous class action securities lawsuits. The knowledge and experience of Robbins Geller is not only reflected in its firm resume, but has been previously recognized by a federal court which described it as "one of the most successful law firms in securities class actions, if not the preeminent one, in the country." *In re Enron Corp. Securities Litig.,* 586 F.Supp. 2d 732, 789-90, 797 (S.D. Tex. 2008).   That court also cited the law firm's "clearly superlative litigating and negotiating skills." *Id.* at 789.   Lead Plaintiff's selection of Robbins Geller to prosecute the claims in this case reflects Lead Plaintiff's understanding of the importance of experienced and competent counsel as well as its intent to provide adequate representation to the class members.

Defendants also challenge the adequacy of Lead Plaintiff as a representative on the grounds that its relationship with Robbins Geller creates a potential conflict of interest based on Lead Plaintiff's claims and those of the proposed class members.   Adequacy of representation may be absent where a lead plaintiff's interests potentially conflict with those of the other prospective class members.   Thus, adequate representation does not  exist where  lead plaintiffs "have interests that are actually or potentially antagonistic to the interests and objectives of other class members." *Mays v. Tennessee Valley Authority*, 274 F.R.D. 614, 633 (E.D. Tenn. 2011) (citing 7A Wright & Miller § 1768 (3d ed. 2005)).   In such circumstances, "the concern is that the named plaintiffs cannot vigorously prosecute the interests and objectives of the  class." *Id.*   However, "only a conflict that goes to the very subject matter of the litigation will defeat a party's claim of representative status." *Lowery,* 273 F.R.D. at 680.   As a result,"'not every potential disagreement between a class representative and the class members will stand in the way of a class suit.'" *Id.* (quoting Newberg

§ 3:26 at 433-34 (4th ed. 2002)).

The Court concludes that Defendants have not presented evidence sufficient to show the existence of an actual or potential conflict of interest that would adversely impact Lead Plaintiff's ability to vigorously prosecute and protect the interests of the class.   Contrary to Defendants' contention, the Monitoring Agreement does not present a conflict of interest, as courts have recognized that such agreements do not create conflicts impacting the adequacy of the lead plaintiff's representation. *See, e.g., In re UTStarcom, Inc. Securities Litig.,* 2010 WL 1945737, at *8 (N.D. Cal. May 12, 2010) (unpublished opinion); *Silverman v. Motorola, Inc.*, 259 F.R.D. 163, 173-74 (N.D. Ill. 2009).   Courts have also found that monitoring agreements like the one in this case illustrate a lead plaintiff's involvement in, and awareness of, the financial issues involved in the litigation. *See In re Cooper Cos. Securities Litig.,* 254 F.R.D. 628, 636 (C.D. Cal. 2009); *In re NeoPharm, Inc. Securities Litig.,* 225 F.R.D. 563, 567-68 (N.D. Ill. 2004).   At least one court has found the absence of a monitoring agreement might be seen as demonstrating a lack of diligent investment oversight. *In re American Italian Pasta,*  2007 WL 927745, at *5.   The Court concludes that the Monitoring Agreement here does not adversely impact Lead Plaintiff's ability to adequately represent the class in this case, nor does it create a potential conflict of interest impairing  its ability to do so.

Furthermore, because of the importance of adequate representation to the class members' rights, adequacy must be continually monitored by the Court as this action proceeds. *Pelt,* 539 F.3d at 1284-85. "Once the decision to certify a class has been made, the court remains under a continuing duty to monitor the adequacy of representation to ensure that class counsel provides zealous, competent representation through the proceedings and to address conflicts of interests if they

develop." *In re Integra Realty Resources, Inc.,* 262 F.3d 1089, 1112 (10th Cir. 2001) (citing *Key v. Gillette Co.*, 782 F.2d 5,7 (1st Cir.1986); *In re Fine Paper Antitrust Litig.*, 617 F.2d 22, 27 (3d Cir.1980)).   The Court will monitor these proceedings to ensure that the class members are adequately represented.

The Court has reviewed the parties' briefs, considered their respective legal arguments, and considered the evidence of record.  Having done so, the Court concludes that Lead Plaintiff has satisfied its burden of establishing the requisite elements of Rule 23(a).

B.  Rule 23(b) requirements:

Having concluded that Lead Plaintiff has satisfied the Rule 23(a) requirements, the Court must next determine whether the action qualifies for class certification under Fed. R. Civ. P. 23(b)(1)(A), (b)(1)(B), (b)(2) and/or (b)(3).  In this case, Lead Plaintiff contends certification is authorized pursuant to Fed. R. Civ. P. 23(b)(3), which "allows a class action if 'the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.'" *In re Ribozyme Pharmaceuticals, Inc. Securities Litigation,* 205 F.R.D. 572, 578 (D. Colo. 2001) (quoting Fed.R.Civ.P. 23(b)(3)). Thus, the Court must not only find that common questions of law or fact predominate, but must also conclude that a class action is the superior means of adjudicating the issues.

"'The predominance test is not a numerical test and does not require the court to add up the common issues and the individual issues and determine which is greater.'"  *Bovee v. Coopers & Lybrand,* 216 F.R.D. 596, 605 (S.D. Ohio 2003) (quoting *Deutschman v. Beneficial Corp.,*132

F.R.D. 359, 375 (D.Del. 1990)).  Instead, the Court "must determine whether the members of the class seek a remedy to a common legal grievance and whether the common questions of law and fact central to the litigation are common to all class members." *Id.*  "Class wide issues predominate if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject to only individualized proof." *Moore v. PaineWebber, Inc.,* 306 F.3d 1247, 1252 (2d Cir. 2002).  "Predominance is a test readily met in certain cases alleging consumer or securities [claims] or violations of the antitrust laws." *Amchem Prods.,* 521 U.S. at 625.

Claims alleging misrepresentations contained in "written documents addressed to the class as a whole rather than an individualized sales pitch" are likely to predominate over individual issues. *In re Lilco Sec. Litig.,* 111 F.R.D. 663, 669 (E.D.N.Y. 1986).  More specifically, predominance of common issues has been found where all prospective class members' claims are based on the same alleged material misrepresentations or omissions in a stock offering.  *Schwartz v. Celestial Seasonings, Inc.,* 178 F.R.D. 545, 554 (D. Colo. 1998); *In re Lilco,* 111 F.R.D. at 669.

Defendants contend that Lead Plaintiff cannot satisfy its burden of showing that common claims predominate because it must demonstrate that all members of the proposed class can trace their shares to the allegedly deficient registration statement.[5]  Defendants argue that, given the nature of the stock and the transactions whereby purchasers obtained the stock, tracing creates individual issues which preclude a finding of predominance.

In a securities case involving multiple offerings and a pre-existing pool of fungible common

---

[5]Defendants also assert that, if the Court certifies this case as a class action, difficulties in tracing impact the class definition.  That contention is discussed *infra.*

stock, courts have found that those who purchased in the aftermarket cannot trace their purchases to a particular registration statement. *See, e.g., Krim v. PcOrder.com,* 402 F.3d 489, 498-99 (5th Cir. 2005); *Barnes v. Osofsky,* 373 F.2d 269, 272 (2d Cir. 1967). Courts have also recognized that the ability to trace shares in the aftermarket after a secondary offering has been complicated by the "modern practice of electronic delivery and clearing of securities trades, in which all deposited shares of the same issue are held together in fungible bulk." *In re IPO Securities Litig.,* 227 F.R.D. 65, 118 (S.D.N.Y. 2004); *see also In re Bank of America Corp. Securities, Derivative, & Employee Retirement Income Sec. Act (ERISA) Litig.*, 2012 WL 370278 (S.D.N.Y. Feb. 6, 2012) (unpublished opinion).

Difficulties in tracing do not, however, automatically exclude from a class those who obtained their stock through an aftermarket purchase. *Krim,* 402 F.3d at 495 ("there is no reason to categorically exclude aftermarket purchasers"); *Barnes,* 373 F.2d at 273 (recognizing "extension of liability to open-market purchasers"). Aftermarket purchasers have standing to pursue their claims if they can prove the securities they purchased were sold in the offering covered by the challenged registration statement. *See Joseph v. Wiles,* 223 F.3d 1155, 1159 (10th Cir. 2000).

With respect to the impact of tracing on the predominance requirement of Rule 23(b)(3), "[t]he common question of whether the registration statement was materially misleading predominates over any secondary tracing issues that might be encountered." *Schwartz,* 178 F.R.D. at 554 n. 4; *see also Freeland v. Iridium World Communications, Ltd.*, 233 F.R.D. 40, 46 (D. D.C. 2006); *In re Data Access Systems Securities Litig.,* 103 F.R.D. 130, 146 (D. N.J. 1984). Courts have recognized that "[i]t would be inappropriate to foreclose Plaintiffs' resort to the class action format

24

simply because some of their cases may be difficult to prove." *Freeland*, 233 F.R.D. at 46. As *Freeland* noted, considering potential proof difficulties at the certification stage is contrary to the rule that a court must not "'conduct a preliminary inquiry into the merits of a suit in order to determine whether it may be maintained as a class action.'" *Id.* (quoting *Eisen*, 417 U.S. at 177).

Furthermore, courts addressing this issue have held that "[t]he issue of tracing is a merits issue, not appropriate for consideration" at the class certification stage. *Schwartz*, 178 F.R.D. at 557; *see also Freeland*, 233 F.R.D. at 44; *In re Dynegy, Inc. Securities Litig.*, 226 F.R.D. 263, 282 (S.D. Tex. 2005).

In this case, the parties addressed the issue of tracing in the 2011 Stipulation. They stipulate in part that "[p]ersons and entities...that purchased stock directly or indirectly in the July 2008 secondary offering of Chesapeake common stock...at $57.25 per share satisfy the 'tracing' requirements of Section 11." 2011 Stipulation at ¶ 1. In addition, the parties also stipulate that "[p]ersons and entities...that can demonstrate by their records and/or records of the Underwriters, Lehman Brothers, or Chesapeake" that they purchased or received stock from those who "purchased or were allocated shares in the Offering" meet the tracing requirements. *Id.* at ¶ 2. The parties further stipulated that those who do not fall into these categories and who purchased the stock on the open market do not meet the tracing requirements of Section 11. 2011 Stipulation at ¶ 4.

The Court agrees with those courts considering this issue in the context of the Rule 23(b) predominance requirements that the issue of tracing does not preclude certification of a class action in all cases, and consideration of the tracing difficulties of some potential class members involves an assessment of the merits of their claims, a consideration which is not properly addressed at the

certification stage.   The Court further concludes that the parties' 2011 Stipulation minimizes the difficulties cited by Defendants as possibly creating issues impacting some, but not all, potential class members.   Because the common question of material misrepresentation or omission predominates over tracing issues, *see Schwartz,* 178 F.R.D. at 554 n. 4, the Court concludes that such issues do not preclude satisfaction of the Rule 23(b)(3) predominance requirement in this case.

Accordingly, the Court concludes that Lead Plaintiff has satisfied its burden of establishing that common issues predominate over individual issues with respect to the prospective class, as required by Rule 23(b)(3).

The Court further concludes that Plaintiff has met its Rule 23(b)(3) burden of demonstrating that a class action is superior to other available methods to fairly and adequately adjudicate the controversy.   Pursuant to the March 13 Stipulations, the parties have stipulated that a class action is a superior method of litigating the claims asserted.   *See* March 13 Stipulations at ¶ 5.   Furthermore, as Lead Plaintiff points out, many investors in the prospective class may have suffered small losses which would not make it financially practical for them to separately litigate their claims, a factor recognized as favoring class actions.   *See, e.g., Phillips Petroleum Co. v. Shutts,* 472 U.S. 797, 809 (1985).   Additionally, class actions have been recognized as a particularly appropriate means of resolving securities actions involving allegations of material misrepresentations or omissions.   *Basic, Inc. v. Levinson,* 485 U.S. 224, 250 (1988).   The Court concludes that a class action is a superior means of adjudicating the claims at issue in this lawsuit.

Accordingly, the Court concludes Lead Plaintiff has satisfied its burden with regard to the requirements of Rule 23(a) and those of Rule 23(b)(3), and that a class action should be certified.

C. Definition of the class:

Having determined that Lead Plaintiff has satisfied the requirements of Rule 23(a) and (b), the Court must next define the class to be certified in this case. "Before the court may certify a class pursuant to Rule 23, 'the class definition must be sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member of the proposed class.'" *Garrish v. United Auto., Aerospace, and Agric. Implement Workers,* 149 F.supp. 2d 326, 330-31 (E.D. Mich. 2001) (quoting 5 James Wm. Moore, et al., *Moore's Federal Practice*, ¶ 23.21[1] (3d ed.1998)) ("*Moore's Federal Practice*"). "The identity of class members, moreover, must be ascertainable by reference to objective criteria." *Id.* at 331 (citing *Crosby v. Social Security Admin.*, 796 F.2d 576, 580 (1st Cir.1986)). "A precise definition allows the Court to determine who would be entitled to relief, who would be bound by a judgment, and who is entitled to notice of the action." *Id.* (citing 5 *Moore's Federal Practice*, ¶ 23.21[3]).

The parties in this case disagree regarding the appropriate class definition, and they have proposed separate definitions. Although their post-hearing proposed findings and conclusions reflect revisions to the definitions each initially proposed, they have been unable to reach agreement with respect to the definition to be adopted by the Court.[6]

Lead Plaintiff proposes defining the class as follows:

All persons or entities that purchased or otherwise acquired Chesapeake stock issued pursuant to the registration statement and prospectus filed with the SEC in connection with Chesapeake's July 2008 Offering.

Lead Plaintiff also proposes that the Court exclude from this class definition the defendants, the

---

[6]The parties' respective definitions quoted herein are the revised definitions appearing in their post-hearing proposed findings of fact and conclusions of law.

officers and directors of Chesapeake and their immediate families, and all subsidiaries and affiliates of Defendants and their officers and directors.

Defendants have proposed the following class definition:

> All persons or entities who purchased or otherwise acquired Chesapeake Energy Corporation ("Chesapeake") stock, directly in Chesapeake's July 9, 2008 secondary public stock offering, from an underwriter or participating dealer at a price of $57.25 per share, held the stock through the alleged corrective disclosure on October 10, 2008, and who were damaged thereby.

Defendants also state that the definition should contain essentially the same exclusions as those proposed by Lead Plaintiff.

During the March 14 hearing, the Court directed the parties to confer and attempt to reach an agreement regarding the language of the proposed definition. Although they could not reach agreement, each has proposed an alternative definition of the class. In its alternative definition, Lead Plaintiff suggests the Court could certify two subclasses pursuant to Rule 23, consisting of:

> 1.  For claims under § § 11 and 15 of the Securities Act, all persons or entities that purchased Chesapeake stock issued pursuant to the registration statement and prospectus filed with the SEC in connection with Chesapeake's July 2008 Offering or traceable to the registration statement pursuant to the parties' stipulation ordered by the Court on August 3, 2011.

> 2.  For claims under § 12(a)(2) of the Securities Act, all persons that purchased Chesapeake stock issued pursuant to the prospectus or oral communications issued in connection with Chesapeake's July 2008 Offering.

Both subclasses proposed by Lead Plaintiff would exclude Defendants, their officers, directors, families and related entities. Lead Plaintiff states that, although legal authority supports the certification of a single class, it has included a proposal for subclasses in order to address the Court's concerns at the March 14 hearing regarding second purchasers and the parties' 2011 Stipulation.

Defendants have proposed the following alternative class definition:

All persons or entities who purchased or otherwise acquired Chesapeake Energy Corporation ("Chesapeake") stock, directly or indirectly in Chesapeake's July 9, 2008 secondary public stock offering, from an underwriter or participating dealer, or from a person that purchased or otherwise acquired Chesapeake stock from an underwriter, at a price of $57.25 per share, and who were damaged thereby.

Defendants' alternative class definition also excludes Defendants, their officers, directors, families and related entities from the class.

Lead Plaintiff indicates that, if the price limitation is removed from Defendants' alternative definition, it believes agreement could be reached on the definition to be included. *See* Lead Plaintiff's proposed findings of fact and conclusions of law [Doc. No. 207] at p. 23 n. 10.

The parties agree that there should be a single class definition for both § 11 and § 12 claims, and courts considering a class definition where both § 11 and § 12 claims are asserted have generally held that a single class definition is appropriate. *See, e.g., Freeland,* 233 F.R.D. at 42; *In re PE Corp. Securities Litig.,* 228 F.R.D. 102, 104 (D. Conn. 2005); *Schwartz*, 178 F.R.D. at 557. Although aftermarket purchasers may not recover under § 12(a)(2) because it is limited to direct purchasers, they may properly be included in a class because common questions remain predominant over individual questions. *See Freeland,* 233 F.R.D. at 44. The issue is one of recoverable damages rather than class definition. *Id.* Thus, the Court will adopt a single class definition for this case.

Lead Plaintiff objects to including the $57.25 price per share in the class definition, arguing that limiting the class to those who purchased at a set price would improperly exclude all second purchasers who can trace their purchases, and only first purchasers paid $57.25 per share. Lead Plaintiff contends the dollar amount limitation is contrary to law and would contradict the 2011

29

Stipulation regarding tracing.

A review of the court decisions defining classes reflects that the definitions typically do not include a specific stock price.  Instead, they include language limiting the class to those who purchased pursuant to, or "traceable to," a registration statement.  *See, e.g., Freeland*, 233 F.R.D. at 42; *In re Independent Energy Holdings PLC Securities Litig.*, 210 F.R.D. 476, 478 (S.D.N.Y. 2002). Other courts have included in the class definition a limitation based on the time period in which stock was purchased.  *See, e.g., Schwartz,* 178 F.R.D. at 557.

Defendants correctly note that some courts have excluded aftermarket purchasers from the class definition.  *See, e.g., In re Bank of America Corp.,* 2012 WL 370278; *Tsirekidze v. Syntax-Brillian Corp.,* 2009 WL 2151838 (D. Ariz. July 17, 2009) (unpublished opinion); *In re PE Corp.,* 228 F.R.D. at 111.  In the foregoing decisions, the courts defined the class as limited to those who purchased in the offering, and were damaged thereby, and did not include those who could trace their purchases to the offering.  As Lead Plaintiff points out, however, in at least one of these cases, the limitation to those who purchased in the  offering was not at issue because the lead plaintiff proposed that limitation.  *In re Bank of America Corp.,*  2012 WL 370278, at *13.

The Court concludes that the authority cited by both parties shows there is no precise rule for determining the language of the class definition.  On the contrary, the appropriate definition is dependent on the facts and circumstances of each case.

In this case, Lead Plaintiff seeks to include aftermarket purchasers in the potential class, to the extent that, for § 11 purposes, those purchasers can trace their investments. Furthermore, the 2011 Stipulation contemplates that aftermarket purchasers will be included in the class because the parties

expressly addressed those persons and entities who would be able to trace their purchases to the Offering and those who would be unable to do so.    The 2011 Stipulation also includes a reference to the $57. 25 per share price:

> 1.  Persons and entities (including their assignees, heirs, or devisees) that purchased stock directly or indirectly in the July 2008 secondary offering of Chesapeake common stock (the "Offering") at $57.25 per share satisfy the "tracing" requirements of Section 11 of the Securities Act of 1933 ("Section 11").  Plaintiff is in the class of purchasers that satisfy the "tracing" requirements of Section 11.

2011 Stipulation at ¶ 1.  However, the parties also stipulated that:

> 2.  Persons and entities...that can demonstrate by their records and/or records of the Underwriters, Lehman Brothers, Chesapeake, that they purchased or received stock from persons or entities that purchased or were allocated shares in the Offering meet the tracing requirements of Section 11.

*Id.* at ¶ 2.  This stipulation does not reference a specific share price, and suggests that aftermarket purchasers are contemplated as potential class members if they can prove the necessary connection between their purchases and the Offering.  In addition, the parties stipulated that individuals and entities who do not satisfy the requirements of either paragraph 1 or paragraph 2 will not be able to trace.  *Id.* at ¶ 4.

The Court acknowledges that the 2011 Stipulation is not expressly directed at the issue of the class definition.  However, it demonstrates the parties' contemplation that, if a class action is certified, some aftermarket purchasers will be included in the defined class.

The Court has found no authority requiring the inclusion in a class definition of a specific price at which the class members must have purchased the shares at issue.   Although the purchase price will impact the potential damages a class member may be able to prove at trial, that issue relates to matters of proof and the merits of class members' claims.  The Court does not find it essential to

include a price per share in the class definition.

Accordingly, having considered the parties arguments in light of the applicable law and the facts of this case, the Court finds that the certified class should be defined and limited as follows:

All persons or entities who purchased or otherwise acquired Chesapeake Energy Corporation ("Chesapeake") stock, directly or indirectly in Chesapeake's July 9, 2008 secondary public stock offering (the "Offering"), from an underwriter or participating dealer, or from a person that purchased or otherwise acquired Chesapeake stock from an underwriter in connection with the Offering, and who were damaged thereby. Excluded from the class are the defendants and the immediate family members of defendants who are individuals, all officers and directors of any defendant and their immediate family members, any entity in which a defendant has a controlling interest or is a subsidiary of, and the employees, affiliates, legal representatives, heirs, predecessors, successors, and assigns of the defendants.

The class certified herein is defined accordingly. At the present time, no subclass is contemplated.

V.  Conclusion:

For the foregoing reasons, Lead Plaintiff's Motion to Certify [Doc. No. 106] is GRANTED. This action is hereby certified as a class action pursuant to Fed. R. Civ. P. 23. Lead Plaintiff is the class representative, and Lead Counsel will serve as class counsel. The certified class is defined as set forth herein.

IT IS SO ORDERED this 30th day of March, 2012.

TIMOTHY D. DeGIUSTI
UNITED STATES DISTRICT JUDGE

32