UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| UNITED FOOD AND COMMERCIAL WORKERS UNION, Individually and On Behalf of All Others Similarly Situated,<br><br>　　　　　　　　　　Plaintiff,<br><br>　vs.<br><br>CHESAPEAKE ENERGY CORPORATION, et al.,<br><br>　　　　　　　　　　Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | No. 5:09-cv-01114-D<br><br>CLASS ACTION<br><br>LEAD PLAINTIFF'S MOTION TO COMPEL DEFENDANT AUBREY McCLENDON TO PRODUCE DOCUMENTS AND SUPPORTING BRIEF |

708406_1

Pursuant to Federal Rules of Civil Procedure 26(b) and 34, Lead Plaintiff United Food and Commercial Workers Union Local 880 Pension Fund respectfully moves the Court for an order compelling defendant Aubrey McClendon to produce a subset of documents responsive to Request No. 1 from Plaintiff's First Set of Requests for Production of Documents to Aubrey McClendon.

## I.     INTRODUCTION

In the span of only a few days in October 2008, over 30 million shares of Chesapeake Energy Corporation's ("Chesapeake") stock flooded the stock market from one source: Chesapeake's CEO, defendant Aubrey McClendon ("McClendon"). By the time the deluge ended, McClendon had poured into the market substantially all of his shares, amounting to over 5% of Chesapeake's outstanding shares. Chesapeake's stock price, which began the week valued at $28.92 each, had lost over 40% of their value, closing the week at $16.52. Recognizing the damage wrought by this tsunami, Chesapeake issued a press release at week's end, which confirmed market fears that McClendon, Chesapeake's self-proclaimed "largest individual shareholder," apparently did not own his shares outright. Still, over three years later, the extent of the information Chesapeake and McClendon had concealed remains unclear. This motion seeks the documents necessary to provide that clarity.

In the Offering Documents, defendants attributed to McClendon unqualified "Ownership" of 29,529,975 shares of Chesapeake's common stock. The only other statement regarding those shares was that 29,332,493 of them were "held in bank or brokerage margin accounts or escrow accounts securing brokerage accounts." There was absolutely no indication that any of the shares "held" in margin accounts were, in fact,

"margined" – *i.e.*, not owned outright and subject to precisely the kind of forced sale that struck Chesapeake's shareholders only three months after the offering. Because defendants failed to disclose the margined status of some or all of these shares, they also omitted all of the information Lead Plaintiff would have needed to assess the extent of the risk these margined shares posed: the number of shares margined, the amount of the loans against these shares, and the terms of the margin accounts. Because the Offering's misleadingly incomplete representation regarding McClendon's "Ownership" of these 29,332,493 shares is a critical pillar of this case, it is apparent that Lead Plaintiff is entitled to whatever documents are necessary to establish at trial exactly how many of those shares were margined, as well as the amounts and terms of such margin loans. Lead Plaintiff respectfully requests that the Court order McClendon to produce these limited documents.

## II.   BACKGROUND CONCERNING THE PARTIES' CONFERRAL

Counsel for Lead Plaintiff and McClendon exchanged emails and held a conference call[1] regarding Lead Plaintiff's need for the foregoing documents, which are a subset of Request No. 1 from Lead Plaintiff's First Set of Requests for Production of Documents to McClendon. Lead Plaintiff served this request for production over a year ago, and although the set was part of a motion to compel filed late last year, that motion did not expressly seek production of documents responsive to Request No. 1. Instead, as to the request for

---

[1]   Lead Plaintiff's counsel is located at 655 West Broadway, Suite 1900, San Diego, California, and defendants' counsel is located at 405 Howard Street, San Francisco, California. Given the distance, a personal conference was infeasible under Western District of Oklahoma Local Rule 37.1, and the meet-and-confer process occurred telephonically.

production to McClendon, the parties, and thus the Court's order, focused exclusively on Request No. 2, which sought various categories of personal financial information relating to McClendon's ability to satisfy his margin loans – as opposed to information about the margin loans themselves. Nevertheless, because Request No. 1 was technically within the scope of the motion, defendants contend that the Court considered the request and rejected it, albeit without saying so. From Lead Plaintiff's perspective, the documents sought in this motion are so plainly discoverable and the request encompassing them so clearly unaddressed by the parties, there is no reason to believe this Court would have rejected their production without saying so. The parties, therefore, are at an impasse.

## III.   FACTUAL BACKGROUND

### A.   Shares Attributed to McClendon

The Prospectus for the July 2008 Offering that is the subject of this case incorporated by reference a number of Chesapeake's prior SEC filings, including its Form 14A, filed on April 29, 2008. In the "Security Ownership" section of that Form 14A was a table that listed McClendon as the Beneficial Owner of 29,529,975 shares of Chesapeake's common stock, amounting to 5.5% of Chesapeake's outstanding shares. *See* Declaration of Jason A. Forge in Support of Lead Plaintiff's Motion to Compel Defendant Aubrey McClendon to Produce Documents ("Forge Decl."), Ex. 1 at 28. A footnote to that entry in the table provided that 29,332,493 of those shares attributed to McClendon were "held in bank or brokerage margin accounts or escrow accounts securing brokerage accounts." *Id.* at 29. The Form did not disclose how many of the 29.3 million shares were held in any of these three types of accounts. To the extent any of the 29.3 million shares were held in margin accounts, there

was no indication that such shares were, in fact, "margined" – *i.e.*, not owned outright and potentially subject to forced sale. Likewise, there was no disclosure of the number of shares margined, the amount of the loans against these shares, or the terms of the margin accounts.

      **B.**     **Margin Accounts and Margin Trading**

A margin account allows investors to borrow money on a secured basis from banks or brokerage firms for a number of purposes, including the purchase of securities. Shares held in a margin account can be owned outright (that is, owned free and clear, without any loan against the shares) or the shares can be "margined" (that is, owned subject to a loan secured by the shares held in a margin account). The difference between the fair market value ("FMV") of the shares held in the margin account less the amount of the margin loan (or debit amount) is called equity. Equity in a margin account can be expressed in either dollar terms or as a percentage of the FMV of the shares in the margin account. For example, if the FMV of shares in a margin account is $200 and the margin loan is $120, the equity value is $80 and the margin equity percentage is 40%. Maintaining a minimum margin equity percentage in a margin account is a fundamental notion in margin lending. For instance, an investor can buy outright $100 of shares by putting up the full $100 price without the use of any loans secured by the shares. Alternatively, an investor can buy the same $100 of shares by borrowing on margin $50 from his/her margin lender, putting up the $50 difference in cash and having the $50 margin loan secured by all of the shares purchased. Shares purchased on margin are not owned outright; if the margin equity percentage falls below a required level (independently set by the margin lender), the margin lender has unilateral rights to either sell these shares to pay off the margin loan or to demand that the margin

account owner increase the margin equity percentage to the required level by (i) depositing sufficient new cash into the margin account; (ii) depositing sufficient new shares into the margin account in order to increase the FMV of shares in the margin account; or (iii) selling off sufficient shares in the margin account and applying the proceeds to pay down the margin loan. *See* Forge Decl., Ex. 2 at 5 n.2.

Several types of information would have informed investors as to the circumstances under which the 29.3 million shares attributed to McClendon could be sold precipitously: (i) the amount of shares in each type of account, including shares other than Chesapeake; (ii) the existence or amount of loans in each type of account; (iii) the maximum credit limits set for any margin account;[2] (iv) the borrowing limit available in any margin account;[3] (v) the so-called "house" maintenance requirements set for any margin account;[4] and (vi) the existence

---

[2] The maximum credit limit is set by a margin lender based on such factors as credit worthiness of the borrower, share price volatility and diversification, and concentration of shares held in margin accounts. In lay terms, a credit limit expresses the maximum dollar amount of credit exposure to the account holder the margin lender is willing to accept.

[3] The borrowing limit is typically a function of the loan-to-value ratio the margin lender will extend on each particular share held in margin accounts. Margin lenders uniquely decide the maximum loan-to-value ratio allowed for each share. In lay terms, a borrowing limit is a function of the maximum percentage the margin lender will lend on the fair market value of each particular share in the margin account. Thus, for a given set of shares held in a margin account, one can determine the potential borrowing limit available; however, the credit limit (discussed above) sets an overall ceiling on the potential borrowing limit of the margin account holder.

[4] The "house" maintenance requirement is expressed as the percentage of equity a margin borrower must maintain in the margin account, including higher maintenance margin requirements for volatile stock and concentrated or large positions in a single stock. In lay terms, the percentage of equity in a margin account is analogous to the percentage of equity in a home: the fair market value less outstanding debt divided by the fair market value.

- 5 -

of other resources held by McClendon outside of the noted margin accounts. *See* Forge Decl., Ex. 2, ¶19.

### C. McClendon's Margin Calls

On Friday, October 3, 2008, Chesapeake's stock ended the week valued at $28.92 per share. *See* Forge Decl., ¶3. By the following Friday, October 10, 2008, the price of Chesapeake stock had dropped to $16.52 per share. *Id.* For the week, the trading volume of Chesapeake's shares totaled 319 million shares compared to 121 million from the prior week. *Id.* The fuel for this sell off was over 30 million shares sold by McClendon. Having concealed this risk for months, Chesapeake responded with a one-sentence statement: "Chesapeake Energy Corporation (NYSE:CHK) today disclosed that its Chief Executive Officer, Aubrey K. McClendon, involuntarily sold substantially all of his shares of Chesapeake common stock over the past three days in order to meet margin loan calls." *See* Forge Decl., Ex. 3. Below this statement were scripted comments from McClendon, including the following: "I have been the company's largest individual shareholder for the past three years and frequently purchased additional shares of stock on margin as an expression of my complete confidence in the value of the company's strategy and assets." *Id*.

---

House maintenance requirements for margin accounts are subject to unilateral actions by the margin lender (i.e., the house), often taking effect immediately without notice to margin borrowers. Volatile markets or financial distress of a margin lender can lead to abrupt declines in credit availability to margin borrowers, including automated forced sales of margined shares in falling markets.

This press release was the first time defendants confirmed that McClendon had margined any shares of Chesapeake stock. Defendants have yet to reveal, and McClendon has refused to produce documents that would reflect, exactly how many of those shares McClendon had margined, the terms under which they were margined, and how many of them were truly involuntarily sold.

### D. The Complaint

Among other allegations, the Amended Complaint alleges that, "[t]he fact that Defendant McClendon had margined his stock and that the stock was subject to seizure and sale should the value of his investments decline, was a material fact to investors in the Secondary Offering as it would have altered the total mix of information regarding Chesapeake stock." *See* Amended Complaint, Doc. No. 1-1, ¶35.

### E. Lead Plaintiff's Previous Motion to Compel

On October 14, 2011, Lead Plaintiff filed a motion to compel regarding its First Set of Requests for Production of Documents to McClendon, its First Set of Interrogatories to McClendon, its First Set of Requests for Production of Documents to Chesapeake, and its First Set of Interrogatories to Chesapeake. Although Request No. 1 from the First Set of Requests for Production of Documents to McClendon was technically within the scope of this motion, the motion itself made no mention of Request No. 1 nor of any of the information sought in this request, which is limited to the relevant information defendants withheld from their statement that the 29,332,493 shares of Chesapeake stock attributed to McClendon were "held in bank or brokerage margin accounts or escrow accounts securing brokerage accounts."

- 7 -

Instead, Lead Plaintiff's memorandum and defendants' opposition focused on various categories of McClendon's personal financial information sought in Request No. 2, which relate to the allegation that McClendon lacked the liquidity necessary to satisfy his margin loans.  *See* Doc. No. 128 at 16-20; Doc. No. 133 at 11-19.  Indeed, defendants' opposition quoted eight categories of documents Lead Plaintiff was seeking, and all eight were from Request No. 2.  *Compare id.* at 11-12 to Exhibit 4 to Forge Decl. at 12-13.  Consistent with the parties' exclusive focus as to the First Set of Requests for Production of Documents to McClendon, Request No. 2 was the only request addressed in the January 6, 2012 Order resolving Lead Plaintiff's motion.  *See* Order, Doc. No. 167 at 8-9.

## IV.   ARGUMENT

### A.   Discovery Standards

The Court's January 6, 2012 Order ably sets forth the applicable standards governing discovery, and there is nothing extraordinary about the parties' present dispute.  Put simply, "Rule 26(b) will not permit unlimited discovery.  Rule 26(b)(1) permits discovery only of '[r]elevant information' and the discovery must 'appear[ ] reasonably calculated to lead to the discovery of admissible evidence.'"  *Murphy v. Deloitte & Touche Group Ins. Plan*, 619 F. 3d 1151, 1163 (10th Cir. 2010) (citation omitted).  "'[T]he standard for determining whether information is relevant for purposes of pretrial discovery is substantially broader than the standard for relevance during trial.'"  *In re Cooper Tire & Rubber Co.*, 568 F. 3d 1180, 1189 (10th Cir. 2009) (quoting 7 James William Moore, *et al.*, *Moore's Federal Practice*, §37.22[2][a] (3d ed. 2007)).  "In one respect, the term 'relevance' clearly is broader than 'admissibility' at trial: for purposes of discovery, '[r]elevant information need not be

admissible at trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence.'" *Cooper Tire*, 568 F. 3d at 1189 (quoting Fed. R. Civ. P. 26(b)(1)). Still, "the court must limit the frequency or extent of discovery otherwise allowed by these rules or by local rule" where, *inter alia*, the Court finds "the burden or expense of the proposed discovery outweighs its likely benefit, considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues." Fed. R. Civ. P. 26(b)(2)(C) (iii).

### B. The Requested Documents Are Limited and Relevant

Regarding the 29,332,493 shares defendants attributed to McClendon as being "held in bank or brokerage margin accounts or escrow accounts securing brokerage accounts," Lead Plaintiff has narrowed down Request No. 1 to only those documents sufficient to establish at trial the following, for the period of April 29, 2008 through October 10, 2008:

1. The number of the 29,332,493 shares that were margined or encumbered in any way;

2. The number of the 29,332,493 shares in each of the "bank or brokerage margin accounts or escrow accounts securing brokerage accounts" in which they were held;

3. The amount of loans in each of the "bank or brokerage margin accounts or escrow accounts securing brokerage accounts" in which any of the 29,332,493 shares were held;

4. The terms of each of the "bank or brokerage margin accounts or escrow accounts securing brokerage accounts" in which any of the 29,332,493 shares were held (such terms to include the maximum credit limits, the borrowing limits, the so-called "house" maintenance requirements, and any other terms necessary to determine the circumstances under which there could be a forced sale of any of the 29,332,493 shares);

5. The identity and value of other assets held in the "bank or brokerage margin accounts or escrow accounts securing brokerage accounts" in which any of the 29,332,493 shares were held that were available to avoid or satisfy any margin calls;

6. The identity and value of any other assets that McClendon had pledged to avoid or satisfy any margin calls concerning of the 29,332,493 shares held in the "bank or brokerage margin accounts or escrow accounts securing brokerage accounts"; and

7. Any disclosures to, or inquiries by, Chesapeake (including its agents) or any of the Underwriter Defendants (including their agents) concerning any of the foregoing information.

As can be seen, Lead Plaintiff seeks a very modest production. Yet, such documents are critical to proving the allegation that defendants' unqualified statement of McClendon's "Ownership" of 29,529,975 shares of Chesapeake common stock was misleadingly incomplete, and the statement that 29,332,493 of these shares were merely "*held* in bank or brokerage margin accounts or escrow accounts securing brokerage accounts" was deceptively innocuous. *See* Forge Decl., Ex. 1 at 28 and 29 (emphasis added). These documents, and the ease with which defendants could have obtained and disclosed the information they reflect, will also rebut any due diligence defense defendants may attempt to prove at trial.

Moreover, all of these documents should be immediately ascertainable by McClendon – mostly from whatever institutions through which he margined his shares. Likewise, the time period is no greater than necessary under the circumstances presented here: beginning with the day defendants made their representation regarding McClendon's unqualified ownership of 29,332,493 Chesapeake shares and ending the day defendants finally confirmed that McClendon had margin loans against a still undisclosed number of those

shares. Vital documents whose production entails a minimal burden is a recipe for production, not for continued recalcitrance.

### C. This Court's January 6 Order Did Not Address Request No. 1

As the Court no doubt recalls, and as the parties' prior briefs confirm, the McClendon documents at issue in Lead Plaintiff's first motion were those relevant to the allegation "that Defendant McClendon 'lacked the cash' – i.e., liquid assets – necessary to satisfy his margin loans." *See* January 6, 2012 Order at 8. Such documents were sought in Request No. 2 of the First Set of Requests for Production of Documents to McClendon. *See* Forge Decl., Ex. 4 at 12-13. Given this focus, the thrust of the parties' arguments and this Court's analysis was how to strike the right balance between Lead Plaintiff's right to discovery of documents relevant to this allegation and McClendon's privacy interests. *See* January 6, 2012 Order at 8. Ultimately, the Court ordered "that discovery may be had regarding documents covered by Request No. 2, subparts (a) and (d) only, as of the date set forth in the request." January 6, 2012 Order at 8 (footnote omitted). This Court also prescribed protections in addition to the existing Stipulated Protective Order. Subparts (a) and (d) encompassed all bank, brokerage, or other financial account statements, as well as financial statements identifying McClendon's assets, liabilities, or income – all of which was limited so as to reflect McClendon's financial status as of July 8, 2009. *See* Forge Decl., Ex. 4 at 12-13.

There was no mention by the parties or the Court of the allegation in the Amended Complaint that, "[t]he fact that Defendant McClendon had margined his stock and that the stock was subject to seizure and sale should the value of his investments decline, was a material fact to investors in the Secondary Offering as it would have altered the total mix of

information regarding Chesapeake stock." *See* Amended Complaint, Doc. No. 1-1, ¶35. This allegation directly relates to defendants' unqualified statement of McClendon's "Ownership" of Chesapeake's common stock and their deceptively innocuous statement that 29.3 million of those shares were merely "held" in bank or brokerage margin accounts or escrow accounts securing brokerage accounts. Unlike Lead Plaintiff's first motion, the present motion seeks production of a very limited set of documents that are essential to this allegation and have only minimal implications for McClendon's privacy interests. Such documents are a subset of Request No. 1 of the First Set of Requests for Production of Documents to McClendon. *See* Forge Decl., Ex. 4 at 11-12. McClendon has already publicly disclosed that he sold over 30 million shares of Chesapeake's stock during the week of October 6, 2008, as well as the prices at which he sold these shares. He has also publicly claimed that these were "involuntary and unexpected sales," and the company has publicly claimed that McClendon "involuntarily sold substantially all of his shares of Chesapeake common stock over the past three days in order to meet margin loan calls." *See* Forge Decl., Ex. 3. Under these circumstances, it cannot be reasonably argued that whatever negligible remaining privacy interest McClendon has as to documents revealing the details of these margin loans trumps Lead Plaintiff's right to such critical information.

It is clear that the Court has not previously considered, much less determined, these or any other arguments regarding the discoverability of the documents this motion seeks.

## V. CONCLUSION

For the foregoing reasons, Lead Plaintiff respectfully requests that the Court order McClendon to produce the limited categories of documents set forth above.

| | |
|---|---|
| DATED: May 15, 2012 | Respectfully submitted,<br><br>ROBBINS GELLER RUDMAN<br>  & DOWD LLP<br>JAMES I. JACONETTE<br>JASON A. FORGE<br>FRANCIS A. DIGIACCO<br>DAVID W. HALL<br><br>s/ JASON A. FORGE<br>JASON A. FORGE<br><br>655 West Broadway, Suite 1900<br>San Diego, CA 92101<br>Telephone: 619/231-1058<br>619/231-7423 (fax)<br><br>ROBBINS GELLER RUDMAN<br>  & DOWD LLP<br>SAMUEL H. RUDMAN<br>DAVID A. ROSENFELD<br>58 South Service Road, Suite 200<br>Melville, NY 11747<br>Telephone: 631/367-7100<br>631/367-1173 (fax)<br><br>ROBBINS GELLER RUDMAN<br>  & DOWD LLP<br>RANDI D. BANDMAN<br>52 Duane Street, 7th Floor<br>New York, NY 10007<br>Telephone: 212/693-1058<br>212/693-7423 (fax)<br><br>Lead Counsel for Plaintiff |

                LYTLE, SOULÉ & CURLEE, P.C.
                MICHAEL C. FELTY
                MICHAEL A. BETTS
                119 North Robinson, Suite 1200
                Oklahoma City, OK  73102
                Telephone:  405/235-7471
                405/232-3852 (fax)

                Local Counsel

                SCHWARZWALD McNAIR & FUSCO LLP
                EBEN O. McNAIR IV
                616 Penton Media Building
                1300 East Ninth Street
                Cleveland, OH  44114-1503
                Telephone:  216/566-1600
                216/566-1814 (fax)

                Additional Counsel for Plaintiff

CERTIFICATE OF SERVICE

I hereby certify that on May 15, 2012, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I caused to be mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on May 15, 2012.

s/ JASON A. FORGE
JASON A. FORGE

ROBBINS GELLER RUDMAN
    & DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-3301
Telephone:  619/231-1058
619/231-7423 (fax)

E-mail:  jforge@rgrdlaw.com

708406_1

# Mailing Information for a Case 5:09-cv-01114-D

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Hissan Ahsan Bajwa**
  hissanbajwa@paulhastings.com

- **Lily I Becker**
  lbecker@orrick.com,rrivera@orrick.com,gjohnson@orrick.com

- **Michael A Betts**
  betts@lytlesoule.com,mjones@lytlesoule.com

- **Francis A DiGiacco**
  fdigiacco@rgrdlaw.com

- **Michael C Felty**
  felty@lytlesoule.com,weis@lytlesoule.com,fisher@lytlesoule.com

- **Jason A Forge**
  Jforge@rgrdlaw.com,Tholindrake@rgrdlaw.com

- **E Joseph Giometti**
  jgiometti@orrick.com

- **David W Hall**
  dhall@rgrdlaw.com

- **Kenneth P Herzinger**
  kherzinger@orrick.com

- **Christin J Hill**
  chill@orrick.com,rquiban@orrick.com

- **James I Jaconette**
  jamesj@rgrdlaw.com,karenc@rgrdlaw.com,dhall@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **David S Keenan**
  dkeenan@orrick.com

- **Drew Neville , Jr**
  dneville@hartzoglaw.com,gbrown@hartzoglaw.com

- **Reagan Therese Roth**
  reaganroth@paulhastings.com

- **Jodi R Sarowitz**

- jsarowitz@loeb.com,tcummins@loeb.com

- **M Todd Scott**
  tscott@orrick.com,elee@orrick.com

- **Jonathan N Strauss**
  jstrauss@loeb.com,tcummins@loeb.com

- **Robert P Varian**
  rvarian@orrick.com,bclarke@orrick.com

- **James R Webb**
  jim.webb@mcafeetaft.com,karen.hill@mcafeetaft.com,dianna.peters@mcafeetaft.com

- **Alyson M Weiss**
  aweiss@loeb.com,tcummins@loeb.com

- **Ryan S Wilson**
  RWilson@hartzoglaw.com,dcecrle@hartzoglaw.com,acox@hartzoglaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

```
Randi Dawn Bandman
,
Mary Katherine Blasy
,
Jack Gerald Fruchter
,
Christopher J Keller
,
Mark Peter Kindall
,
David Avi Rosenfeld
,
Samuel Howard Rudman
,
Barry G Sher
,
```