**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**

UNITED FOOD AND COMMERCIAL            )
  WORKERS UNION, et al.,                        )
                                          )
                  Plaintiff,            )
                                          )
vs.                                                                )            No. CIV-09-1114-D
                                          )
CHESAPEAKE ENERGY CORPORATION,    )            Class Action
  et al.,                                                    )
                                          )
                Defendants.         )

## ORDER

Before the Court is the joint motion for summary judgment [Doc. No. 162] of Defendants

Chesapeake Energy Corporation ("Chesapeake") and Defendants Aubrey K. McClendon, Marcus

C. Rowland, Michael A. Johnson, Richard K. Davidson, Frank A. Keating, Breene M. Kerr, Charles

T. Maxwell, Merrill A. Miller, Jr., Donald L. Nickles, and Frederick B. Whittemore (the "Individual

Defendants").   Chesapeake and the Individual Defendants argue the undisputed material facts

establish they are entitled to judgment as a matter of law. Lead Plaintiff, United Food and

Commercial Workers Union, filed a response to the motion, and the movants filed a reply.

I. Background:

In the Amended Complaint, Lead Plaintiff alleges Defendants violated the Securities Act of

1933 in connection with a July 9, 2008 public offering of 25 million shares of Chesapeake Energy

Corporation's ("Chesapeake") common stock (the "Offering").   Specifically, Lead Plaintiff alleges

Defendants violated §§11 and 12(a)(2) of the Securities Act, 15 U. S. C. §§77k(a) and 77*l*(a)(2), by

omitting from the registration statement and related documents certain material facts, thereby

rendering the statement misleading to potential investors.  Lead Plaintiff also asserts a claim against

Chesapeake Chief Executive Officer Aubrey K. McClendon ("McClendon") and nine other individuals, seeking to hold them liable for the omissions based on their status as "control persons" under the provisions of § 15 of the Securities Act.

Lead Plaintiff identifies three categories of allegedly omitted material facts. First, it contends Defendants failed to properly disclose the "true risk and uncertainties" concerning the approximately 29 million shares of Chesapeake common stock held by McClendon, a substantial portion of which was held in margin accounts; Lead Plaintiff alleges Defendants failed to disclose that McClendon lacked the financial resources necessary to satisfy his margin loans. *See* Amended Complaint, ¶¶ 34-37. Second, Lead Plaintiff alleges Defendants failed to properly disclose Chesapeake's "exposure" to Lehman Brothers, Inc. ("Lehman") resulting from hedging contracts because Defendants did not disclose that Lehman was the "counterparty to a material portion of the contracts hedging Chesapeake's oil and natural gas production." Lead Plaintiff contends the hedging contracts created a potential significant financial obligation for Lehman, and it was experiencing serious financial difficulties at the time of the July 9, 2008 offering, thus creating a risk that Lehman would be unable to perform its contractual obligations to Chesapeake. Amended Complaint, ¶¶ 38-51. Finally, Lead Plaintiff alleges Defendants failed to disclose that many of Chesapeake's hedging contracts contained a "kick-out" or "knockout" provision whereby the counterparty's exposure is eliminated if the price of natural gas falls below the price specified in the contract. Lead Plaintiff contends that, although Defendants disclosed the existence of hedging contracts, they failed to include sufficient detail to permit investors to evaluate the possible risks associated with those contracts and the kick-out provisions. Amended Complaint, ¶¶ 52-55.

Lead Plaintiff contends that the foregoing matters constitute material omissions because the

information would have been important to a potential investor's evaluation of the risks associated with the purchase of Chesapeake stock and the decision whether to purchase the same.  Lead Plaintiff further contends Defendants were aware of the omitted facts and had a duty to disclose them.

As set out in the Amended Complaint, in October of 2008, McClendon was required to sell his Chesapeake stock because he was unable to satisfy margin calls.  Furthermore, Lehman's financial collapse rendered it unable to satisfy its hedging contract obligations to Chesapeake, thereby allegedly causing a decline in the value of Chesapeake's gas contracts and an ultimate decline in the value of its stock.  Additionally, Lead Plaintiff contends the kick-out provisions in other hedging contracts resulted in Chesapeake receiving unfavorable gas prices, thereby contributing to the decline in the value of Chesapeake stock, resulting in damages to Lead Plaintiff and other investors.

Chesapeake and the Individual Defendants seek judgment on these claims, arguing that the undisputed material facts establish they satisfied their legal disclosure obligations in the Offering documents, and there were no omissions.  They further argue that, even if there were omitted facts, the omissions on which Lead Plaintiff relies for its claims were not material. The movants also argue that the failure to include the information cited by Lead Plaintiff could not have caused a loss.  Lead Plaintiff argues the evidence is sufficient to create material factual disputes precluding summary judgment.

II. Summary judgment standard:

Summary judgment shall be granted where the undisputed material facts establish that one party is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(a); *Celotex Corp. v. Catrett*, 477

U.S. 317, 323 (1986).  A material fact is one which may affect the outcome of the suit under the governing law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  To avoid summary judgment, a plaintiff must present more than a "mere scintilla" of evidence; the evidence must be such that "a reasonable jury could return a verdict for the non-moving party." *Id.*  The facts in the record and reasonable inferences therefrom must be viewed in the light most favorable to the nonmoving party.  *Swackhammer v. Sprint/United Mgmt. Co.,* 493 F.3d 1160, 1167 (10th Cir. 2007); *MacKenzie v. City & County of Denver*, 414 F.3d 1266, 1273 (10th Cir. 2005).  However, to establish the existence of a "genuine" material factual dispute, the nonmoving party must present evidence to show more than "some metaphysical doubt as to the material facts."  *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 45 U.S. 574, 588 (1986).

Where the undisputed facts establish that a plaintiff cannot prove an essential element of a cause of action, the defendant is entitled to judgment on that cause of action.  *Celotex,* 477 U.S. at 322.  However, it is not the responsibility of the summary judgment movant to disprove the plaintiff's claim; rather, the movant need only point to "a lack of evidence for the nonmovant on an essential element of the nonmovant's claim."  *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998).  The burden then shifts to the nonmovant to "go beyond the pleadings and 'set forth specific facts' that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Id.* (citations omitted).  Where the movant seeks judgment on a claim or affirmative defense on which it bears the burden of proof, "the moving party must establish, as a matter of law, all essential elements of the issue before the nonmoving party can be obligated to bring forward any specific facts to rebut the movant's case."  *Pelt v. Utah*, 539 F.3d 1271, 1280 (10th Cir. 2008).

4

III.  The record before the Court:

In ascertaining the propriety of summary judgment based on undisputed material facts, the Court examines the evidence submitted by the parties, including documents, affidavits, depositions, and related materials.  Fed. R. Civ. P. 56(c).  In addition, the Court may take judicial notice of the contents of Securities and Exchange Commission ("SEC") filings which constitute matters of public record.  *In re Morgan Stanley Information Fund Securities Litig.*, 592 F.3d 347, 355 n. 5 (2d Cir. 2010).   The Court may also take judicial notice of "factual information found on the world wide web."  *O'Toole v. Northrop Grumman Corp.*, 499 F.3d 1218, 1225 (10th Cir. 2007).   Additionally, the Court "may take judicial notice of well-publicized stock prices" when considering a motion for summary judgment.  *Greenhouse v. MCG Capital Corp.*, 392 F.3d 650, 655 n. 4 (4th Cir. 2004); *see also In re SemGroup Energy Partners, L.P., Securities Litigation*, 2009 WL 3713524, at *2 (N.D. Okla. Nov. 4, 2009) (unpublished) (citing *O'Toole*, 499 F. 3d at 1225).

The record in this case reflects that, on July 9, 2008, Chesapeake offered for sale shares of its common stock.  The registration statement for the Offering is submitted as Exhibit 4 to the Declaration of Lily I. Becker [Doc. No. 328] in support of Defendants' reply ("Registration Statement").  The Registration Statement expressly incorporates by reference certain Chesapeake prior SEC filings, to wit:

> •Annual Report on Form 10-K for the fiscal year ended December 31, 2007, including the potions of our Proxy Statement on Schedule 14A filed on April 29, 2008 that are incorporated therein;
> •Quarterly Report on Form 10-Q for the quarterly period ended March 31, 2008;
> •Current Reports on Form 8-K filed on January , 2008, January 24, 2008, March 20, 2008, March 26, 2008, April 1, 2008, April 16, 2008, April 18, 2008, May 12, 2008, May 23, 2008, May 27, 2008, May 29, 2008, June 4, 2008, June 11, 2008, June 12, 2008 and July 8, 2008 (excluding any information furnished pursuant to Item 2.02 or Item 7.01 of any such Current Report on Form 8-K); and
> •Registration Statement on Form 8-B (File No. 001-13726) filed on December 12, 1996, as amended by our Current Report on Form 8-K filed on March 26, 2008.

Registration Statement at p. S-29.  The Registration Statement further incorporates by reference "any future filings made by us with the SEC under Sections 13(a), 13(c), 14, or 15(d) of the Exchange Act (excluding any information furnished pursuant to Item 2.02 or Item 7.01 of any such current report on Form 8-K that is filed in the future and is not deemed filed under the Exchange Act), until the underwriters have sold all of the shares of the common stock."  *Id.*

The Registration Statement provides that "the information incorporated by reference is an important part of this prospectus supplement, and information that we file later with the SEC will automatically update and supersede this information as well as the information included in this prospectus supplement." Registration Statement at p. S-29.  Additionally, prospective investors are advised of the manner in which copies of the SEC filings and the documents incorporated by reference can be obtained, without charge, and provided with the address and telephone number of a contact for that purpose.  *Id.*

The Registration Statement contains disclosures regarding the existence of Chesapeake's hedging contracts, and reports the financial results of its hedging contracts as early as 2006. Registration Statement at p. S-3. As discussed in more detail, *infra,* Chesapeake reports that, although substantial profits had been realized from hedging contracts in previous years, the company incurred $1.1billion of unrealized losses from such contracts in the first quarter of 2008. Registration Statement, p. S-3.  Chesapeake also reports its expectation that additional substantial losses will be incurred in the quarter ending June 30, 2008. *Id.*

Additional details regarding Chesapeake's hedging contracts are contained in the section of the Registration Statement entitled "Risk Factors," identifying risks associated with the purchase of the stock offered.  Registration Statement at p. S-13.  This section explains the purpose of the

hedging activities, discloses that hedging contracts may expose Chesapeake to the risk of financial loss, and describes the circumstances which could contribute to such loss.  *Id.*

These sections of the Registration Statement do not expressly discuss the fact that some hedging contracts contained "kickout" or "knockout" provisions.  As explained in more detail, *infra,* SEC filings incorporated by reference in the Registration Statement contained such information. *See* Chesapeake May 12, 2008 Form 10-Q, Ex. 4 to Christin Hill Declaration [Doc. No. 163] , pp. 34-37, (hereinafter "Hill Ex.").

On July 31, 2008, Chesapeake issued a news release in which it reported additional details of the results of its hedging contracts for the second quarter of 2008.  Lead Plaintiff's Ex. 21. This reported, *inter alia,* an unrealized non-cash after-tax mark-to-market loss of $2.085 billion, "primarily as a result of higher natural gas and oil prices as of June 30, 2008 compared to March 31, 2008."  *Id.*   Registration Statement at p. S-3.  The July 31, 2008 disclosure thus confirmed Chesapeake's disclosure in the Registration Statement that it anticipated incurring additional substantial losses in the quarter ending June 30, 2008.

The Registration Statement and materials incorporated therein do not expressly identify the counterparties to Chesapeake's hedging contracts.  On June 30, 2008, Chesapeake had hedging contracts with 20 counterparties, and Lehman was one of those counterparties.  Ex. 15 to Lily I. Becker Declaration [Doc. No. 328] ("hereinafter Becker Ex.").

The Registration Statement references Lehman's business relationship with Chesapeake, as it notes "[a]n affiliate of Lehman Brothers Inc. is a participant in the drilling business with us.  We and that affiliate have each contributed to the venture approximately $25 million for our equity interest and $20 million as a loan.  Another affiliate of Lehman Brothers Inc. is the owner of an

entity to which we made sales representing 15% of our total revenue in 2007.  In addition, affiliates of certain of the underwriters are counterparties to our hedging transactions and sale/leaseback transactions."  Registration Statement at p. S-24.

At the time of the Offering, Lehman was not indebted to Chesapeake as a result of its status as a counterparty on the hedging contracts.  Instead, Chesapeake was indebted to Lehman.  On June 30, 2008, Chesapeake owed to Lehman the sum of $463,375,477 on hedging contracts.  Declaration of Chesapeake Senior Account Manager Kajsa Greenhoward [Doc. No. 164], at ¶4.  Greenhoward prepared a summary of Chesapeake's hedging contracts as of June 30, 2008, listing the counterparties and the amounts owed by or to Chesapeake as of June 30.  Becker Ex. 15.  The summary reflects Chesapeake owed Lehman $463,375,477 on that date.  *Id.* The Greenhoward summary also shows the amounts owed by or to Chesapeake on its hedging contracts after the Offering, as of July 25, 2008, and it reflects that Chesapeake owed Lehman the sum of $116,488,072 on the hedging contracts on July 25.  Becker Ex. 15.   By August 29, 2008, Chesapeake's indebtedness to Lehman had declined to $84 million.  Becker Ex. 16.

On September 15, 2008, Lehman filed a bankruptcy action.  By that date, Chesapeake no longer owed Lehman money attributable to the hedging contracts; instead, Lehman was indebted to Chesapeake.  In October, Chesapeake publicly announced that Lehman's indebtedness would "not exceed $50 million."  October 14, 2008 Chesapeake SEC Form 8-K, Hill Ex. 9, p. 7.

The Registration Statement and materials incorporated therein disclose that substantially all of Aubrey McClendon's Chesapeake common stock was held in margin accounts on the Offering date.  At the time of the Offering, McClendon owned over 29 million shares of Chesapeake common stock.  This is disclosed in the Registration Statement by virtue of the statement's express

incorporation of certain Chesapeake SEC filings.  *See* Registration Statement at S-29.  Included in the incorporated SEC filings is Chesapeake's April 29, 2008 Schedule 14A, a copy of which is submitted as Hill Ex. 10.  The Schedule 14A contains a list of the individuals, including McClendon, who owned more than five percent of the Chesapeake outstanding common stock.  Hill Ex. 10, p. 28.  The list is accompanied by notes regarding the stock ownership.  *Id.* at p. 29.  The following is reported as an explanatory note regarding shares held by McClendon and others in margin accounts.  The explanatory note states in pertinent part that the total of shares  "includes shares held in bank or brokerage margin accounts or escrow accounts securing brokerage accounts (Aubrey McClendon, 29,332,493 shares)." Hill Ex. 10, p. 29 note (d).

The record reflects that McClendon's common stock was also held in margin accounts in 2007.  Those  margin holdings were publicly disclosed in a Schedule 14A filing with the SEC on April 30, 2007.   Hill Ex. 11 at p. 26.   According to that document, McClendon then held approximately 26,213,942 shares of common stock, and that figure included shares  "held in bank or brokerage margin accounts or escrow accounts securing brokerage accounts."  *Id.* at p. 27, note (d).

On October 10, 2008, Chesapeake issued a news release announcing that, during the previous three days, McClendon had "involuntarily sold substantially all of his shares of Chesapeake common stock" and that he did so "in order to meet margin loan calls."  Lead Plaintiff's Ex. 30.  In the news release, McClendon stated that the "involuntary and unexpected sales were precipitated by the extraordinary circumstances of the worldwide financial crisis," and "in no way do these sales reflect my view of the company's financial position or my view of Chesapeake's future performance potential."  *Id.*  He further stated that he had been the company's largest individual shareholder for

the past three years and "frequently purchased additional shares of stock on margin as an expression of my complete confidence in the value of the company's strategy and assets." *Id.*

McClendon's forced sales occurred during a period of significant declines in the national and international stock markets. On September 29, 2008, the Dow Jones Industrial Average ("Dow") experienced a drop of almost 778 points, its "biggest single-day point loss ever." CNN Market Report (September 29, 2008), http://www.CNNMoney.com. The Dow reflected significant, virtually unprecedented declines during the time period of October 1 through 10, 2008. During eight trading days from October 1 through October 10, the Dow dropped a total of 2,399.47 points or 22.11%. *Stock Market Crash of 2008,* http://www.money-zine.com. During the same week, the Standard & Poor 500 fell more than 20%. *Id.*

Public reports, including national and international news reports, establish that the Dow experienced wild swings on October 10, 2008, and ultimately closed just 128 points down on that date. However, the Dow was 1,874 points (18%) down for the entire week ending October 11, 2008. During that week, there were significant national and international developments which impacted the global stock markets. The Dow dropped below 8,600 on October 9, a five-year low. On October 10, markets in Europe and Asia were in free-fall; the Dow, within minutes of opening on that date, dropped 697 points to below 7,900. *See, e.g., Global Financial Crisis in October 2008,* http://www.infosources.org; *Stock Market Crash of 2008,* http://www.money-zine.com. Volatility indexes relied on by Lead Plaintiff and Defendants reflect wild market swings during this period. *See, e.g.,* Declaration of Dr. Erik Lie, Lead Plaintiff's Ex. 2, p. 4; Declaration of Dr. Allan W. Kleidon [Doc. No. 165] in support of Defendants' motion, ¶ 98, pp. 45-46. During this time period, Chesapeake's stock declined in value from approximately $22 per share on October 8 to

approximately $16 per share on October 10, 2008.  Defendants' Ex. 2.

After a brief "uptick in Mid-October, the market would begin a second decline" later in the month.  *Stock Market Crash of 2008,* http://www.money-zine.com.  On October 24, the Dow fell 312.30 points, to 8,378.95, its lowest level since April 25, 2003; the S&P 500 fell to its lowest level since April 11, 2003; and the NASDAQ composite fell 51.88 points, to 1,552.03, its lowest level since May 23, 2003.  *Id.*

Lehman's financial status was widely publicized in 2008, after it faced losses due to the continuing subprime mortgage crisis.  In March of 2008, some market analysts speculated that it would be the next major investment bank to fall.  However, Lehman posted a profit in the first quarter of 2008; on June 9, 2008, it announced a $2.8 billion second-quarter loss, but also announced that it had raised an additional $6 billion in capital.  Lead Plaintiff's Ex. 41, 42.  On July 9, 2008, Lehman's stock closed at $19.74 per share.  Defendants' Ex. 7.  On the July 9 date of the Offering, Lehman's long-term issuer credit was rated "A1" by Moody's, "A" by Standard and Poor's, and "A+" by Fitch.  *See* Declaration of Dr. Allan W. Kleidon [Doc. No. 165] at page 37, ¶ 79 (citing *Bloomberg*).  On September 12, 2008, Lehman's stock  closed at $3.65 per share and, when it filed bankruptcy on September 15, it closed at 21 cents per share.  Defendants' Ex. 7.

After Lehman's September 15, 2008 bankruptcy, Chesapeake conducted a September 23 telephone conference with stock analysts.  The transcript of the conference, submitted as Defendants' Exhibit 6 to Christin Hill's Declaration [Doc. No. 163], reflects that the discussion focused on the status of Chesapeake's development and drilling activities, as well as its hedging positions and the impact of knockout provisions. One question mentioned Lehman, and it was posed in the context of whether Chesapeake was concerned about the financial stability of its other

counterparties. The question referred to Lehman as "pretty low on your totem pole." Hill Ex. 6 at

p. 21. Chesapeake identified the five largest counterparties, which did not include Lehman. *Id.*

McClendon expressed optimism that Chesapeake's counterparties would return "to the prosperity

that they have enjoyed in the past." *Id.* at p. 22.

In October of 2008, after Lehman's bankruptcy and McClendon's sale of his stock,

Chesapeake received communications from analysts regarding its future plans, including whether

it would restructure hedging contracts and the costs associated with restructuring. Declaration of

Shannon Nome, Lead Plaintiff's Ex.7.

On or about October 7, 2008, an investor communicated to Chesapeake his complaint that

the company had not issued any press releases commenting on the decline in its stock, and noting

that there were rumors that should be addressed regarding land values, McClendon's margin sales,

and the impact of hedging contracts. Declaration of David Bunzel, Lead Plaintiff's Ex. 6. On or

about October 29, 2008, a Chesapeake investor communicated with the company to complain that,

when McClendon announced his purchases of Chesapeake common stock, the announcement did

not disclose that the stock was purchased on margin. Declaration of Mark Libera, Lead Plaintiff's

Ex. 5.

IV. Application:

Defendants' motion seeks judgment as a matter of law on both issues of materiality and the

absence of loss causation. Because Lead Plaintiff must prove materiality as an element of its claim,

the Court first addresses the propriety of summary judgment on that issue.

A. Materiality and duty to disclose:

The movants argue the undisputed facts establish that Lead Plaintiff cannot satisfy its burden

of proving any of the three categories of information allegedly omitted from the Offering  was material to the investors' decisions regarding the purchase of Chesapeake stock.    Although materiality presents a mixed question of fact and law, materiality is "appropriately resolved as a matter of law" when "reasonable minds cannot differ on the question." *TSC Industries, Inc. v. Northway,* 426 U.S. 438, 450 (1976); *Greenhouse v. MCG Capital Corp.,* 392 F.3d 650, 657 (4th Cir. 2004); *In re Constellation Energy Group, Inc. Securities Litig.*, 738 F.Supp. 2d 614, 624 (D. Md. 2010) ("materiality may be decided by a court where no reasonable jury could find the fact material").

    To prevail on its claim under the Securities Act,[1] Lead Plaintiff must prove the registration statement "'contained an untrue statement of material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading.'" *In re Morgan Stanley Information Fund Securities Litigation*, 592 F.3d 347, 358 (2d Cir. 2010) (quoting 15 U.S.C. § 77k(a)).  A plaintiff may satisfy this essential element by proving either an affirmative statement made misleading by virtue of an omission or the existence of omitted information which the defendant was legally obligated to disclose. *In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 272 F.Supp. 2d 243, 248 (S.D.N.Y. 2003).  The omission of information, absent a duty to disclose the same, is not a basis for liability. *Grossman v. Novell, Inc.,* 120 F.3d 1112, 1124 (10th Cir. 1997).

    The question of materiality "is an objective one, involving the significance of an omitted or misrepresented fact to a reasonable investor." *TSC*, 426 U.S. at 445.   "It is not enough that a statement is false or incomplete, if the misrepresented fact is otherwise insignificant." *Basic, Inc.*

---

[1] Although some of the decisions cited herein analyze materiality in the context of a claim arising under the 1934 Act rather than, as here, the 1933 Act, the materiality rules are the same under both enactments. *See, e.g., In re Morgan Stanley Information Fund Securities Litig.*, 592 F.3d 347, 360 (2d Cir. 2010).

*v. Levinson*, 485 U.S. 224, 238 (1988).   Instead, a fact is material only if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Id.* at 231-32; *TSC*, 426 U.S. at 449.   "Whether information is material also depends on other information already available to the market; unless the statement 'significantly altered the total mix of information' available, it will not be considered material." *Grossman,* 120 F.3d at 1119 (quoting *TSC*, 426 U.S. at 449).   "It is important to note that a 'reasonable investor' is neither an ostrich, hiding her head in the sand from relevant information, nor a child, unable to understand the facts and risks of investing." *Greenhouse*, 392 F.3d at 656.

The determination of materiality "requires delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact," but may be resolved as a matter of law if reasonable minds cannot differ on the question. *TSC,* 426 U.S. at 450. The "total mix of information available varies on a fact-specific and case-by-case basis," but the Court may look to documents cited in the complaint, SEC filings, press releases, and other materials to determine the information available to prospective investors at the relevant time. *Greenhouse*, 392 F.3d at 656-57.

Materiality must be determined as of the date of the alleged omission because   "the importance of the misrepresented facts should not be judged with the advantage of hindsight." *Gebhardt v. ConAgra Foods, Inc.*, 335 F.3d 824, 831 (8th Cir. 2003).   The  total mix of information must be viewed "from the perspective of a reasonable investor at the time of the misrepresentation, not from the perspective of a reasonable investor looking back on how events unfolded." *Id.*  "The

materiality analysis may not be conducted using '20/20 hindsight.'" *In re ProShares Trust Securities Litigation*, 889 F. Supp.2d 644, 655 (S.D.N.Y. 2012) (quoting *Panther Partners, Inc. v. Ikanos Communications, Inc.*, 538 F.Supp.2d 662, 668 (S.D.N.Y. 2008)). *See also Pommer v. Medtest Corp.*, 961 F.2d 620, 625 (7th Cir. 1992); *Securities and Exchange Comm'n v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 880 (2d Cir. 1968). "'To be actionable, a statement or omission must have been misleading at the time it was made; liability cannot be imposed on the basis of subsequent events.'" *Underland v. Alter,* 2011 WL 4017908, at *5 (E.D. Pa. Sept. 9, 2011) (unpublished) (quoting *In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1330 (3d Cir. 2002)).

In this case, Lead Plaintiff does not point to a specific statement in the Offering documents that is misrepresented. Instead, Lead Plaintiff relies on information which was allegedly omitted. Lead Plaintiff argues that, in addition to the disclosures made in the Offering materials, Defendants should have disclosed additional facts which it contends were material to prospective investors and which rendered the Offering misleading as a result of the omissions.

Whether Defendants had a duty to disclose the additional information requires a showing that they had a "legal obligation to disclose the allegedly omitted information." *In re Merrill Lynch,* 272 F.Supp. 2d at 248 (citing 15 U. S. C. § § 77k and 77*l*(a)(2)). "'[A]n omission is actionable under the securities laws only when the corporation is subject to a duty to disclose the omitted facts.'" *In re Morgan Stanley Information Fund,* 592 F.3d at 361 (quoting *In re Time Warner Inc. Sec. Litig*., 9 F.3d 259, 267 (2d Cir.1993)); *Burekovitch v. Hertz,* 2001WL 984942, at *9 (E.D.N.Y. July 24, 2001) (unpublished). "A corporation is not required to disclose a fact merely because a reasonable investor would very much like to know that fact." *In re Time Warner,* 9 F.3d at 267. "[A] fact may be material, but if there is no duty to disclose it, then there is no liability for failing to do so." *In re*

*CDNOW, Inc. Securities Litigation,* 138 F. Supp. 2d 624, 636 n. 12 (citing *In re Time Warner*, 9 F.3d at 267 and *Glazer v. Formica Corp.*, 964 F.2d 149, 157 (2d Cir. 1992)). "[A] statement of principal investment risks does not create an obligation to disclose the commonly understood risks associated with securities." *In re Lehman Bros. Securities and ERISA Litigation*, 799 F. Supp. 2d 258, 283 (S.D.N.Y. 2011) (citing *In re Morgan Stanley*, 592 F.3d at 366).

Moreover, "companies are not required to disclose speculative facts which might have some unknown impact on future earnings." *In re Williams Sec. Litig.*, 339 F.Supp. 2d 1242, 1263 (N.D. Okla. 2003). Instead, "they are required to disclose material facts *which are known at the time of the preparation of the disclosure documents.*" *Id.* (emphasis added). "[A] company is not required to engage in "'educated guesses or predictions,'" but it must disclose "'basic facts so that outsiders may draw upon their own evaluative expertise in reaching their own investment decisions.'" *Consolidated Gold Fields, PLC v. Anglo American Corp. of South Africa Ltd.*, 713 F. Supp. 1457, 1470 (S.D.N.Y. 1989) (quoting *SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 848–49 (2d Cir.1968), *cert. denied*, 394 U.S. 976(1969)).

In evaluating the materiality of "contingent or speculative information or events," the question "'will depend at any given time upon a balancing of both the indicated probability that the event will occur and the anticipated magnitude of the event in light of the totality of the company activity.'" *Basic*, 485 U.S. at 238 (quoting *Texas Gulf Sulphur Co.*, 401 F.2d at 849); *City of Philadelphia v. Fleming Companies, Inc.*, 264 F.3d 1245, 1265 (10th Cir. 2001) (citations omitted).

"A company is not required to speculate about future events which are unlikely to occur or which the company is convinced will not occur. Such speculation could easily mislead and confuse shareholders." *Consolidated Gold Fields*, 713 F. Supp. at 1470.

In this case, Defendants argue that Lead Plaintiff cannot, as a matter of law, prevail on these claims because they satisfied the duty to disclose material information in the Offering materials. According to Defendants, purportedly omitted information could not have been known to them at the time of the Offering. Defendants further argue that the materiality of the allegedly omitted information was dependent upon speculation about possible future occurrences which could not have been predicted at the time of the Offering. Finally, Defendants argue the allegedly omitted information could not have been material because, when additional details were disclosed to the market, there was no impact on Chesapeake's stock price.

As mentioned, because Lead Plaintiff must establish the existence of material omissions to prevail on its claims under the 1933 Act, the Court will consider the three categories of alleged omissions in light of the governing law and the facts in evidence. Applicable to its analysis of Lead Plaintiff's claims, the Court generally notes that the global economic climate in the months following the Offering was marked by extreme volatility and signaled the onset of a financial crisis the proportions of which had arguably not been seen since the market crash in 1929. *See* §III, *supra,* at pp. 10-11. Much of Lead Plaintiff's argument relies upon events subsequent to the Offering to bolster the notion that certain allegedly omitted facts were material. This *post hoc* reasoning is unpersuasive. It is beyond serious debate that the course of world economic events of September and October 2008 could have been foreseen by these Defendants in the numerous ways implicated by Lead Plaintiff's arguments.

1. Chesapeake's hedging strategy and existence of kickout or knockout provisions:

Lead Plaintiff alleges that the Offering materials omitted material facts because there was no disclosure regarding the existence of Chesapeake's hedging contracts for the sale of natural gas

and oil production.   Lead Plaintiff also argues that, even if the hedging contracts were disclosed, Chesapeake omitted material facts by failing to disclose that some of those contracts contained knockout or kickout provisions.   Defendants argue that, contrary to Lead Plaintiff's contentions, the material facts regarding its hedging strategy, including the existence of knockout and kickout provisions, was fully disclosed in the Offering materials.

The Registration Statement for the Offering contains disclosures regarding the existence of Chesapeake's hedging contracts as well as the fact that some of those contracts contained "kickout" or "knockout" provisions. At page S-3 of the Registration Statement, Chesapeake disclosed information regarding the existence of its hedging contracts, and it explained the attendant risks. It is apparent from this section that the existence of hedging contracts was not a new development, as Chesapeake's disclosures show it had engaged in a hedging strategy since at least as early as 2006 because it discusses the profits derived from hedging in 2006 and 2007.   Thus, investors were aware of that strategy and the fact that Chesapeake had been involved in hedging for at least two years  at the time of the Offering.   According to the Registration Statement:

**Hedging policy and impact of mark-to-market losses**

One of our strategies has been to manage our exposure to price volatility in marketing our natural gas and oil by entering into natural gas and oil price risk management arrangements for a portion of our expected production generally for periods of up to 30 months into the future.  While our hedging strategy allows us to predict with greater certainty the effective natural gas and oil prices to be received for our hedged production, this strategy can also limit the prices we actually realize for our natural gas and oil production and therefore reduce our natural gas and oil revenues in the future.  During 2006 and 2007, we earned $2.5 billion in additional revenues as a result of our hedging activities.  This year, however, natural gas and oil prices have increased dramatically relative to the level at which we have hedged a significant portion of our production.  As a consequence, our hedging activities negatively impacted our earnings in the first quarter of 2008 during which we incurred $1.1 billion of unrealized losses associated with mark-to-market changes in the value of outstanding hedging contracts.  Commodity prices have continued to increase since March 31, 2008, and we anticipate incurring additional substantial

unrealized losses in the quarter ended June 30, 2008, and we expect such losses could result in our reporting negative revenues from natural gas and oil sales and will result in an overall net loss for such quarter.

The Registration Statement also contains a section entitled "Risk Factors," and each identified risk factor is listed with an explanation of its impact on the risks associated with the purchase of the stock offered.  Included in the discussion of risk factors is the following section related to hedging:

**Our hedging activities may reduce the realized prices received for our natural gas and oil sales and require us to provide collateral for hedging liabilities.**

In order to manage our exposure to price volatility in marketing our natural gas and oil, we enter into natural gas and oil price risk management arrangements for a portion of our expected production.  Commodity price hedging may limit the prices we actually realize and therefore reduce natural gas and oil revenues in the future. Our commodity hedging activities will impact our earnings in various ways, including recognition of certain mark-to-market gains and losses on derivative instruments.  The fair value of our natural gas and oil derivative instruments can fluctuate significantly between periods.  For example, for the quarter ended March 31, 2008, we incurred $1.132 billion of unrealized losses associated with mark-to-market changes in the value of outstanding hedging contracts accounted for under SFAS No. 133.  The fair value of our natural gas and oil derivative instruments outstanding as of March 31, 2008 was a liability of approximately $2.232 billion. As a result of increasing commodity prices subsequent to March 31, 2008, we anticipate incurring additional substantial unrealized losses in the quarter ended June 30, 2008, and we expect such losses could result in our reporting negative revenues from natural gas and oil sales and will result in an overall net loss for such quarter. In addition, our commodity price risk management transactions may expose us to the risk of financial loss in certain circumstances, including instances in which:

• our production is less than expected;
• there is a widening of price differentials between delivery points for our production and the delivery point assumed in the hedge arrangement; or
• the counterparties to our contracts fail to perform under the contracts.

All but three of our commodity price risk management counterparties require us to provide assurances of performance in the event that the counterparties' mark-to-market exposure to us exceeds certain levels.  Most of these arrangements allow us to minimize the potential liquidity impact of significant mark-to-market fluctuations by making collateral allocations from our revolving bank credit facility or directly pledging natural gas and oil properties, rather than posting cash or letters of credit with the counterparties.  Future collateral requirements are uncertain, however, and

will depend on the arrangements with our counterparties and highly volatile natural gas and oil prices.

Registration Statement at  S-13.

The Registration Statement and other SEC filings incorporated therein by reference do not disclose the total number of counterparties to Chesapeake's hedging contracts, nor do they identify those counterparties.  In a portion of the Registration Statement, the Company discloses that "affiliates of certain of the underwriters are counterparties to our hedging transactions and sale/leaseback transactions."  Registration Statement at S-24.  Lehman is disclosed as one of the underwriters.

The Court finds that Defendants disclosed in detail the existence of hedging contracts, the purpose of Chesapeake's hedging strategy, the previous profits derived from hedging, and the then-current and anticipated likely losses resulting from its hedging activities.  The attendant risks of hedging and its potential negative impact on Chesapeake's financial status were also disclosed in detail.  The Court finds no material omission of information regarding the existence of Chesapeake's hedging contracts or the attendant risks at the time of the Offering.

However, Lead Plaintiff's Amended Complaint expands the claim of material omission to include the contention that Defendants failed to disclose the fact that some of Chesapeake's hedging contracts contained "kickout" or "knockout" provisions which could also have a financial impact, depending on the price of oil and natural gas in the future.

Lead Plaintiff correctly argues the existence of kickout or knockout provisions in the hedging contracts is not expressly discussed in the Registration Statement. However, SEC filings were incorporated in the Registration Statement by reference.  Registration Statement at S-29.  Among the items specifically listed and incorporated by reference is Chesapeake's Form 10-Q, filed May

12, 2008 and covering the period ending March 31, 2008.  A copy of the form is submitted as

Exhibit 4 to the Declaration of Christin Hill in support of Defendants' motion ("Hill Ex. 4").  This

form discloses the existence of knockout swaps in the company's hedging contracts.  In a section

entitled "Quantitative and Qualitative Disclosures About Market Risk," there is a section entitled,

"Natural Gas and Oil Hedging Activities."  Hill Ex. 4 at p. 34.  In that section, Chesapeake states:

> Our results of operations and operating cash flows are impacted by changes in
> market prices for natural gas and oil.  To mitigate a portion of the exposure to
> adverse market changes, we have entered into various derivative instruments.  As of
> March 31, 2008, our natural gas and oil derivative instruments were comprised of
> swaps, basis protection swaps, knockout swaps, cap-swaps, call options and collars.
> These instruments allow us to predict with greater certainty the effective natural gas
> and oil prices to be received for our hedged production.  Although derivatives often
> fail to achieve 100% effectiveness for accounting purposes, we believe our derivative
> instruments continue to be highly effective in achieving the risk management
> objectives for which they were intended.

*Id.*  With respect to knockout provisions, Chesapeake further explained that "[f]or knockout swaps,

Chesapeake receives a fixed price and pays a floating market price.  The fixed price received by

Chesapeake includes a premium in exchange for the possibility to reduce the counterparty's

exposure to zero, in any given month, if the floating market price is lower than certain pre-

determined knockout prices."  Hill Ex. 4 at p. 34.  Chesapeake then reported the natural gas and oil

sales for the current quarter, compared to the same quarter in 2007, and included the dollar value

of unrealized gains or losses resulting from the derivatives.  *Id.* at p. 35.  Additionally, it reported

the details of its existing derivatives, including knockout swaps, for 2008 through 2010.  *Id.* at pp.

36-37.

Defendants also submit the Form 10-Q filed by Chesapeake on August 6, 2008, and

covering the period ending June 30, 2008.  Hill Ex. 5.  This report provides additional detail

regarding hedging contracts during the reporting quarter, and it reflects the additional 2008 losses

which Chesapeake reported in the Registration Statement were expected to be incurred in the second quarter.  Chesapeake also issued a July 31, 2008 news release confirming its second-quarter losses, including those attributable to hedging activities.  Lead Plaintiff's Ex. 21.

Lead Plaintiff offers no persuasive authority supporting a contention that additional details of Chesapeake's hedging contracts should have been disclosed in the Offering materials.  At least one court has found that "a statement regarding a company's hedging strategy obliges it to disclose when it *alters* or *suspends* that strategy."  *In re Lehman Bros.*, 799 F.Supp. 2d at 283 (emphasis added).  In this case, however, the disclosures were detailed, and there is no allegation that Chesapeake substantially altered or suspended its hedging strategy at the time of the Offering.

The Court finds that the Offering materials disclosed in detail the risks associated with Chesapeake's hedging strategy. Its disclosures also reflected that hedging contracts were subject to negotiation, and the volatility in natural gas and oil pricing necessarily rendered precise projections uncertain at any specific time.  Registration Statement, at S-13.  "[A] registration statement need not disclose every possible permutation of the risk, nor 'predict the precise manner in which the risks will manifest themselves.'" *In re ProShares,* 889 F. Supp. 2d at 655 (quoting *In re AES Corp. Secs. Litig.*, 825 F. Supp. 578, 588 (S.D.N.Y. 1993)).  Chesapeake's disclosures regarding the nature of the hedging contracts and the associated risks explained the inability to precisely predict the outcome of those contracts at the time of the Offering.  The Court easily finds that the disclosures satisfy Defendants' legal obligation.

The Court concludes that the evidence establishes Lead Plaintiff cannot satisfy its burden of showing that Defendants omitted facts regarding Chesapeake's hedging contracts and that such alleged omission was material.  The considerable detail with which Chesapeake disclosed the

hedging contracts in the Registration Statement reflects that potential investors were clearly advised of the risks associated with the hedging strategy, including the disclosure that hedging resulted in losses for the first quarter of 2008 and was expected to result in additional losses in the second quarter.    Moreover, the supplemental materials incorporated by reference in the Registration Statement include further details describing the nature of the hedging strategy, including the existence of knockout or kickout provisions in some hedging contracts.   The Court concludes that the information provided is sufficient to satisfy the duty to disclose, and  Defendants are entitled to summary judgment on this issue.

2.  Chesapeake's exposure to Lehman as a counterparty to some hedging contracts:

Lead Plaintiff also contends there was a material omission in the Offering materials because Chesapeake did not disclose its "hedging exposure" to Lehman at the time of the Offering, and that, given Lehman's financial status at the time, this information would have altered the total mix of information that a reasonable potential investor would have considered.  Defendants argue that Lead Plaintiff cannot show that any omission was material because Chesapeake had no hedging exposure to Lehman at the time of the Offering.  Furthermore, Defendants argue, even if such exposure had existed, the possibility that it would detrimentally impact the value of Chesapeake's stock was  so speculative and remote that it could not have been disclosed with any reasonable degree of certainty.

The evidence before the Court reflects that, at the time of the Offering, Lehman did not owe Chesapeake an indebtedness related to the hedging contracts to which Lehman was a counterparty. Instead,  the evidence shows that Chesapeake was indebted to Lehman on those contracts.  As of June 30, 2008, Chesapeake owed Lehman in excess of $463 million on the parties' hedging contracts. Declaration of Kajsa Greenhoward, Chesapeake Senior Account Manager [Doc. No. 164]

23

("Greenhoward declaration").

In the ensuing months, however, the respective hedging positions of Chesapeake and Lehman changed as a result of changes in "mark to market" gains and losses for sales of oil and natural gas.  A summary prepared by Greenhoward shows the "mark to market" positions applicable to the hedging contracts, and compares Lehman's exposure on June 30, 2008 and on July 25, 2008. Becker Ex. 15.   According to that summary, on June 30, 2008, Chesapeake owed Lehman $463,375,477 on hedging contracts.   Becker Ex. 15.   By July 25, 2008, after the Offering, Chesapeake's exposure to Lehman had dropped to $116,488,072.  *Id.*   The indebtedness owed to Lehman further declined and, as of August 29, 2008, Chesapeake owed Lehman $84 million on the hedging contracts.  Becker Ex. 16.

By the time Lehman filed its bankruptcy action on September 15, 2008, the hedging positions had changed, and Chesapeake no longer owed Lehman in connection with the hedging contracts. Instead, Lehman owed Chesapeake.   Chesapeake publicly announced that the loss attributable to this indebtedness would "not exceed $50 million."  October 14, 2008 Chesapeake SEC Form 8-K, Christin Hill Declaration Ex. 9, p. 7.

As Lead Plaintiff points out, in 2007 and 2008 prior to the Offering, there were numerous public reports regarding the negative impact on the economy, both nationally and internationally, resulting from the mortgage loan or credit crisis in the United States.  These articles reflect declines in the Dow and other market indicators, and the increasing national and international concerns regarding economic uncertainty. Lead Plaintiff's Exs. 8 -16.  These exhibits also reflect the positive impact on the stock market of the Federal Reserve Board's actions regarding interest rates, followed by subsequent uncertainty and volatility in both United States and international markets.  Lead

Plaintiff's Exs. 15 and 16.

Although these exhibits do not specifically mention Lehman, Lead Plaintiff submits March 2008 news articles speculating about the future of Lehman and other investment banks following the demise of Bear Stearns. Lead Plaintiff's Ex. 18, 38, 39 40. In June, 2008, London newspapers reported Lehman's losses as well as the fact that it had raised $6 billion of capital and expected to raise an additional $4 billion. Lead Plaintiff's Exs. 41, 42. Lead Plaintiff also submits June 2008 news articles from publications in the United States reporting the same news regarding Lehman. Exs. 43-45. The remaining news reports offered by Lead Plaintiff and reflecting general negative developments in the national and international stock markets do not target Lehman, but reflect the historical facts regarding the uncertain economic atmosphere in 2007 and 2008. Lead Plaintiff's Exs. 19-20.

That Lehman's financial status was publicly reported as uncertain at the time of the Offering did not, however, mandate disclosure of its status as a counterparty to some Chesapeake hedging contracts. Lead Plaintiff does not argue, and obviously cannot prove that, on July 9, 2008, Defendants had actual knowledge both that Lehman was certain to fail and that such failure would result in financial losses to Chesapeake. Nor does Lead Plaintiff point to any specific securities statute or rule that mandated the disclosure of Lehman's status as a counterparty to some hedging contracts. Instead, Lead Plaintiff argues that Defendants had sufficient knowledge, in July of 2008, that Lehman was at risk and that its financial collapse would detrimentally impact the value of Chesapeake's stock. As a result, Lead Plaintiff argues Defendants should have disclosed Chesapeake's "exposure" to Lehman as a counterparty to some hedging contracts. Lead Plaintiff contends this exposure was material to potential investors and altered the total mix of information

available to them at the time of the July 9, 2008 Offering.  But, as is true generally of Lead Plaintiff's allegations, its argument is persuasive only in the clear light of hindsight, and it seeks to require of Defendants a prescience not expected by the law.

In evaluating the materiality of "contingent or speculative information or events," the question "'will depend at any given time upon a balancing of both the indicated probability that the event will occur and the anticipated magnitude of the event in light of the totality of the company activity.'" *Basic*, 485 U.S. at 238 (quoting *Texas Gulf Sulphur Co.*, 401 F.2d at 849); *City of Philadelphia v. Fleming Companies, Inc.*, 264 F.3d 1245, 1265 (10th Cir. 2001) (citations omitted). "A company is not required to speculate about future events which are unlikely to occur or which the company is convinced will not occur. Such speculation could easily mislead and confuse shareholders." *Consolidated Gold Fields*, 713 F. Supp. at 1470.

Lead Plaintiff's argument overlooks the fact that, at the time of the Offering, Chesapeake did not have any "exposure" to Lehman as a result of Lehman's counterparty status.  Instead, as noted above, Chesapeake was indebted to Lehman at the time of the Offering and it continued to be indebted through at least the end of August, 2008.  Becker Exs. 15, 16.

Due to the nature of the hedging contracts and the volatility of oil and natural gas prices, however, it was possible at the time of the Offering that, at some point in the future, the indebtedness owed by Chesapeake to Lehman could be altered so that Chesapeake would be owed money resulting from Lehman's counterparty status.   That possible future occurrence was speculative at the time of the Offering, and Lead Plaintiff does not offer persuasive argument or authority as to how  Defendants could have reasonably predicted such an occurrence with sufficient information to assist investors, nor does Lead Plaintiff explain what specific facts Defendants were obligated to

disclose in this regard.

While there are few court decisions analyzing the materiality of an omission related to a company's business relationship with an economically distressed entity, at least one court has expressly rejected the contention that there was a duty to disclose that relationship.  *In re Constellation Energy Group, Inc. Securities Litig.*, 738 F.Supp. 2d 614, 627 (D. Md. 2010).  In *Constellation,* the plaintiff alleged that the company omitted from a registration statement material facts related to its business relationship with Lehman.  Among the allegedly omitted material facts was "the extent of Constellation's exposure to Lehman's credit risk before Lehman's bankruptcy." *Id.*  The plaintiff argued that Constellation was required to disclose the "nature and extent of its exposure to Lehman" at the time of the offering.

The court rejected the claim that there was a duty to disclose additional facts, noting there was no contention that the defendants "knew more than the market did about Lehman's volatile situation prior to Lehman's bankruptcy, such that they should have specifically disclosed the risks posed by Constellation's counterparty relationship to Lehman." *Id.* at 628.  The court found the plaintiff's allegations insufficient to state a claim, and dismissed the claim.

Because other claims were not dismissed, the parties engaged in discovery.  The plaintiff subsequently sought leave to amend the complaint to reallege the material omission claim, arguing that new evidence supported the claim.  *In re Constellation Energy Group, Inc. Securities Litig.*, 2012 WL 1067651 (D. Md. Mar. 28, 2012) (unpublished).  Included in the new evidence  were Constellation's internal documents which reflected that Lehman was included on an internal "watch list" which identified counterparties whose credit mattered to Constellation.  The court rejected this evidence as insufficient to create a duty to disclose the company's potential exposure to Lehman,

finding it was "one of over two hundred companies" on the list and "Constellation owed Lehman money" at the relevant time.  *Id.* at *11.   According to the court, "it is a stretch to suggest that the large sum Constellation owed to Lehman should have been disclosed.   Indeed, given that Constellation had no direct net credit exposure to Lehman, it remains unclear what plaintiffs believe Constellation should have disclosed and when."  *Id.*   The court denied the request to amend to assert this allegation, finding the amendment would be futile.  *Id.* at *4.

The Court finds the decision in *Constellation* persuasive, as it underscores the absence of a duty to disclose speculative future events contingent upon a company's possible future failure coupled with an uncertain level of exposure, at the time of the offering, which might result from that failure.   Furthermore, as in *Constellation*, the evidence in this case shows that, at the time of the Offering, Chesapeake had no direct credit exposure to Lehman and, in fact, Chesapeake owed Lehman a substantial sum on the hedging contracts.   That Lehman's financial status was publicly known to be questionable at the time of the Offering did not create a situation in which Chesapeake could have predicted with any reasonable certainty both that Lehman would eventually become bankrupt *and* that, at the time of its bankruptcy, it would owe funds to Chesapeake.   "The securities laws do not require clairvoyance in the preparation of offering documents; these documents are not guarantees of an offering's subsequent success, nor do they insure investors against the vicissitudes of technology and industry, nor the volatility of the stock  market itself."  *Panther Partners, Inc. v. Ikanos Communications, Inc.*, 538 F. Supp. 2d 662, 664 (S.D.N.Y. 2008).   The securities laws do not "provide investors with broad insurance against market losses," and cannot protect investors against unexpected catastrophic losses. *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 345 (2005).

The evidence also establishes that, because of the volatility in oil and natural gas prices during this time period, it was obvious that the economic relationship between Chesapeake and its counterparties, including Lehman,[2] could change and result in an indebtedness owed to Chesapeake by Lehman or by any one of the other counterparties to the hedging contracts.  The evidence further shows that Chesapeake disclosed the risks associated with these uncertainties in the Offering.  *See* Registration Statement at S-3, S-13.   However, there is no evidence in the record to show that Chesapeake could predict, with any degree of reasonable certainty, at the time of the Offering that its June 30, 2008 indebtedness to Lehman of over $463 million would be altered to the point that, when Lehman filed bankruptcy on September 15, Lehman would actually owe up to $50 million to Chesapeake.[3]

To find that Chesapeake was required to disclose its "hedging exposure" to Lehman at the time of the July 9, 2008 Offering, Chesapeake would have been required to speculate that 1) despite the absence of such exposure on July 9, there was a susbstantial possibility of such exposure at some unknown point in the future; and 2) Lehman's financial status would continue to decline to the point that, at some unknown future time, it would file bankruptcy.

The parties' respective expert witnesses' reports reflect their considerable efforts to predict, at the time of the Offering, whether Lehman would ultimately be bankrupt at a time when it was indebted to Chesapeake as a result of the hedging contracts to which Lehman was a counterparty.

---

[2]The Registration Statement references Lehman's business relationship with Chesapeake, as it notes "[a]n affiliate of Lehman Brothers Inc. is a participant in the drilling business with us.  We and that affiliate have each contributed to the venture approximately $25 million for our equity interest and $20 million as a loan.  Another affiliate of Lehman Brothers Inc. is the owner of an entity to which we made sales representing 15% of our total revenue in 2007.  In addition, affiliates of certain of the underwriters are counterparties to our hedging transactions and sale/leaseback transactions."  Registration Statement at p. S-24.

[3]Attempts to establish a material factual dispute over the actual extent of Lehman's post-bankruptcy debt to Chesapeake do not preclude summary judgment, as the Court must focus on materiality as of the time of the Offering.

The expert witnesses present complicated analytic models to support their opinions regarding whether, at the time of the Offering, both occurrences could or could not be reasonably predicted. Defendants' expert, Dr. Allan W. Kleidon, opines that, at the time of the Offering, the probability that Lehman would file bankruptcy on or before September 15 was "extraordinarily remote," and was less than one in thousands. Declaration of Dr. Kleidon [Doc. No. 165] at ¶¶ 78, 79, 80. Lead Plaintiff's experts challenge the accuracy of the analytic model employed by Dr. Kleidon. Dr. Eric Lie, for example, questions the accuracy of Dr. Kleidon's computations. However, Dr. Lie opines that, even if the analytic model utilized by Dr. Kleidon is used but with more realistic input, the probability of Lehman's stock falling below $12.93 from its July 9, 2008 price of $19.74 per share within one year was 61%; the probability of that drop within six months was 45%, and within three months was 27%. Declaration of Dr. Lie, Lead Plaintiff's Ex. 2, ¶ 25. Even using these calculations, the probability that Lehman *would not* be defunct within three months was 73%.

The Court finds that the calculations of both experts, based on complicated economic models and projections, reflect the difficulties encountered in imposing upon a company a duty to disclose, at the time of an offering, the possibility of financial decline of an entity with which the company had a contractual relationship. Even more problematic is the imposition of a duty requiring the offering company to predict the possibility that one of its contractual counterparts would become bankrupt. The existence of debate regarding the methodology to utilize in making such predictions as well as the mathematical processes required to do so demonstrates to the Court that such a duty, under the circumstances here, could not properly be imposed in the context of the uncertain and volatile economic conditions during the time period of the Offering and the months thereafter.

The Court concludes that such speculation was beyond the scope of disclosures required of

Chesapeake at the time of the Offering.  The volatility of the market during the time period following the Offering and the resulting severe impact on Chesapeake and many other companies was not reasonably foreseeable at the time of the Offering.  That Lehman's financial status deteriorated to the point of bankruptcy at a time when the volatility of oil and natural gas prices detrimentally impacted Chesapeake's hedging position vis-a-vis Lehman could not have been predicted with any reasonable degree of certainty.  Thus, Defendants did not violate any duty to disclose additional information, and cannot be liable on this contention.  Accordingly, Defendants are entitled to judgment on this claim.

3. Extent to which Aubrey McClendon's stock was held in margin accounts and his financial ability to satisfy margin calls:

Lead Plaintiff further contends that the Offering materials omitted the fact that McClendon's stock was substantially held in margin accounts and also failed to disclose that, if margin calls occurred, he lacked sufficient liquid assets to satisfy the calls.   Defendants argue that, contrary to Lead Plaintiff's contention, the extent of McClendon's margin holdings was disclosed in the Offering materials.  Furthermore, they argue that Lead Plaintiff has not identified any applicable statute or regulation which imposes upon McClendon a duty to disclose the details of his margin holdings, nor is there a statutory or regulatory requirement that he disclose his personal finances. Additionally, Defendants argue that such omissions could not have been material to potential investors because, at the time of the Offering, Defendants could not have reasonably predicted both that margin calls would occur and that McClendon would lack the finances to satisfy the margin calls.

The undisputed facts establish that, on October 10, 2008, Chesapeake issued a press release announcing that McClendon had "involuntarily sold substantially all of his shares of Chesapeake

common stock over the past three days in order to meet margin loan calls." Lead Plaintiff's Ex. 30. In the release, McClendon stated that the sales "in no way" reflected his view of "the company's financial position" or "Chesapeake's future performance potential." *Id.* He also stated that he had been the company's "largest individual shareholder for the past three years and frequently purchased additional shares of stock on margin as an expression of ... complete confidence in the value of the company's strategy and assets." Lead Plaintiff's Ex. 30. On October 10, 2008, Chesapeake filed with the SEC its Form 4 reflecting changes in the beneficial ownership of its securities, and the form reflected the sales. Hill Ex. 14.

The evidence also reflects that, at the time of the Offering, McClendon had approximately 29 million shares of Chesapeake common stock. This was disclosed in the Registration Statement by virtue of the statement's express  incorporation of certain Chesapeake SEC filings. *See* Registration Statement at S-29. Included in the incorporated SEC filings is Chesapeake's April 29, 2008 Schedule 14A, a copy of which is submitted as Hill Declaration Ex. 10. The Schedule 14A contains a list of the individuals, including McClendon, who owned more than five percent of the Chesapeake outstanding common stock. Hill Ex. 10, p. 28. The list is accompanied by notes regarding the stock ownership. *Id.* at p. 29. An explanatory note regarding stock holdings states in pertinent part: "includes shares held in bank or brokerage margin accounts or escrow accounts securing brokerage accounts (Aubrey McClendon, 29,332,493 shares)." Hill Ex. 10, p. 29 note (d).

As Defendants point out, the fact that McClendon held shares in margin accounts was not a new development at the time of the July 9, 2008 Offering. The record reflects that the existence of his margin holdings was publicly disclosed in Schedule 14A filings with the SEC on April 30, 2007. Hill Ex. 11 at p. 26. According to that document, McClendon then held approximately

26,213,942 shares of common stock, and it was disclosed that those shares were "held in bank or brokerage margin accounts or escrow accounts securing brokerage accounts." *Id.* at p. 27, note (d).

As Defendants argue, there is no SEC rule or regulation requiring a majority shareholder to disclose that he or she holds shares in margin accounts. The SEC requires directors and executive officers to disclose shares that are "beneficially owned," and the "amount of shares that are pledged as security." SEC Regulation S-K, Item 403(b), 17 C.F.R. § 229.403(b). The Registration Statement, which incorporated Chesapeake's April 29, 2008 Schedule 14A, discloses this information for McClendon and other executives. Hill Ex. 10, pp. 28-29.

As a general rule, the risks associated with holding stock in margin accounts need not be disclosed because such risks are "universally known." *Newman v. L.F. Rothschild, Unterberg, Towbin*, 651 F. Supp. 160, 164 ( S.D.N.Y. 1986). Few court decisions have considered whether a majority shareholder has a duty to disclose that his stock is held in margin accounts, but those decisions generally reject the existence of such a duty. "While a controlling shareholder's decision to commit large quantities of his stock as security in margin trading undoubtedly has the potential to affect the price of that stock, plaintiff has not and cannot allege an affirmative duty imposed by common law to keep the public appraised of such a decision." *Burekovitch v. Hertz*, 2001 WL 984942, at *9 (E.D.N.Y. July 24, 2001) (unpublished). "Such a duty, if it exists at all, must arise under the federal securities laws. Even then, such a duty arises only under certain circumstances." *Id.* The court then explained that "'[A]s a general matter in federal securities law, there is no affirmative duty to disclose unless (1) a Commission statute or rule requires disclosure, (2) an 'insider' (or the issuer itself) is trading, or (3) a previous disclosure is or becomes inaccurate, incomplete, or misleading.'" *Id.* (quoting *In re Time Warner*, 9 F.3d at 267). In *Burekovitch,* the

court found no statute or SEC regulation which established a duty to disclose the extent of the shareholder's margin holdings.

"Federal securities law imposes no general duty to disclose material information in connection with trading activities." *In re Safeguard Scientifics,* 2004 WL 2700291, at *3 (E.D. Pa. Nov. 18, 2004) (unpublished) (citing *Oran v. Stafford*, 226 F.3d 275, 285 (3rd Cir. 2000)). The court in *Safeguard* found no legal basis for requiring disclosure of a company founder's margin trading or financial liabilities. According to the court, margin trading is a "heavily regulated activity which, if executed lawfully in an open market, does not create a false impression of supply and demand subjecting traders to independent disclosure requirements." *Id.,* at *4. Because there was no duty to disclose the information, the court granted summary judgment in favor of the defendant. *Id.*

According to Lead Plaintiff's contention, even if McClendon's disclosure of the margin holdings was adequate, that disclosure was rendered misleading because he failed to disclose that, if there were margin calls, he lacked the cash to satisfy them. Lead Plaintiff argues that the additional information regarding McClendon's financial resources thus was necessary to avoid rendering the information regarding his margin accounts misleading.

Lead Plaintiff cites no persuasive authority to support this contention. The Court finds that, under the circumstances here, such disclosure is beyond the scope of that which is reasonable because it requires speculation about unpredictable future events that could not be ascertained at the time of the Offering. To require such disclosure is to require Defendants to speculate that, at some time in the foreseeable future: 1) there would be margin calls as to all shares held by McClendon,

34

and 2) that, at that time, due to a substantial decline in the value of his holdings, he would lack the financial resources to satisfy those calls.  Again, the virtually unprecedented economic melt-down that occurred in the months following the Offering could not have been foreseen.  Both the above contingencies are too remote and speculative to require their disclosure.  Absent a duty to disclose this information, liability for its omission cannot be imposed on Defendants.

Accordingly, the Court concludes the evidence establishes Defendants are entitled to judgment on Lead Plaintiff's claim that Defendants violated the 1933 Act by omitting material information regarding McClendon's margin holdings and his financial resources.

B. "Loss causation" or "negative causation":

Defendants also seek judgment on their affirmative defense that, even if the omissions on which Lead Plaintiff relies were material, they could not have caused the losses it claims resulted from the decline in the value of Chesapeake's stock.  Having concluded that Lead Plaintiff cannot prove the essential element of a material omission, however, the Court need not address Defendants' alternative argument asserting negative causation.

V.  Conclusion:

For the foregoing reasons, the Court finds that moving Defendants[4] are entitled to judgment as a matter of law on Lead Plaintiff's claims that they are liable for violation of Sections 11 and 12(a)(2) of the 1933 Act by failing to disclose material facts related to the three contentions asserted

---

[4]With respect to the Section 15 claims asserted against the Individual Defendants as "control persons," Defendants ask the Court to also grant judgment on those claims because there can be no liability as to control persons in the absence of liability under Sections 11 and 12(a)(2).  In its response, Lead Plaintiff does not dispute this conclusion, but argues judgment should not be entered on the Section 11 and Section 12(a)(2) claims.  Inasmuch as the Court has granted judgment on the underlying claims, the Individual Defendants are also entitled to judgment on the basis of their status as control persons.

by Lead Plaintiff.   Defendants' motion is, therefore, GRANTED.

IT IS SO ORDERED this 29th day of March, 2013.

_____
TIMOTHY D. DeGIUSTI
UNITED STATES DISTRICT JUDGE